E-FILED
Tuesday, 30 August, 2016  08:50:51 AM
Clerk, U.S. District Court, ILCD

FILED

AUG 2 9 2016

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

Edith McCurry _____ )
_____ )
_____ )      CIVIL ACTION
(Name of the plaintiff or plaintiffs) )
                                  )
               v.                 )      NO. 16-2273
                                  )
KENCO LOGISTIC SERVICES, LLC, a ___ )
                                  )
Tennessee Limited Liability Company, ___ )
                                  )
Mars, Inc, Kelvin Walsh, Mike Manzello, __ )
                                  )
David Jabaley, Tammif Fowler, _____ )
                                  )
and Mario Lopez _____ )

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

- Plaintiff X  DOES ❑DOES NOT demand a jury trial.

### I. PARTIES

- The plaintiff is Edithh McCurry _____,

whose street address is 6239 South 13110 East Road _____ _____ ,

(city) Pembroke Township ___ (state) IL_____ (ZIP) 60958 __

(Plaintiff's telephone number)  815-735-4281

- The defendant is KENCO LOGISTICS, a Tennessee Limited Liability Company, Mars, Inc., Kelvin Walsh, Mike Manzello, David Jabaley, Tammi Fowler, and Mario Lopez, whose

street address is 2001 Riverside Dr, (Kenco)    6885 Elm Street (Mars). _____ ,

(city) Chattanooga/ McLean __(state) TN/ VA___ (ZIP) 37406/ 22101 ____

(Defendant's telephone number)    (423) –756-5552 / 703-821-4900 ___

1

(city)<u>Manteno</u> _____ (state)<u> Il </u>   (ZIP) <u>60950</u>___

5. The plaintiff [*check one box*]

- ❑    was denied employment by the defendant.

- ❑    was hired and is still employed by the defendant.

- X    was employed but is no longer employed by the defendant.

6.  The defendant discriminated against the plaintiff on or about, or beginning on or about,

(month)____, (day) ____, (year) <u> 1999 Mars & 2013 Kenco and Mars </u>   .

## II. JURISDICTION

7.  Jurisdiction over this claim is based on 28 U.S.C. § 1331. Plaintiff alleges

that the defendant(s) discriminated against Plaintiff because of Plaintiff's:

X  Age (The Age Discrimination in Employment Act, 29 U.S.C. § 621)

- Color (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

- Disability (The Americans with Disabilities Act, 42 U.S.C. § 12101
        and/or The Rehabilitation Act, 29 U.S.C. § 701)

- National Origin (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

X Race (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

X Race (42 U.S.C. § 1981)

- Religion (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

X Sex/Gender (Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e)

X Sex/Gender (Equal Pay Act, 29 U.S.C. § 206)

- Use of Leave (Family and Medical Leave Act, 29 U.S.C. § 2611)

X  Other (list): <u>Conspiracy, Intentional and Willful Interference, Aiding and Abetting, Intentional Infliction of emotional distress</u> _____

8. Plaintiff  X HAS  ❏ HAS NOT filed a charge before the United States Equal
   Employment Opportunity Commission (EEOC) relating to this claim of
   employment discrimination. **[Attach a copy of charge to this complaint.]**

9. Plaintiff  X HAS  ❏ HAS NOT filed a charge before the Illinois Department of Human
   Rights (IDHR) relating to this claim of employment discrimination. **[Attach a copy
   of charge to this complaint.]**


- Plaintiff  X HAS  ❏ HAS NOT received a Right to Sue Notice. If yes, Plaintiff's
Right to Sue

   Notice was received on or about (date) <u>May 31, 2015</u>  _____ .

   **[Attach copy of Notice of Right to Sue to this complaint.]**


### III. FACTS IN SUPPORT OF CLAIM


- The defendant intentionally discriminated against Plaintiff [***check only those that
apply***]:

   (a) ❏       by failing to hire the plaintiff.

   (b) ❏       by terminating the plaintiff's employment.

   (c) X       by failing to promote the plaintiff.

   (d) X       by failing to stop harassment;

   (e) ❏       by failing to reasonably accommodate the plaintiff's disabilities.

   (f) ❏       by failing to reasonably accommodate the plaintiff's religion.

   (g) X       by retaliating against the plaintiff because the plaintiff did something
              to assert rights protected by the laws;

   (h) X       by coercing, intimidating, threatening or interfering with the plaintiff's
              exercise or enjoyment of rights;

(i)  X    with respect to the compensation, terms, conditions, or privileges of
          employment;

(j )  X   other (specify):  Hostile and Animus Work Environment Based on
          Race, Misrepresentation, Intentional Infliction of Emotional Distress


State here briefly and as clearly as possible the essential facts of your claim. Describe
precisely how each defendant in this action is involved. Give dates and places.
Concentrate on describing as clearly and simply as possible what employment action
or situation you allege to have been illegal and how it violated your rights. It is not
necessary to make legal arguments or cite any cases or statutes.




See Attached




4

- THEREFORE, the plaintiff asks that the court grant the following relief to the plaintiff [*check only those that apply*]

    - ❏ Direct the defendant to hire the plaintiff.

    - ❏ Direct the defendant to re-employ the plaintiff.

    - ❏ Direct the defendant to promote the plaintiff.

    - ❏ Direct the defendant to reasonably accommodate the plaintiff's religion.

    (e) ❏ Direct the defendant to reasonably accommodate the plaintiff's disabilities.

    (f) ❏ Direct the defendant to (specify): _____

g) X    If available, grant the plaintiff appropriate injunctive relief, lost wages, liquidated/double damages, front pay, compensatory damages, punitive damages, prejudgment interest, post-judgment interest, and costs, including reasonable attorney fees and expert witness fees.

(h) X    Grant such other relief as the Court may find appropriate.

(Plaintiff's signature)

*Edith McCurry*

Edith McCurry

(Plaintiff's name)

6239 South 13110 East Road

(Plaintiff's street address)

(City) Pembroke Township_____    (State) IL    (ZIP)  60958_____

(Plaintiff's telephone number) (815) –735-4281

Date: August 29, 2016

III.

**VENUE**

4.     Venue is proper in the United States District Court for the Central District of Illinois, Eastern Division pursuant to 28 U.S.C. 1391 (b) wherein McCurry worked and where KENCO regularly conducts business and where are wrongful conduct complained of herein occurred.

IV.

**THE PARTIES**

**PLAINTIFF**

5.     MCCURRY is a citizen of the United States and is an African American male and at all relevant times herein; he has resided in Illinois, in the County of Will and was an employee of KENCO within the meaning of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq., and applicable case law.

6.     MCCURRY was employed with KENCO and its predecessors, whom at all times acted as agents of Mars, Inc., since on or about August 2012 through various 3rd party management companies; beginning with 4T's Management Company and then with KENCO since April 2013.

DEFENDANT

7.      At all relevant times herein, Defendant KENCO was a 3rd party Logistics management servicing agent for Defendant Mars, Incorporated employing over 3000$^{+}$ employees nationwide and is a Tennessee and Virginia Limited Liability Company, respectively.

8.      KENCO maintained an office in Manteno, Illinois and currently maintains offices in Bolingbrook, Illinois, and conducts business within the State of Illinois and Cook County and within the judicial district. Defendant KENCO'S primary place of business is in Chattanooga, Tennessee and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, et seq..

9.      MARS, Incorporated currently maintains an office in Manteno, Illinois. Defendant KENCO'S primary place of business is in Mclean, Virginia and is an employer within the meaning of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e, et seq..

## V.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

MCCURRY has complied with the administrative prerequisites of §506 of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-5 as follows:

10.     On or about, January 7, 2015, McCurry timely filed a formal charge of discrimination with the Illinois Department of Human Rights (hereafter the "IDHR") which was cross-filed with the Equal Employment Opportunity Commission (hereafter "EEOC") as Charge Numbers 2015CA1804 and 21B-2015-01135, respectively.

10.    MCCURRY promptly and diligently accommodated all IDHR and EEOC requests for information and fully cooperated in the agency's investigation of this matter.

11.    MCCURRY has exhausted all available administrative remedies in accord with the aforementioned statutes prior to instituting this Civil Action, and MCCURRY was issued a Notice of Right to Sue from EEOC on May 23, 2016.Meterd on May 24, 2016 and received May 31, 2016.  No administrative prerequisites are required before a plaintiff files a complaint pursuant to the Civil Rights Act of 1866, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

VI.

**FACTUAL ALLEGATIONS**

12.    McCurry was employed with predecessors of KENCO on or about June 1999 as the

Assistant Office Manager, for a 3rd party management company whom at all times acted as

agents of Mars, Inc., beginning with 4T's Management Company and then with KENCO on

April 21, 2013.

13.    McCurry was responsible for managing the Truck Builders, a four (4) person team,

who received the daily distribution orders from MARS, Inc. and disseminated them for

fulfillment to the warehouse; as well as, payroll for the co-pack, warehouse and distribution

center (temporary and full-time employees), attendance, Human Resources, and other

assigned tasks.

14.    At all relevant times, Defendants KENCO and MARS, Inc., employed in excess of

fifteen (15) employees for at least twenty (20) calendar weeks in 2013, 2014 and 2015.

15.    At all relevant times, all matters regarding compensation, terms, conditions, rights

and privileges of MCCURRY's employment were governed and controlled by Defendant(s)

MARS and KENCO.

16.    At all relevant times MCCURRY possessed the skills, experience and qualifications

necessary to work in his employment position and adequately and completely performed all

of the functions, duties and responsibilities of his employment with Defendant KENCO.

17.    KENCO, upon information and belief was acting as the agent of Mars and in its conduct and actions as alleged herein and was acting in a capacity within the scope of its authority, or, if said conduct was outside the scope of its authority, said conduct was known; authorized and ratified by Mars.

18.    Plaintiff filed charges that were dually filed at the Illinois Department of Human Rights and EEOC.

19.    MARS, Inc., and 4T's management through ingenuity and family alliance collaborated, championed, and implemented the vertical startup of the MARS Manteno facility.

20.    The MARS Manteno facility is a co-pack, warehouse and distribution center for Mars, Inc.

21.    The MARS Manteno facility has been in operation since 1999.

22.    The MARS Manteno facility was managed by 4T's, a thru put, from 1999 until 2013.

23.    The Mars-Manteno facility, since its inception in 1999, has been a fully functional facility comprised of a General Manager, Operations Manager, Accounting and Human Resource Department, supervisors, and workers.

24.    MARS, Inc. specifically provided on a daily basis:

a.    On site Regional District Manager

b.    Morning meetings regarding the daily "Plan"

c.    Fulfillment orders generated by Mars, Inc. through the WMS-SAP

    i. Through put of a Billion pounds or more annually of candy at the

Mars Manteno facility

d.    Mars, Inc. warehouse quality manual

e.    Cross-functional collaboration between departments

25.    MARS, Inc. routinely and regularly provided incentives to the Mars Manteno

employees.

26.    MARS, Inc. issued a Request for Proposal (RFP) in late 2012 or early 2013 to bid on

the upcoming management vacancy at the MARS Manteno warehouse and distribution

facility in Manteno, IL

27.    Kenco Logistics is a 3rd party logistics company that manages warehouse and

distribution centers for other companies.

28.    Kenco Logistics responded to the RFP issued by MARS, Inc.

29.    MARS, Inc. identified and retained the management services of Kenco Logistics in

early 2013.

30.    On or about February 15, 2013, 4T's notified the Mars Manteno employees in writing that the owner was retiring, that another distributor would be taking over the MARS account, that it was expected that most employees would be hired to essentially perform the same work, and that technically the plant was being closing under 4T's management.

31.    Kenco Logistics replaced the services of 4T's Management.

32.    Kenco Logistics is a 3rd party logistics company that manages warehouse and distribution centers for other companies.

33.    Kenco Logistics stated to the Illinois Department of Human Rights and the EEOC in its Position Statement beginning on or about November 2014 in case number 2014CF0475, and subsequently again in case number 2014CF2858, 2014CF2992, 2014CF3057, 2014CF3161, 2015CF0310, 2015CF0811, 2015CF1145, 2015CF0342, 2015CF0990, 2015CF1315, 2015CA1464, 2014CF3162, 2015CF0003, 2015CF0006, 2015CF0515, 2015CF0516, 2051CF0699, 2015CA1054, 2015CA1590 and others that "Kenco is a third-party logistics company ("3PL") that operates and manages warehouses and order fulfillment operations for other companies."

34.    On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for Mars, Inc.

35.    Kenco Logistics is a privately held company in the state of Tennessee

36.   Kenco Logistics corporate structure, operating structure and legal structuring is not synonymous with any other company.

37.   Kenco Logistics is part of the Kenco Group

38.   Kenco Group current Chairman & CEO is Jane Kennedy Greene

39.   Kenco Group President and COO David Caines

40.   Kenco Logistics was hired to Manage the Mars, Inc. Manteno facility in Manteno, IL

41.   Mars, Inc. is a privately held company in Virginia

42.   Mars, Inc. paid Kenco Logistics a management fee to manage the Mars Manteno facility

43.   Mars, Inc. passed thru their costs through Kenco Logistics with the exception of the lease, taxes, fire protection, insurance, rack expense/amortization, management fee, material handling fee were direct pays.

44.   Specifically, Mars, Inc. passed thru Kenco Logistics the salaries of all the employees (temporary and part & full time employees), as well as, any invoices of the Mars Manteno facility.

45.    This function performed was synonymous to that of the services provided by ADP, LLC.

46.    Mars, Inc. managed Kenco Logistics

47.    Specifically, Mars, Inc. continued to provide daily guidance to the Mars, Manteno facility.

a.    On site Regional District Manager

b.    Morning meetings regarding the daily "Plan"

c.    Fulfillment orders generated by Mars, Inc. through the WMS-SAP

    i.  Through put of a Billion pounds or more annually of candy at the Mars Manteno facility

d.    Mars, Inc. warehouse quality manual

e.    Cross-functional collaboration between departments

48.    Mars Manteno was a part of the network of Mars distribution centers.

49.    Mars Manteno was the Midwest distribution center

Mars Manteno serviced twelve (12) Midwestern states and Canada

50.    Mars Manteno was infrastructually similarly situated to the other four (4) distribution centers in the network in organization.  For example, but not limited to:

    a.    General Manager

    b.    Operations Manger

c.    Accounting/Human Resources

d.    And the like….

51.   Organizationally the Mars Manteno General Manager answered to and conferred with the onsite RDM of Mars, Inc., as a matter of the course of ordinary business operations.

52.   *Black's Law Dictionary* defines "employee" as "a person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.

53.   Mars, Inc. provided and stipulated such terms and conditions of employment, to Kenco Logistics, as well as, compliance; specifically with the Mandates of Mars outlined in the **Mars US Warehouse Quality Manual** and public policy, including but not limited to FSMA (Food safety and Modernization Act, 2002 Bioterrorism Act, CFR Title 21, and any other applicable public policy, just as it would with any employee and as it had done with the previous Management Company at the Mars Manteno Facility and its various other warehouse.

54.   Mars, Inc. required Kenco Logistics and Kenco Logistics agreed to be compliant with Public Policy, as it relates to the codified laws of the land, just as it would with any employee.

55.     Specifically, Mars, Inc. provided Kenco Logistics with company policies, procedures, manuals and the like, just as it would with any employee.  In addition, Mars, Inc. provided the necessary tools to perform the assigned job functions, such as but not limited to: Leasing the facility, the equipment (warehouse and office), the computers, the software, as well as, the maintenance, upkeep and repairs of such, just as it would for any employee.

56.     Specifically, Mars, Inc. provided to Kenco Logistics, just as it had its former management company on a regular and ongoing basis, a comprehensive standard to safeguard the Quality and Food Safety of its products in the outbound pipeline. The document was developed in conjunction with Global Quality and Food Safety Requirements.

57.     Specifically, Mars, Inc. set the performance management standards and goals for Kenco Logistics, just as it would with any employee.

58.     Kenco Logistics because of its multifunctional and multilayers of management types can be coined as a "Super Manager."

59.     Specifically, Mars, Inc. provided it's "Super Manager" Kenco Logistics with ongoing guidance, support and management continually

60.     Specifically, Mars, Inc. provided this support, guidance and management to its "Super Manager" Kenco logistics and the Mars Manteno Facility, by way of an in-house Regional Distribution Manager (RDM).

61.   Kenco Logistics, it's "Super Manager" just as any employee would, on an ongoing regular and regimented basis conferred with, Mars, Inc. for directives and goals, while conforming to these directives, and reporting the results of such to Mars, Inc.

62.   Just as any manager would, Kenco Logistics a type of "Super Manager" dovetailed their management styles to synergize the mandates of it employer, Mars, Inc. and public policy to meet the performance management goals set by Mars, Inc.

63.   Pointedly, Public policy drives industry standards that drive company policy. Specifically, in this case the Food, Drug and Cosmetic Act (FD&C Act), Food Safety and Modernization Act (FSMA, the 2002 Bioterrorism Act and other Acts, as well as, The World Health Organization (WHO), Codex Alimentarius, FAO and other organizations, shape and form the various recognized Global Food Safety Initiative (GFSI) benchmarks; which include but are not limited to: FSSC 2200, ISO2200, BRC, IFS, SQF and other food safety standards.

64.   Specifically, Kenco Logistics was assigned the task of implementing a written Quality Management System based upon the current non-documented procedures and protocols being performed at the Mars Manteno facility.  This standard was based upon ISO, the International Standard of Organization.

65.   Kenco Logistics Quality Management System is based on an ISO, the International Standard of Organization; the specific ISO standard is 9001:2008.

66.    Specifically, Kenco Logistics implemented a written Quality Management System at the Mars Manteno Facility.

67.    Mars, Inc. and Kenco Logistics are both certified to some Global Food Safety Initiative standard and or benchmark.

68.    Pointedly, yearly external audits are required to remain compliant to the Quality Management System, along with internal audits.

69.    Furthermore, the Federal Government under the 2001 Bioterrorism Act and the 2011 Food Safety Modernization Act, require all august body participants along the food supply chain to be complaint; Essentially from farm to fork.

70.    Kenco Logistics publicly purports to "ensure all requirements are documented according to the ISO-9001:2008 structure and are incorporated into the sites' standard operating procedures. Through regular internal audits and program development, Kenco's quality team provides support and industry expertise in FDA, OSHA, EPA, DEA, DOT, and numerous other compliance agencies."

71.    Specifically, the system implemented at the Mars Manteno facility was to be a standardization of all policies, procedures, mandates and the like.  This included, but was not limited to job analysis, job descriptions and the corresponding operating procedures for each job.  These and all-encompassing documents are authored and vetted.

72.    Pointedly, all Quality Management systems, including but not limited to this Mars Manteno Quality Management System, mandate that all documents are to be catalogued, controlled, maintained, and stored amongst other requirements.

73.    Pointedly, Kenco Logistics developed an Appendix A for the Mars Manteno Facility that catalogued the corresponding standardized documents for the Mars Manteno Facility. This included but was not limited to Job descriptions, Standard Operating Procedures, policies, and forms.

74.    Pointedly, Kenco Logistics also maintained an Appendix F, a higher matrix of Appendix A, top tier documents, that catalogued the corresponding standardized documents for the Kenco Logistics as a whole, inclusive of the Manteno Facility, as well as, other managed facilities.  This included but was not limited to Job functions by titles, Standard Operating Procedures, policies, forms and the like.

75.    Pointedly the documents itemized in Appendix A for the site super ruled those documents in Appendix F because they were customized to the specific employer's and site requirements.

76.    To ensure proper dissemination and training, each policy and or procedure are to be signed off by each employee and a record retained of such.

77.    Pointedly, no deviation from any policy and procedure is to occur, without following the procedure of the exception procedure and an approval of such on any level.

78.    President, David Caines, of the Kenco Group referred to the employees of the Mars

Manteno site specifically as Mars, Inc. employees.

79.    The "Super Manager's" role was to manage and enforce the directives and mandates

of Mars, Inc. at the Mars Manteno facility that was owned, leased and operated by Mars,

Inc. since the Mars, Inc. Manteno inception in 1999.

80.    Title VII provides that it is "an unlawful employment practice for an employer to fail

or refuse to hire or discharge any person or otherwise ... to discriminate against any

individual with respect to [his or her] compensation, terms, conditions, or privileges of

employment because of such individual's race, color, religion, sex, age or natural origin."

81.    Title VII is at bottom an enterprise liability scheme. It is structured to hold employing

entities—not individuals—accountable for discrimination within the organization.

82.    The Mars-Manteno facility, since its inception in 1999, has been a fully functional

facility comprised of a General Manager, Operations Manager, Accounting and Human

Resource Department, supervisors, and workers.

83.    Kenco, Mars, Inc., "Super Manager" provided back office support to the accounting

and human resource department, as well as, the implantation of Kenco management

styles, including but not limited to: Kenco Quality Management System (KQMS), an ISO

9001:2008 based system, Operational Excellence and Continuous Improvement based upon Lean and Six Sigma principles.

84.   The specific back office support provided by Kenco entailed pass on the invoices/bills of the Mars Manteno facility to Mars, Inc. after they were receipted, reconciled and the like the Mars Manteno Facility Accounting Department.  In addition to the invoice pass thru to Mars, Inc., Kenco also passed thru the Mars Manteno payroll by issuing the payroll checks, after the payroll had been processed, verified and submitted by the Mars Manteno Accounting Department for the five (5) different payrolls that comprised the Mars Manteno Facility to Kenco's payroll department.

85.   The additional specific back office support provided by Kenco was the recruitment and hiring of salaried personnel for the Mars Manteno facility, as well as, other Human Resource support, such as but not limited to: training, benefit administration, and the like.

86.   The KQMS style was to standardize the facility to bring compliance to 21CFR110, Food Safety and Modernization Act, 2002 Bioterrorism Act, as well as, any other applicable Global Food Safety Initiative (**GFSI**) benchmarked schemes; in addition to, streamlining business process, increase efficiency, profitability and accountability.

87.   The claims of disparate and disparate treatment and impact by McCurry and others were reported to the site Human Resource Personnel-Leonard Szplett, Kelvin Walsh-General Manager, Mike Manzello Operations Manager, Mario Lopez-General Manager Tammi Fowler-Senior Manager Employee Relations, Dan Dey-Director of Risk

Management, Paula Hise V.P. of Operations, and other corporate persons, by email, phone, fax, and in-person on numerous occasions.

88.    Specifically these claims were made in December 2013-Novemebr 2014.

89.    At all times, Kelvin Walsh, ("Walsh"), a White, American male, held the position of General Manager. Walsh was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of MCCURRY's employment with Defendant KENCO.

90.    At all relevant times, Walsh, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

91.    At all times relevant, Mike Manzello, ("Manzello"), a White male, held the position of Operations Manager, reporting to Walsh. Manzello was in a position of authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of MCCURRY's employment with KENCO

92.    At all relevant times, Manzello managed operational activities relative to the receipt and distribution of inventory for Mars, Inc., including but not limited to: hiring, scheduling, workflow and the like.

93.  At all times, David Jabaley, ("Jabaley"), a White, American male, held the position of Director of Operations at Kenco Logistics a part of the Kenco Group.  Jabaley was in a position

of authority to undertake tangible employment decisions and/or control the terms and conditions of MCCURYY's employment with Defendant KENCO.

94.  At all relevant times, Jabaley, acting on behalf of Kenco Corporate the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

95.  At all times, Mario Lopez, ("Lopez"), a White, American male, held the position of General Manager at the Mars, Inc. Manteno facility.  Lopez was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of MCCURYY's employment with Defendant KENCO.

96.  At all relevant times, Lopez, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

97.  At all times, Tammi Fowler, ("Fowler"), a White, American female, held the position of Senior Employee Manager at the Kenco Corporate.  Fowler was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of MCCURYY's employment with Defendants.

98.  At all relevant times, Fowler, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

99.  At all times, Lori Varvel, ("Varvel"), a White, American female, held the allege position of

HR Manager at the Mars, Inc. Manteno facility.  Varvel was in a position of authority to

undertake tangible employment decisions and/or control the terms and conditions of

MCCURYY's employment with Defendants.


100. At all relevant times, Varvel, acting on behalf of Kenco the managing agent for Mars, Inc.

directed and approved all operational activities, including but not limited to: hiring, pay,

scheduling, performance management, workflow and the like.


101.  At all times relevant, Valerie Lillie, ("Lillie"), a White female, held the position of Quality

Coordinator, reporting to Walsh. Lillie was in a position of authority to undertake or

recommend tangible employment decisions and/or control the terms and conditions of

MCCURRY's employment with KENCO.


102.  At all relevant times, Lillie coordinated/managed all quality activities relative to the

operation and maintenance of the facility, the receipt and distribution of inventory for

Mars, Inc., quality matrixes and plans, pest control, standard operating procedures,

sanitation and safety, as well as Mars, Inc. requirements and other industry specific

regulatory mandates and guidelines such as but not limited to: FDA and OSHA.


103.  McCURRY was employed with predecessors of KENCO on or about June 14, 1999 as

the Assistant Office Manager, for a 3rd party management company whom at all times

acted as agents of Mars, Inc., beginning with 4T's Management Company and then with

KENCO on April 21, 2013.

104.    McCurry was responsible for managing the Truck Builders, a four (4) person team, who received the daily distribution orders from MARS, Inc. and disseminated them for fulfillment to the warehouse; as well as, payroll for the co-pack, warehouse and distribution center (temporary and full-time employees), attendance, Human Resources, and other assigned tasks.

105.    In 1999, Marcia DeRoiser was hired as an office worker.

106.    A few weeks later DeRosier was promoted to Office Manager and began managing the "Truck Builders."

107.    DeRoiser was paid significantly more than McCurry.

108.    DeRoiser was significantly less qualified than McCurry.

109.    DeRoiser at the time did not even have a High School education/Diploma.

110.    DeRoiser performed significantly less work than McCurry.

111.    The scope of DeRoiser work was less sophisticated, technical and complex than McCurry and who was paid significantly more than McCurry.

112.    Pointedly, DeRoiser was afforded better fringe benefits, terms and conditions of employment than McCurry.

113.    McCurry complained to management.

114.   Thereafter, McCurry became the target of disparate and disparaging treatment and impact.

115.   Pointedly, McCurry was never disciplined for work performance or any other impropriety, or company infraction.

116.   4T's had no real written policies and procedures, as it related to employment matters.

117.   Employees, African-Americans, who complained to McCurry and Management about disparate and disparaging treatment and impact, were terminated; usually within a relative time to give rise to a retaliatory motive.

118.   Pointedly, DeRoiser was afforded better fringe benefits, terms and conditions of employment than McCurry.

119.   McCurry complained to management.

120.   Thereafter, McCurry became the target of disparate and disparaging treatment and impact.

121.   Pointedly, McCurry was never disciplined for work performance or any other impropriety, or company infraction.

122.   4T's had no written policies and procedures, as it related to employment matters.

123.   Employees, African-Americans, who complained to McCurry and Management about disparate and disparaging treatment and impact, were terminated; usually within a relative time to give rise to a retaliatory motive.

124.   Pointedly, From 1999 through 2015 African-Americans and those who opposed the disparate and disparaging treatment of African-Americans, including McCurry, were subject to harsher scrutiny, discipline, harassment, humiliation, intimidation, retaliation, unequal terms and conditions of employment, disparate pay, defamation, retribution, and termination amongst other things creating an animus and hostile work environment.

125.   African-Americans had also been mischaracterized, misclassified, and underpaid.

126.   Beginning in 2001 McCurry began being significantly underpaid for performing the same job functions and activities along the same exact lines of business, as Leonard Szplett, non-black.

127.   Pointedly, McCurry and Szplett's possessed the same identical credentials.

128.   Pointedly, McCurry and Szplett equally divided the duties of the HR and Accounting Departments.

129.   Pointedly, McCurry and Szplett could cross-functionally perform each other's duties and tasks.

130.   Pointedly, McCurry and Szplett worked independently of one another, except when it related to Human Resources (employee matters).

131.   In 2012, under the direction of Kelvin Walsh's management leadership, the Mars Manteno facility became a pervasively heightened animus and hostile work environment, precipitating a shooting inside the Mars Manteno warehouse.

132.    From 2012 moving forward, in this animus and hostile work environment, McCurry and others at the Mars Manteno facility were in constant fear of their safety and well-being.

133.    Under the same management direction later in 2012, Defendant's newly promoted General Manger, Kelvin Walsh's, open disdain and dislike for later African-Americans and those who opposed the disparate and disparaging treatment of African-Americans became more pronounced when one of Walsh's first acts as General Manger was terminating Don Stonchus, a Supervisor, without a valid or lawful reason.

134.    Stonchus a former supervisor of the Mars Manteno facility, after realizing Walsh's apathy and abhorrence for African-Americans, Stonchus began opposing the disparate and disparaging treatment of African-Americans.

135.    Again this continued to surmount the hostile and animus environment, as well as, becoming exemplary of what the retributions would be if one stepped out of line to oppose disparate and disparaging treatment and impact; akin to the plantation mentality.

136.    Upon information and belief, Stonchus fell into a deep depression after his unwarranted and unlawful termination; Stonchus committed suicide.

137.    Shortly, thereafter, MARS, Inc. issued a Request for Proposal (RFP) in late 2012 or early 2013 to bid on the upcoming management vacancy at the MARS Manteno warehouse and distribution facility in Manteno, IL.

138.    On or about April 2013, Kelvin Walsh collaborated with the incoming management company, Kenco, to memorialize pay rates and equivalent job functions from the 4T's conversion to Kenco.

139.    McCurry and Szplett were trained in May of 2013 according to Defendant's Human Resources policies, procedures, and protocols at Defendant, Kenco's, corporate office in Chattanooga, TN, by Tammi Fowler and others.

140.    Both Szplett and McCurry had a dotted line Defendant, Kenco's, corporate HR, specifically Tammi Fowler.

141.    Defendant's policies, procedures, protocols and the like were governed by a Quality Management ISO based System, specifically the Kenco Quality Management System (KQMS).

142.    Defendant Kenco had corporate policies, procedures, protocols, forms and the like; they were tethered in Appendix F.

143.    Facilities managed by Defendant, Kenco, had site specific policies, procedures, protocols, forms and the like.

144.    Mars Manteno site was to have site specific policies, procedures, protocols, forms and the like.

145.    According to company policy, employees were to be trained on all applicable policies, procedures, protocols, forms and the like.

146.    According to company policy a record and/or log of this training was to be kept.

147.    Pointedly, according to company policy employees who were trained on policies, procedures, protocols, forms and the like were to sign off on that training.

148.    Pointedly, according to company policy a record of employee's signature and acknowledgment of the policies, procedures, protocols, forms and the like were to be maintained.

149.    The policies, procedures, protocols, forms and the like were to be developed, implemented and maintained by the Quality Engineer.

150.    In August of 2013, Morris Tyson began requesting to return back to work from an injury.

151.    Tyson's repeated requests to return to work were ignored by Defendant's General Manager, Kelvin Walsh.

152.    Defendant's General Manager, Kelvin Walsh finally informed Tyson that he could not return to work unless he was a 100% without restrictions.

153.    Tyson had over ten (10) years of employment at the MARS Manteno facility as a spotter.

154.    Conversely, during the same time Defendant's General Manager, Kelvin Walsh returned to work a recent hire, Mark Baker, of less than six (6) months to an accommodated position of a window clerk.

155.    Baker and Baker's request to return to work were not ignored by Defendant as Tyson and Tyson's request to return to work.

156.    Pointedly, the window clerk position was a position that Tyson had extensive experience in and could have performed it without any training.

157.    Other modified work was available and had been made available to other non-black employees.

158.    Other non-blacks had not been ignored by Defendant, such as Harold Bell.

159.    Tyson had to be placed on an unpaid leave of absence to protect his employment status; while trying to return to work.

160.    In November of 2014, Karen Smith, outside legal counsel, for Defendant Kenco contacted McCurry to speak with McCurry regarding a charge of discrimination that had been filed against the Defendants by Mary Madison.

161.    McCurry reported to Smith that Madison had made complaints to not only McCurry, but Paula Hise, Len Szplett's and others about the disparaging and disparate treatment and impact subjugated upon her by Defendant's General Manager, Kelvin Walsh.

162.    McCurry also reported that she had witnessed this treatment to Madison, as well as, outlining the disparate and disparaging treatment and impact imposed upon McCurry.

163.    Despite Madison reporting the incidents, no action was taken by Defendant.

164.    Pointedly, Defendant allowed the perpetrator of the acts to initiate, disseminate and execute the adverse actions against Madison.

165.    Defendant's Counsel, Karen Smith, reported to the Illinois Department of Human Rights and EEOC that McCurry was only a clerk and unable to intake such information on behalf of the company.

166.    Defendant's counsel was fully aware of McCurry's role and position as HR Administrator.

167.    Pointedly, Defendant had posted on Defendant's website that McCurry was the HR Administrator for the Mars Manteno site.

168.    Defendant's Counsel, Karen Smith, intentionally, willfully, and maliciously defamed, marginalized, and mischaracterized McCurry and McCurry's job functions to the Illinois Department of Human Rights and EEOC to obstruct justice, impede the administration of justice, to avoid culpability and liability.

169.                                                    Contrarily to McCurry's statements to Smith, Smith went on to say to the Illinois Department of Human Rights and EEOC that Madison instructed McCurry not to take any action about the complaints waged against defendant.

170.    Pointedly, this is an egregious outright and blatant lie.

171.    McCurry never stated such, nor did Madison instruct McCurry to not take any action.

172.    Pointedly, Madison had been given ten (10) days after receipt of the "PIP" Performance Improvement Plan dated July 8, 2013 and that was acknowledge by signature with Madison on July 9, 2013 to respond.

173.    Madison emailed Walsh, Hise, and Szplett on or about July 22, 2013 in response to the "PIP" stating again that she had been treated differently and not afforded the same opportunities.

174.    Madison was not afforded the thirty (30) days to improve after the submitted response.

175.    Madison was terminated on August 9, 2013.

176.    Defendant did not follow its own requirements.

177.    Pointedly, Madison's "PIP" did not correlate with any corresponding site or corporate policy.

178.    Pointedly, Madison's "PIP" did not correlate with the Defendant's documentation policy or procedure.

179.    Again, Defendant violated its own policies, procedures, protocols and the like.

180.    Defendant intentionally and willfully ostracized McCurry out of Madison's investigation at the Illinois Department of Human Rights and EEOC.

181.    Defendant failed to list McCurry as having firsthand knowledge or as a representative of the company having firsthand knowledge during the investigation.

182.    Immediately after speaking with Smith, McCurry began being ostracized, marginalized, harassed and retaliated against by Defendant.

183.    McCurry began being overburden with other tasks that were assigned to her outside the scope of McCurry's job function, as well as, impossible deadlines on an ongoing and regular basis by senior management.

184.    Defendant began capriciously changing the shifts, without notification to McCurry.

185.    Defendant's actions caused and created payroll errors, impossible deadlines, intentional stress and hostile employees.

186.    In December of 2013, McCurry questioned Walsh about Nathan Doss's pay disparity.

187.    Walsh informed McCurry that Tammi Fowler, Senior Manager of Employee Relations, had authorized Doss's pay raise due to a promotion to be incremental.

188.    Pointedly, Fowler is a certified member of the SHRM-The Society of Human Resources.

189.    Pointedly, Fowler asserts her "responsibilities include management of the Employee Relations function for the five Kenco Companies; providing interpretation and advice to HR Managers and Site Managers on employment law, organization policy and overall employee relations issues; conducting investigations related to claims of harassment or discrimination and recommending steps for resolution; reviewing termination requests and providing management with appropriate action plans; and educating Managers regarding the spirit and intent of laws, regulations and company policies."

190.    Pointedly, no other non-black external or internal Lead Associate immediately preceding or proceeding Doss was subjugated to such adverse terms and conditions of employment.

191.    Pointedly this again was against Defendant's compensation policy.

192.    Pointedly, Defendant hired an external candidate, Stephanie Dumas, who did not meet Defendant's requirements for Lead Associate Position.

193.    Pointedly, this was against Defendant's policy.

194.    Furthermore, Dumas was given a premium shift, first (1st) shift, Monday - Friday.

195.    In March of 2104, Madison informed the IDHR/EEOC that McCurry was whom she had reported the incidents of disparate and disparaging treatment and impact to.

196.    Madison requested that McCurry be present during the Fact Finding Conference for the charges filed at the Illinois Department of Human Rights and EEOC.

197.    McCurry affirmed that Madison had reported the matter, as well as, McCurry knew how she felt because of how McCurry had been treated.

198.    Immediately, after the Fact Finding Conference McCurry began to be aggressively retaliated against, harassed, and further marginalized.

199.    Pointedly, within days, under Defendant's General Manger, Kelvin Walsh's, direction Valerie Lillie pressured McCurry to agree to change her job description/title from HR Administrator.

200.    Effectively this change would mean that McCurry would report directly to Walsh instead of Szplett, the HR/Accounting Manager.

201.    Upon information and belief, no one else has been subject to having their job description/title changed; despite continuing to perform said duties.

202.    McCurry opposed such change in her job description/title.

203.    Szplett also opposed such change in McCurry's job description/title.

204.    Pointedly, Walsh did not have the professional, educational, or experiential acumen to manage or oversee McCurry and the work she performed, as Walsh only had a high school diploma and not experience in HR or accounting.

205.    Pointedly Walsh did not meet Defendant's criteria for being the General Manager.

206.   Simultaneously, McCurry again began to be subjugated to greater workloads and impossible deadlines by Kelvin Walsh and others.

207.   McCurry was assigned Operations reports, KPI metric reports, Safety data reconciliation reports, as well as, other tasks; in addition to being the:

   a. Wellness Advocate;

   b. Communication Advocate;

**In addition to being responsible for:**

   a. Time and Attendance

   b. Employee Personnel Files

   c. Vacations

   d. Five (5) separate and distinct payrolls for permanent and temporary employees due simultaneously

   e. Organizes reviews, reconciles, and audits forms associated with federal, state, and local authorities, such as W-2's

   f. Oversees the distribution of paychecks or arranges direct deposit programs

   g. Ensures payroll records are updated and reports on any matter of interest.

   h. Provide administrative recruiting support

   i. Assist in troubleshooting within electronic timekeeping and accounting system.

   j. Reviews and assists in labor, leave, and payroll tax general ledger account reconciliations.

   k. Prepare and process data & paperwork as part of new hire, status changes, background checks. employees personal changes, employee verifications, new hires, and employee benefits (401K, leave of absence, PTO, terminations, status changes, etc.)

l. Train and answer employee questions in respect to Ultipro Core and Ultipro Time Management

m. Serve as subject matter expert on employee benefit packages

n. Serve as subject matter expert in Communication/HR/Health and Wellness advocate for the site.

o. Responsible for assisting with background checks, the drug screen process for all new hires: coordination of random drug testing program per corporate requirements.

p. Manage time and process payroll for Permanent and Temporary employees; including overtime

q. Regulate Security via issuance of Identification cards to all authorized vendors, customers and personnel.

r. Attend project meetings, webinars, and project training sessions

s. Organize Corporate events held at the Mars site, such as, but not limited to Founders day celebration

208. On or about Mid-August 2014, McCurry began receiving sent emails from corporate saying that McCurry never gets payroll in on time.

209. McCurry explained the constraints of:

a. The faulty time clock;

    a. Not recording time properly or at all

    b. Rolling back employee time to previous work week; effectively shorting the employees hours

b. Capriciously changing the shifts without making an appraisal of such changes;

c.  24 hour/7 day a week operation;

d.  Within five (5) hours of the shift ending payroll was due and three (3) hours of McCurry's scheduled time to begin work (shift ended at 5:00 am-payroll was due at 10:00 am);

e.  Five (5) separate and distinct payrolls for five (5) different entities;

f.  Employee questions and matters;

g.  Employee requests;

h.  Corporate requests;

i.  An ad hoc report assigned by management relevant to operations;

j.  Manual punches from the employees;

k.  New hires;

l.  Mandatory overtime for all shifts;

m.  Overtime extending past the shift ending time; and

n.  Overtime extending past the close of payroll

210.  McCurry was instructed by Defendant to estimate or guess what time the employees would be finish and record the time as such.

      a.  Effectively shorting the employee of their wages

      b.  Falsifying official records

211.  McCurry complained, protested and refused to do such.

212. McCurry indicated that it was unlawful; it created apathy and hostility from and amongst the employees, lowered morale and ultimately increased the workload and burden for McCurry to back tract and correct these errors.

213. Defendant continued to impose more stringent and impossible deadlines on McCurry as it relates to payroll.

214. Defendant intentionally and willfully changed the shift ending time to 7:30 am from 5:00 am; now 2 and one half hours of the time payroll was due.

215. Defendants mandated overtime for its employees.

216. Most of Defendants employees were not finished working most of the time when payroll was due, even prior to the 7:30 am shift ending time.

217. Defendant had the ability to change the shift.

218. Defendant refused to change the shift so that payroll could be on time, but intentionally used this to continue to harass, inflict emotional and physical stress, as well as, retaliate against McCurry; effectively making this an impossible deadline for McCurry to meet.

219. Manzello reported to McCurry on or about September 2, 2014, upon his termination that Kelvin Walsh, Tammi Fowler, David Jabalay Dan Dey and others conspired against Nathan Doss in regards to his formal complaints of employment discrimination.

220. Manzello indicated several instances where Tammi Fowler and Dan Dey badgered him, once for (2) two hours, about his decision to hire Nathan Doss asking him what was he thinking when he hired him.

221.   Manzello also said that Fowler decided not to invite the leads to a meeting she conducted of employees civil rights; the leads were not invited because she did not want Nathan Doss to know about his rights.

222.   Manzello also said Fowler made remarks that she knew Nathan Doss was smoking weed everyday.

223.   Manzello also indicated that David Jabaley said that he just wished they would write his (Nathan Doss) "black ass" a check and he'd be gone.

224.   Manzello said that the drug test was contrived; Lillie was responsible for the drug test being administered.

225.   Lillie gave him paper work saying that Doss had an accident on equipment (work time injury) as opposed to the alleged reasonable suspicion reason given to him because he was supposed to have smelled like weed.

226.   Doss in fact he was not scheduled to work nor was he working when they gave him the ultimatum of taking the test or being fired.

227.   Doss came to inquire about a jacket that had been taken from him over the weekend.

228.   Doss was forced to swipe in on the clock.

229.   Doss was also given an alcohol test, as well as, the drug test.

230.   Manzello stated that Jabaley instructed him and Lillie, to take Doss' picture when he came back off suspension from allegedly being insubordinate to Saul Beck.

231.   Manzello stated that in fact the company, specifically Jabaley, Dey and Fowler, were looking for ways to terminate Doss' employment with the company.

232.   Manzello also reported to McCurry that they were also looking for ways to terminate McCurry's and Szplett's employment with the company as well.

233.  Manzello also reported that someone from the company had come in his office and taken various paperwork out of his office that could be of aid to Doss, as well as, other employees

234.  McCurry had contact with Doss upon his arrival the day he was accused of smelling like weed.

235.  McCurry did not smell marijuana on Doss.

236.  McCurry told management that she did not smell marijuana on Doss.

237.  On or about the week of October 6, 2014, McCurry was accused of making unauthorized payments to an employee, Dana Woods, African American by David Jabaley, Mario Lopez, and Tammi Fowler

   a.   Woods was suspended for making a comment about an incident that he saw on the national news in a conversation to another employee, Bushey, a white female supervisor, said she felt threatened by the conversation.


      i.   Upon information and belief non-black, African Americans, who made similar comments, or comments that violated persons protected rights were not punished, reprimanded, or suspended

      ii.  Woods was not afforded an opportunity for progressive discipline; he was not counseled, warned or the like.

      iii. Pointedly there is no company policy relating to such.

      iv.  Another psychological tool used to subjugated African-Americans.

v.    Peter Monstwillo, non-black, made racial slurs, epithets and threats to Vernon Henry in February of 2014 in front of a number of employees.

vi.    Monstwillo was not punished.

238.    Mario Lopez stated that making unauthorized payments was stealing from the company.

239.    Fowler indicated that the best punishment for employees was "hitting them in the pocket."

240.    Pointedly there was no written policy on when an employee's vacation pay could and could not be disseminated.

241.    Defendant often used this economic and psychological sanction to harass, intimated, and retaliate against employees by not paying them for weeks at a time and holding their holding their monies (vacation time) in abeyance.

242.    Hourly employees were paid weekly.

243.    On or about November 10, 2014, in further retaliation and harassment McCurry was not offered or made apprised of a promotional opportunity for the position to HR Manager; despite serving in the HR Administrators role for more than 15 years and being educationally equipped.

244.    McCurry had an excellent performance review.

245.    On or about November 10, 2014, the company purported to hire a HR Manager, Lori Varvel.

246.    Upon information and belief, Szplett's, the current HR Manager, had not been apprised that he would or had been replaced.

247.    Varvel had no Human Resource Certification.

248.    The position was not posted as required by company policy; Job Posting Procedure CP.HR. 6.2.2.011.

249.    McCurry was the person responsible for job postings.

250.    Varvel had less experience than McCurry and Szplett.

251.    Varvel was under 40 years of age.

252.    Varvel was paid more than Szplett's and McCurry to perform less work.

253.    Pointedly, Defendant reported to the IDHR/EEOC that Varvel was a HR Generalist and not a HR Manager.

254.    Pointedly, a HR Generalist and a HR Manager are not the same.

255.    Pointedly, Varvel did not meet the qualifications set forth by Defendant to be the HR Manager.

256.    Defendant represented to the IDHR and EEOC that Szplett was not the HR Manager.

257.    Defendant also represented to the IDHR and EEOC that Szplett had no change in responsibilities.

258.    On or about November 21, 2014 Varvel gave McCurry a paper saying that McCurry would no longer have certain responsibilities, and most privileges were revoked, along with McCurry not being able to work overtime.

259.    Effectively McCurry was demoted, retaliated against and harassed.

260.    Effectively more stringent and impossible deadlines were imposed.

261.    McCurry was told that she needed to sign the paper.

262.    McCurry was forced to sign the paper that was presented with these restrictions, revocations, and impositions.

263.    McCurry stated that she felt this was a punishment.

264.    Varvel stated that it was not a punishment

265.    McCurry reiterated that she thought that it was a punishment, as the paper specifically stated that, if McCurry failed to adhere to the terms and conditions, McCurry would be subject to further disciplinary action up to and including termination.

266.    Under duress McCurry signed the paper and made comments on her perception of the paper and what it meant.

267.    Defendant KENCO's document presented to McCurry failed to meet its minimum standards of KENCO's Quality Management System's document control policy/procedure.

268.    Pointedly the paper did not correlate to a policy, procedure or protocol of Defendant's.

269.    Defendant KENCO failed to follow its own performance management procedures and protocols of the company, as they were not implemented or followed despite it being company policy to do so.

    a.    Varvel did not establish goals or a performance matrix for McCurry

    b.    Varvel implemented a written disciplinary step without following the progressive disciplinary protocol or procedure, as company policy dictates.

    c.    Varvel had not evaluated McCurry's work.

d.    Varvel did not assign work to McCurry

270.    Pointedly, this was the same tacit enacted/imposed upon Madison

a.    Madison was never given goals

b.    Progressive discipline/counseling

c.    Or the opportunities afforded by Defendant's policies, procedures, protocols

and the like.

271.    In late November, the IRS levied a wage assignment against McCurry and informed

defendant of such.

272.    Defendant maliciously in harassment and retaliation against McCurry, and against its

own best practices, as well as, public policy, willfully and intentionally garnished McCurry's

entire payroll check for two (2) consecutive weeks.

273.    Pointedly, the IRS notified Defendant and provided a worksheet for Defendant to fill

out assessing a garnishment commensurate with IRS rules and regulations.

274.    Defendant did not abide by the IRS rules and regulations

275.    Defendant never notified McCurry of the garnishment.

276.    Pointedly, the IRS requires that a person not be left indigent.

277.    Pointedly, McCurry as an ordinary course of business and in best practice of

Defendant and in compliance with the IRS filled out such forms for other employees.

278.    No other employees at the MARS Manteno facility had been subjugated to such.

279.    Defendant's actions caused McCurry great irreparable harm, duress and stress.

280.    McCurry needed employment verification of hours worked to remediate the matter

with the IRS.

281.    . On or about November 24, 2014, McCurry asked Varvel for employment

verification of the hours to be worked

282.   49. Varvel asked McCurry the reason she needed employment verification.

283.   50. McCurry stated it was for a personal matter

284.   51. Varvel refused because McCurry would not tell her what it was for, outside of it being for a personal matter.

285.   Pointedly there is no policy, procedure or protocol that requires such a disclosure.

286. McCurry referred to the paper she signed just a few days earlier stating that in fact the paper stated the same thing McCurry was asking for.

287. Varvel stated the paper McCurry signed was not meant to be a legal document; despite both Varvel and McCurry had signed it; despite it had language relevant to the terms and conditions of McCurry's employment, as well as, the fact that it could be used to enforce disciplinary action.

288. McCurry asked the GM, Lopez for employment verification he refused.

289. McCurry asked Fowler and Jason Pendleton for employment verification by email; to date no one has acknowledged McCurry's request.

290. The company was on notice from the IRS that McCurry's wages were to be garnished.

291. McCurry had supplied on numerous occasions employment verifications for employees.


292.   Defendant continued to harass, marginalize, retaliate and inflict intentional emotional and economical stress and duress upon McCurry in refusing to verify her employment.

293. On or about December 19, 2014, McCurry was accused of falsifying a document by Varvel and Lopez.

294. McCurry was written up for signing out at 5:00 pm and allegedly leaving at 6:39 pm according to Varvel.

295. McCurry was also told by Varvel that it was against the law to volunteer her time to a company and not be paid.

296. McCurry was forced and badgered to sign the paper immediately and was not allowed to adequately review the document and comment.

297. McCurry had no foreknowledge or was not even aware that she would be getting a write up on the matter.

298. McCurry was not afforded an opportunity to discuss the matter prior to the disciplinary action

299. As an overreach, the paper that McCurry was mandated to sign stated that McCurry worked overtime without approval.

300. McCurry's shift ends at 5:00 pm.

301. McCurry maintains that she believed she had punched out at 5:00 pm.

302. Pointedly, McCurry was stripped by Varvel of the benefit of being able to punch in and out at her computer in late November of 2014.

303. Other office workers, who were hourly, non-black were still afforded the opportunity to punch in and out at their computers.

304. The time clock to punch in and out was on another floor and in a separate part of the warehouse.

305. McCurry submitted a mispunch slip for 5:00 pm; overtime would not come into play; therefore, the company incurred no burden or violation of its policies.

306. Varvel indicated that she had reviewed the video footage.

307. McCurry requested to see the clock video footage showing that McCurry had not swiped out because the clock malfunctions and does not record time accurately.

308. McCurry was denied the opportunity to review the video footage.

309. McCurry requesting on numerous occasions to see this video footage, was not allowed to see the video footage.

310. The written reprimand also was a mischaracterization of McCurry's job title by stating that McCurry was a HR Clerk, as opposed to her job description of HR Administrator.

311. The reprimand also stated that McCurry would again be subject to further disciplinary action up to and including termination.

312. Varvel also told McCurry that if they wanted to get rid of her they were already skipping steps on people and could have done that to McCurry.

313. Defendant KENCO once again intentionally and willfully failed to follow its own performance management procedures and protocols of the company, as they were not implemented or

314.    followed despite it being company policy to do so.

315. Furthermore, it is not Defendant's KENCO's typical practice to review the video footage when employees miss a punch.

316. Mispunches are typical and daily occurrences

317. McCurry is the sole timekeeper and has never done this to affirm or deny employee's time.

318. Upon information and belief this has never been done before or after for any other employee.

319. Defendant does not have a policy that requires persons to vacate the premises after a shift ends.

320. Defendant could not definitively say what McCurry was allegedly doing between 5:00 pm and 6:39 pm.

321. Mispunched slips were common for the following reasons:

a.   Swipe card

a.   Misplaced

b.   Lost

c.   Forgotten

b.   Faulty time clock

    a. Did not record swiped time

322. Melissa Hansen was hired in May of 2014 as the Co-Pack Coordinator.

323. Hansen began performing the duties of Operations Manager in September of 2014; only after four (4) months as the Co-Pack Coordinator.

324. Hansen did not apply for the Operation Manager's position.

325. Hansen was not eligible for promotion or a job change until May 2015.

326. Hansen was promoted to Operations Manager.

327. Defendant did not follow its own policies, procedures, protocols and the like once again.

328. Hansen was non-black

329. Hansen did not have a college degree.

330. A college degree was a prerequisite for both the Co-Pack and Operations Manager's position.

331. Hansen did not have in warehouse experience.

332. According to Defendant Vernon Henry could not apply for the same position of Co-Pack coordinator because he had not been in his position for six (6) months.

333. Pointedly, at the time of Henry's application Henry was a temporary employee of the Reserve Network.

334. According to Defendant in early 2014 temporary employees could apply for open positions if they were qualified.

335. Pointedly, during the same time Defendant hired another temporary for an open position.

336. Defendant again defamed McCurry by stating to the IDHR and EEOC that McCurry had given Henry the wrong information misleading him to seek employment for open positions at the company.

337. Defendant again committed fraud on the administration of justice by providing misleading and fraudulent information to the IDHR and EEOC

338. From April 2013 to January 6, 2015, McCurry has been coerced into defrauding employees out of time owed for hours work because of a malfunctioned clock that has yet to be fixed.

339. From April 2013 to January 6, 2015, McCurry has been coerced into submitting inaccurate time sheets for employees for hours work because of a malfunctioned clock that has yet to be fixed.

340.    On or about October 2014, McCurry was coerced and forced not to remit monies due to employees because the company has not investigated and resolved disputed hours.

341.    The failure to repair or replace an in accurate and/or faulty time clock is a breach of fiduciary obligation to the employees by Defendants.

342.    The failure to repair or replace an in accurate and/or faulty time clock is a breach of fiduciary obligation to government, as it cheats the government out of employment taxes and the like.

343.    On or about November 21, 2014, McCurry was coerced and forced to work in a position with less responsibilities outside of McCurry's assigned position as the HR Administrator to remain employed at the company.

344.    On or about November 21, 2014, McCurry complained to site management and HR for being intimidated, punished and forced to have to work in a position outside of McCurry's assigned position to remain employed at the company.

345.    McCurry has been subjected to the misuse, abuse and misapplication of company policy for intimation, harassment, bullying, retaliation, threats to personal standing and a mired of other adverse employment decisions because McCurry opposed disparate and disparaging treatment and impact

346.    Similarly situated non-black, African American employees were not treated in this manner

347.   Similarly situated male non-black, African American employees were not treated in this manner

348.   The harassment and discrimination followed the complaint to corporate and HR within such a period of time as to raise an inference of retaliatory motivation.

349.   On or about August 2013 to January 6, 2015 McCurry involuntarily conspired, aided and abetted the company in violation of employees constitutional rights to not be treated differently, disparagingly, or biasedly regarding their fundamental protected rights of being able to return to employees to work with reasonable and without accommodations.

350.   On or about August 2013 to January 6, 2015 McCurry involuntarily conspired, aided and abetted the company in violation of employees constitutional rights to not be treated differently, disparagingly, or biasedly regarding their fundamental protected rights through the intentional and willful manipulation, mischaracterization, and altering of McCurry's verbal and written  statements of accounts of situations regarding disparate, disparaging, violent, and discriminant incidents occurring in the work place that created a hostile and animus work environment.

For example:

a.   Regarding Mary Madison

i.   Stating that I was instructed to do nothing by her.

ii.   That I was a HR Clerk

b.    Regarding Jacque Morrison

    i.    Reporting of injury

    ii.    Termination

c.    Nathan Doss

    i.    Drug test

    ii.    Pay disparity

    iii.    Suspension(s)

    iv.    Various other incidents

d.    Vernon Henry

    i.    Reporting of Racial Slurs and epithets towards Vernon from

Pete

    ii.    Vernon not being interviewed for jobs

    iii.    Pete trying to kill Vernon

    iv.    Denial of unemployment

e.    Scot Marksteiner

    i.    Retraction of employee of the month

    ii.    Job threatened

    iii.    Suspension

    iv.    Drug test

    v.    Indefinite Suspension

f.      Morris Tyson

i.      Failure to return to work ADA

352.    On or about November 2013 to date, McCurry has been involuntarily mischaracterized and defamed by the Defendant and Defendant's Counsel as other than an HR Administrator for the sole purpose to relieve the company of any culpability and liability for unconscionable acts of employment discrimination that violate employees, including McCurry's own, fundamental constitutional rights to not be treated differently or marginalized to achieve illicit, illegal and negative actions towards employees.

353.    Pointedly, McCurry was defamed on more than several occasions by Defendant to the Illinois Department of Human Rights and EEOC.

354.    On or about December 2013-to January 6, 2015, McCurry has involuntarily conspired aided and abetted the company in violation of African American employees constitutional rights, as well as, those who opposed such disparate treatment to not be treated differently, disparagingly, or biasly regarding their fundamental protected rights of not being paid disparately or differently than those non-blacks performing the same duties and tasks, subjecting them to unfavorable shift changes, abuse of authority, terms and conditions of employment and other fringe benefits offered to non-blacks, such as but not limited to access to overtime.

355.    On or about August 26, 2013-Janauary 6, 2015, McCurry has involuntarily aided and abetted the company in the conspiracy of against the violation of employees constitutional rights to not be treated differently, disparagingly, or biasedly regarding employees

fundamental protected rights of being free from a hostile work environment, abuse of authority, harassment, nepotism, favoritism, abuse of authority, racism, being subjugated to harsher and more strenuous work assignments, unfavorable shift assignments, less pay and less hours afforded to be worked created a hostile and racially animus charged work environment

356.   Defendant KENCO intentionally and willfully interfered with the job duties and obligations of McCurry as the HR Administrator in the opposition of disparate and disparaging treatment and impact of employees, especially African American's and those who opposed such.

357.   Defendant KENCO intentionally and willfully interfered with the obligations of McCurry as the HR Administrator to oppose the impeding and obstruction of justice to governmental regulatory agencies, such as but not limited to OSHA and the Department of Human Rights.

358.   Defendant intentionally and willfully spoiled direct evidence submitted from investigations, complaints and the like gathered by McCurry, Szplett and others that could be used to support the position of employees/claimants

359.   Defendant KENCO intentionally and willfully interfered with the job duties and obligations of McCurry as the payroll administrator regarding correction of payroll issues, including hours worked and paid.

360.   Defendant KENCO and its agents, Fowler, Dey, Walsh, Jabaley, Lopez, Lillie, and others, publicly humiliate, degrade, belittle, intimidate and reprimand employees, especially African American's **and those who oppose disparate and disparaging treatment.**

361.    Defendant Kenco and its agents, on an ongoing and regular basis, made intentional and willful adverse decision to continue to subjugate African Americans, including McCurry, and those who opposed disparate and disparaging treatment and impact, to contrived plans of harassment and intimidation in retaliation of waging internal and external complaints of, nepotism, favoritism, racism, discrimination, intimidation, hostile work environment, harassment, coercion, harder work assignments, less pay, humiliation, harsher scrutiny and discipline than non-blacks and those who did not oppose such treatment

362.    Defendant Kenco and its agents intentionally and willfully mischaracterized incidents and events with the intent to incite divisive and chaotic relationships amongst employees and management.

363.    Defendant Kenco and its agents intentionally and willfully propagated misleading, unethical, and fraudulent company policies, protocols, procedures, and practices that were negative, adverse to, and retaliatory towards the employees, especially, African Americans, and those who oppose disparate and disparaging treatment and impact.

364.    Defendants again breached their fiduciary obligation to its employees

a. Defendant Kenco fraudulently propagated a confidential employee hotline to report various employment issues.

i.        Defendants KENCO intentionally and willfully induced and mislead employees into using a non-confidential employee hotline.

ii.        The ill-gotten information was given to Fowler, who in turn gave it to Defendant's KENCO's managers and/or supervisors.

iii.        Allegedly confidential information reported was used by Defendant KENCO and its agents to harass, intimidate, and retaliate against complaining employees

iv.        Again fostering and maintaining an animus and hostile work environment.

b. Defendant KENCO falsely propagated that it would follow company and public policy as it relates to employment matters.

i.        Defendant KENCO intentionally and willfully failed to investigate reported employment matters.

ii.        Defendant KENCO intentionally and willfully failed to fairly and unbiasedly investigate reported employment matters and concerns.

iii.        Defendant KENCO intentionally and willfully failed to fairly and unbiasedly consider all relevant information and facts before implementing adverse employment decisions.

iv.        Defendant KENCO intentionally and willfully failed to implement and deploy corrective and preventive actions under company and public policy.

c.        Defendant KENCO intentionally and willfully failed to fairly and unbiasedly administer the same criterion for the compensation management of non-blacks and blacks.

d.          Defendant KENCO intentionally and willfully failed to fairly and unbiasedly

administer

company and public policy as it relates to employment life cycle of an employee.

i. Defendant KENCO intentionally and willfully failed to fairly and

unbiasedly administer the same criterion for the hiring non-blacks and

blacks.

1.                  Non-qualified non-blacks hired over qualified blacks

a. External non-black candidates hired opposed to internal

qualified blacks

2.                  Hiring of non-blacks with criminal backgrounds while failing

to hire blacks with similar or less offenses

3.                  Not vetting non-blacks prior to working as required by

company and public policy.

            a.  Defendant KENCO intentionally and willfully failed to fairly and

                unbiasedly administer the same criterion used for the terms and

                conditions of employment as it relates to non-blacks and blacks.

                1.Premium shift assignments

                2.40 hour work weeks

                3.Overtime

                4. Shift changes/cancellation

                5.Training

6. Job growth and advancement

7. Job assignments

8. Discipline

9.  Scrutiny

10. Recruitment

11. Onboarding

12. Compensation Management

13. Statutory Compliance

14. Assimilation and Separation

365. Defendant intentionally and willfully submitted false, misleading and fraudulent information that subjugated employees to continual retaliation and harassment through the obstruction and impediment of entitled benefits; such as, but not limited to: unemployment, disability, and Paid Time Off

366. Defendant intentionally and willfully submitted false, misleading and fraudulent information to regulatory and public policy agencies; such as, but not limited to Illinois Department of Human Rights, Illinois Department of Labor, Illinois Department of Employment Security, Department of Labor-OSHA, EEOC, FDA and others.

367. Defendant intentionally, willfully, maliciously and recklessly depicted each and every African-American or those who opposed disparate and disparaging treatment of African-Americans as either an offender of public and company policies, procedures, protocols and the like, obtrusive, inept, low capacity, low functioning, violent, aggressive, stereotypical, incompetent, unteachable, confrontational, along with a vicissitude of allegorical degradative expressions.

368. Defendants allowed its employees and management to make racial slurs, epithets, and threats, such as, but not limited to: referring to African Americans as "Niggers", "Black Bitch", "Black Ass" and the like at the Mars Manteno facility without reprisal.

369.   Pointedly for example, Defendants allowed Pete Monstwillo to make racial threats, slurs and epithets to Vernon Henry, as well as, attempting to kill Henry with a Forklift truck.  This was not the first occasion that Monstwillo had assaulted Henry.

370.   Defendant did not call the police.

371.   Defendant did not follow its own policies, procedures, protocols and the like.

372.   Defendant only gave Monstwillo a written disciplinary action for a three (3) day suspension.

373.   Upon information and belief Defendant paid Monstwillo while he was on this three (3) day suspension.

374.   Defendant did not follow its own policies, procedures, protocols and the like as it relates to its zero tolerance policy of work place violence and other policies.

375.   Defendant terminated Henry for allegedly violating a cell phone policy and posting allegedly posting a picture on face book.

376.   Pointedly, Defendant did not have a social media policy.

377.   Pointedly, the cell phone policy related to the use of a phone and operation of equipment.

378.   Pointedly, Defendant never spoke with Henry before terminating him to affirm this adverse employment decision.

379.   Pointedly, Defendant had no evidence to connect Henry to picture being taken or posted on social media.

380.   Pointedly, Defendant fired Henry while he was out on a requested medical leave of absence.

381.   Pointedly, Defendant destroyed or failed to produce the doctors not submitted to me by Henry on or about October 13, 2013.

382.   Pointedly, Defendant materially altered the personnel files of employees who have waged claims against defendant.

a.       Defendant has not maintained personnel files according to company policy

b.       Personnel files presented by Defendant do not mirror the files that McCurry and Szplett oversaw at the Mars Manteno facility.

c.       Defendant removed documents from these personnel files

d.       Defendant added documents to these personnel files

e.Plaintiff also believes that Defendant also intentionally and willfully interfered with his right to enjoy his protected rights of a fair due process of law.

f. Plaintiff also alleges and believes that Defendant committed obstruction by deception.

a.Defendant knowingly and willingly engaged in misleading conduct by altering Plaintiff's personnel file, as well as, supplying misleading witnesses, information and documentation to hinder the administration of justice at the Illinois Department of Human Rights, Illinois Department of Labor, and EEOC, as well as, the pending judicial proceedings that would make McCurry whole.

g.Plaintiff also alleges and believes that Defendant committed obstruction by destruction of evidence.

a.      Defendant knowingly and willingly engaged in unlawful conduct by altering

Plaintiff's personnel file to impede the administration of justice at the Illinois

Department of Human Rights, Illinois Department of Labor and EEOC, as well as, the

pending judicial proceedings that would make McCurry whole.


h.    Plaintiff also alleges and believes that Defendant committed obstruction of justice

by destruction of evidence.


a.      Defendant knowingly and willingly engaged in unlawful conduct by altering

Plaintiff's personnel file, as well as, statements of account on McCurry' behalf to

obstruct the administration of justice at the Illinois Department of Human Rights, Illinois

Department of Labor and EEOC, as well as, the pending judicial proceedings that would

make Henry whole.


i. Plaintiff also alleges and believes that Defendant committed obstruction of

investigations by destruction of evidence.


a.      Defendant knowingly and willingly engaged in unlawful conduct by altering

Plaintiff's personnel file, inclusive of the investigation file and other relevant parts of

McCurry' file commensurate to the company's  to personnel file keeping policies and

practices, to impede the administration of justice at the EEOC, as well as, the pending judicial proceedings that would make McCurry whole.

j. Plaintiff also alleges and believes that Defendant committed obstruction of an administrative proceeding.

a.      Defendant knowingly and willingly engaged in unlawful conduct by altering Plaintiff's personnel file, as well as, supplying misleading witnesses, information and documentation, including, but not limited: the verified response and position statements, as well as, company policies, procedures and the like, to impede the administration of justice at the Illinois Department of Human Rights and EEOC, as well as, the pending judicial proceedings that would make McCurry whole.

k. Plaintiff also alleges and believes that Defendant committed perjury.

a.      Defendant knowingly and willingly and contrary to oath engaged in unlawful conduct by deliberately supplying misleading witnesses, witnesses without firsthand information, false statements, verifications, position statements and documentation as material facts to impede the administration of justice at the Illinois Department of Human Rights and Employment Security and EEOC, as well as, the pending judicial proceedings under oath, as well as, verification, and certification that would make McCurry  whole.

321.    Plaintiff also alleges and believes that Defendant committed a conspiracy to obstruct and commit fraud against the court.


a. Elliott stated to the Illinois Department of Human Rights and EEOC on or about January 7, 2015 that he was representing Defendant.

b.      Defendant was informed with every filed charged that charges were cross filed with the IDHR and EEOC.

c. Defendant was informed of the EEEOC's recordkeeping and reporting requirements.

d.      Defendant was also informed the participation requirements for participating in a Fact  Finding Conference

Some examples are:

a.       Defendant knowingly and willingly postulated its Vice President of Legal as an individual who had firsthand knowledge of the material facts and/or matters relating to Henry and others by allowing him to be a participant in the Fact Finding Conferences for the Illinois Department of Human Rights and EEOC investigation, being a precursor to an obstruction of the Federal Court.

a.      Defendant knew that it had an admitted history to the court of a pattern and practice of disparate and disparaging treatment and impact towards African Americans; specifically Jay Elliott informed the court of such in Brown vs. Kenco.  {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

b.      Defendant knew it had in excess of 30 discrimination charges filed against Defendant at the Mars Manteno Facility.

c.      Defendant knew that these and other infractions, if found liable, would be a breach of contract with MARS, Inc.

d.      Defendant knew it was truth to the charges filed.

e.      Defendant knew it had violated a number or public policies.

f.      Defendant crafted and contrived a plan to employ Jay Elliott as an employee of Defendant.

g.      Defendant and Elliott discussed Defendant's employment expectations, goals and the like.

h.      Defendant and Elliott agreed upon terms and conditions of Elliott's employment.

i.      Defendant and Elliott knew that Elliott's employment would circumvent Illinois Department of Human Rights and EEOC guidelines.

j.      Defendant knew it would impede the exhaustive remedy process to the administration of justice.

k.      Defendant knew Elliott was a licensed and practicing attorney in the state of Tennessee

l.      Defendant knew that it had retained Elliott as outside counsel in other employment related matters.  {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

m.      Defendant had a well-established relationship with Elliott, Karen Smith and Miller & Martin PLLC.  {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

n.      Defendant knew Elliott was not hired until after the incidents occurred relative to Henry.

Defendant knew that Lori Varvel was not hired as the dedicated Human Resource Manager until after the incidents occurred relative to McCurry in November of 2014.

383.    Plaintiff also alleges and believes that Defendant committed a conspiracy to obstruct and commit fraud against the court.

a.  Elliott stated to the Illinois Department of Human Rights and EEOC on or about January 7, 2015 that he was representing Defendant.

b.  Defendant was informed with every filed charged that charges were cross filed with the IDHR and EEOC.

c.  Defendant was informed of the EEEOC's recordkeeping and reporting requirements.

d.  Defendant was also informed the participation requirements for participating in a Fact  Finding Conference

Some examples are:

b.  Defendant knowingly and willingly postulated its Vice President of Legal as an individual who had firsthand knowledge of the material facts and/or matters relating to McCurry and others by allowing him to be a participant in the Fact Finding Conferences for the Illinois Department of Human Rights and EEOC investigation, being a precursor to an obstruction of the Federal Court.

a.  Defendant knew that it had an admitted history to the court of a pattern and practice of disparate and disparaging treatment and impact towards African Americans; specifically Jay Elliott informed the court of such in Brown vs. Kenco.  {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

b.   Defendant knew it had in excess of 30 discrimination charges filed against Defendant at the Mars Manteno Facility.

c.   Defendant knew that these and other infractions, if found liable, would be a breach of contract with MARS, Inc.

d.   Defendant knew it was truth to the charges filed.

e.   Defendant knew it had violated a number or public policies.

f.   Defendant crafted and contrived a plan to employ Jay Elliott as an employee of Defendant.

g.   Defendant and Elliott discussed Defendant's employment expectations, goals and the like.

h.   Defendant and Elliott agreed upon terms and conditions of Elliott's employment.

i.   Defendant and Elliott knew that Elliott's employment would circumvent Illinois Department of Human Rights and EEOC guidelines.

j.   Defendant knew it would impede the exhaustive remedy process to the administration of justice.

k.   Defendant knew Elliott was a licensed and practicing attorney in the state of Tennessee

l.   Defendant knew that it had retained Elliott as outside counsel in other employment related matters.  {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

m.  Defendant had a well-established relationship with Elliott, Karen Smith and Miller & Martin PLLC.  {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

n.   Defendant knew Elliott was not hired until after the incidents occurred relative to Henry.

Defendant knew that Lori Varvel was not hired as the dedicated Human Resource Manager until after the incidents occurred relative to McCurry in November of 2014.

o.   Defendant knew that Elliott was not physically situated at the Mars Manteno facility.

p.  Defendant knew that Jay Elliott and others such as Tammi Fowler, Senior Manager of Employee Relations, were in Chattanooga, Tennessee and could not have been a party to the incidents in question.

q.  Defendant knew that it could conspire with its employees and not be subject to conspiracy.

r.  Defendant knew that as an attorney Elliott would not be allowed to be an active participant in the Illinois Department of Human Rights and EEOC investigations.

s.  Defendant knew that it had terminated some of the agitators and provocateurs of the allegations set forth by McCurry and others.

t.  Defendant knew that it did not have supporting witnesses to incidents.

u.  Defendant reported to Illinois Department of Human Rights and EEOC that it no longer had its witnesses.

v.  Defendant knew that the incidents with McCurry and others had been contrived and/or valuated differently than those committed by similarly

situated non-blacks or those who did not oppose such disparate and disparaging treatment and impact upon African-Americans.

w.  Defendant knew that it had ostracized its onsite Human Resource Personnel from formal investigations and the like.

x.  Defendant knew it had undermined its onsite Human Resource Personnel from performing their charged duties at the Mars Manteno facility.

y.  Defendant knew that the onsite Human Resource Personnel had reported the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment to management and Kenco Corporate office.

z.  Defendant knew that the onsite Human Resource Personnel had opposed the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment.

aa. Defendant knew that it had misrepresented the onsite Human Resource Personnel stance on the reporting of the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment to the Illinois Department of Human Rights and EEOC.

bb. Defendant knew that it deviated from its organizational structure at the

Mars Manteno Facility.


cc.  Defendant knew that Elliott had no firsthand knowledge.


dd. Defendant knew that they had not taken reasonable steps to correct the

hostile and animus work environment for McCurry and others.


ee. Defendant knew it did not follow its own policies and procedures.


ff.   Defendant knew that the Illinois Department of Human Rights and EEOC

would assume that Elliott and others were legitimate employees of

Defendant.


gg.  Defendant knew that employing Elliott would give him a legitimate

reason to be a party to Defendant's administrative proceedings.


hh. Defendant knew that the Illinois Department of Human Rights and EEOC

would rely on the information provided by Elliott to make an administrative

determination.

ii.   Defendant knew that Elliott would have an unfair advantage over Henry and others, as an Expert in Law and Subject Matter Expert in employment Law.

jj.   Defendant knew that Elliott would be able to mitigate any statements of fact made by Plaintiff's because of his expertise and knowledge.

kk.  Defendant knew that Elliott would be able to use his expert knowledge to aid and abet Defendant in the violation of Henry and others protected rights by deception, conspiracy, manipulation of material facts to Defendant's advantage, presenting materially false and misleading documentation and statements to the Illinois Department of Human Rights and EEOC, impede and obstruct the administration of justice, commit fraud on the court, perjury and a number of unconscionable contrived schemes.

ll.   Defendant knew it was evading the law and circumventing justice.

mm.      Defendant knew that evading the law and circumventing justice at the IDHR and EEOC was a precursor to the obstruction of pending federal court proceedings.

nn. Defendant knew its beahviour's toward the employees of the Mars Manteno, as well as, the administration of justice were/are unlawful, disingenuous, and contrived.

oo. Defendant knew that assault was a criminal offense and punishable as such.

pp. Defendant knew that it aided and abetted the violators of company and public policy that included but was not limited to Mars Manteno employees and Kenco Corporate employees.

qq. Defendant knew that it had discriminated against McCurry.

rr.  Defendant knew it minimalized its actions.

ss.  Defendant's hedged on prevailing at the IDHR and EEOC

tt.  Defendant knew this would cause irreparable harm to McCurry and others.

uu. Defendant knew that providing misleading, deceptive, disingenuous statements and documents would make it more encumbering and difficult for McCurry and others to prevail.

    i.    Defendant knew it hired and promoted Stephanie Dumas against and in violation of its own policies.

    ii.    Defendant knew that it intentionally created a racial, animus and hostile work environment for McCurry and others.

    iii.    Defendant knew it had retaliated against McCurry by suspending him, denying him overtime and equal terms and conditions of employment and writing him up.

c.  Defendant also conspired with Mars Manteno employees, such as, but not limited to: Kelvin Walsh, Mike Manzello, Mario Lopez and Stacey Bushey

384.   Plaintiff also alleges and believes that Defendant committed obstruction by mail

Defendant knowingly and willingly used the United States Mail to further its scheme of fraud by mailing Plaintiff's altered personnel file, as well as, supplying misleading witnesses, information and documentation to impede the administration of justice at the Illinois Department of Human Rights and EEOC, as well as, the pending judicial proceedings that would make McCurry whole.

For example:

    a.  Mailing to the IDHR and EEOC non-effectuated and irrelevant policies.

    b.  Mailing to the IDHR and EEOC verified responses and positions statements under oath and/or perjury that contained deceptive, fraudulent, misleading and disingenuous information that reference policies and procedures that were not relevant to McCurry to commit fraud against the administration of justice and McCurry.

385. As an officer of the court and subject matter experts Defendant and Defendants agents knew better.

386. Upon information and belief racial slurs, epithets, degrading and demeaning remarks were made about McCurry and others by Mars Manteno upper management and Kenco Logistics Tammi Fowler, Dan Dey, David Jabaley and others.  Stating that they should just pay those "niggers" off.