IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

FILED

JAN 1 8 2017

CLERK OF THE COURT
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, ILLINOIS

EDITH MCCURRY                                )
                                             )
                                             )
                                             )
                    PLAINTIFF,               )
                                             )
        VS.                                  )     CASE No.  16-cv-02273-CSB-EIL
                                             )
KENCO LOGISTIC SERVICES, LLC, et al.         )
                                             )
                    DEFENDANTS.              )

PLAINTIFF'S RESPONSE TO DEFENDANT'S PARTIAL MOTION TO DISMISS
PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. PRO. 12(b) (6)


**NOW COMES** Plaintiff,  ("Plaintiff') pro se, and responds to DEFENDANT's Motion to

Dismiss and for his good cause shown in support of her response Plaintiff states the following;

THAT:

**FACTS**


1.      Plaintiff filed this matter to preserve her rights following the issuance of Right to Sue letter

from the Equal Employment Opportunity Commission.


2.      Plaintiff believes that all DEFENDANTS are liable.


3.      MARS, Inc., and 4T's management through ingenuity and family alliance collaborated,

championed, and implemented the vertical startup of the MARS Manteno facility.

2

4.     The MARS Manteno facility is a co-pack, warehouse and distribution center for Mars, Inc.

5.     The MARS Manteno facility has been in operation since 1999.

6.     The MARS Manteno facility was managed by 4T's, a thru put, from 1999 until 2013.

7.     The Mars-Manteno facility, since its inception in 1999, has been a fully functional facility comprised of a General Manager, Operations Manager, Accounting and Human Resource Department, supervisors, and workers.

8.     MARS, Inc. specifically provided on a daily basis:

      a.     On site Regional District Manager

      b.     Morning meetings regarding the daily "Plan"

      c.     Fulfillment orders generated by Mars, Inc. through the WMS-SAP

            i. Through put of a Billion pounds or more annually of candy at the Mars Manteno facility

      d.     Mars, Inc. warehouse quality manual

      e.     Cross-functional collaboration between departments

9.     MARS, Inc. routinely and regularly provided incentives to the Mars Manteno employees.

3

10.     MARS, Inc. issued a Request for Proposal (RFP) in late 2012 or early 2013 to bid on the upcoming management vacancy at the MARS Manteno warehouse and distribution facility in Manteno, IL

11.     MARS, Inc. had a Co-Pack Operation in house at the Mars Manteno Facility, it was ran by Jacobson.

12.     Kenco Logistics responded to the RFP issued by MARS, Inc.

13.     MARS, Inc. identified and retained the management services of Kenco Logistics in early 2013.

14.     On or about February 15, 2013, 4T's notified the Mars Manteno employees in writing that the owner was retiring, that another distributor would be taking over the MARS account, that it was expected that most employees would be hired to essentially perform the same work, and that technically the plant was being closing under 4T's management.

15.     On or about April 2, 2013 Defendants offered Plaintiff employment by letter.

16.     Kenco Logistics replaced the services of 4T's Management.

17.     Kenco Logistics is a 3rd party logistics company that manages warehouse and distribution centers for other companies.

4

18.    Kenco Logistics stated to the Illinois Department of Human Rights and the EEOC in its

Position Statement beginning on or about November 2014 in case number 2014CF0475, and

subsequently again in case number 2014CF2858, 2014CF2992, 2014CF3057, 2014CF3161,

2015CF0310, 2015CF0811, 2015CF1145, 2015CF0342, 2015CF0990, 2015CF1315, 2015CA1464,

2014CF3162, 2015CF0003, 2015CF0006, 2015CF0515, 2015CF0516, 2051CF0699, 2015CA1054,

2015CA1590 and others that "Kenco is a third-party logistics company ("3PL") that operates and

manages warehouses and order fulfillment operations for other companies."


19.    On April 21, 2013, Kenco began managing such a warehouse in Manteno, Illinois for

Mars, Inc.


20.    Kenco Logistics is a privately held company in the state of Tennessee


21.    Kenco Logistics corporate structure, operating structure and legal structuring is not

synonymous with any other company.


22.    Kenco Logistics is part of the Kenco Group


23.    Kenco Group current Chairman & CEO is Jane Kennedy Greene


24.    Kenco Group President and COO David Caines


25.    Kenco Logistics was hired to Manage the Mars, Inc. Manteno facility in Manteno, IL

26.    Mars, Inc. is a privately held company in Virginia

27.    Mars, Inc. paid Kenco Logistics a management fee to manage the Mars Manteno facility

28.    Mars, Inc. passed thru their costs through Kenco Logistics with the exception of the lease, taxes, fire protection, insurance, rack expense/amortization, management fee, material handling fee were direct pays.

29.    Specifically, Mars, Inc. passed thru Kenco Logistics the salaries of all the employees (temporary and part & full time employees), as well as, any invoices of the Mars Manteno facility.

30.    This function performed was synonymous to that of the services provided by ADP, LLC.

31.    Mars, Inc. managed Kenco Logistics

32.    Specifically, Mars, Inc. continued to provide daily guidance to the Mars, Manteno facility.

      i.    a.    On site Regional District Manager

      ii.    b.    Morning meetings regarding the daily "Plan"

      i.    c.    Fulfillment orders generated by Mars, Inc. through the WMS-SAP

      ii.        i.  Through put of a Billion pounds or more annually of candy at the Mars Manteno facility

      iii.    d.    Mars, Inc. warehouse quality manual

      iv.    e.    Cross-functional collaboration between departments

6

33.    Mars Manteno was a part of the network of Mars distribution centers.

34.    Mars Manteno was the Midwest distribution center

      a.  Mars Manteno serviced twelve (12) Midwestern states and Canada

35.    Mars Manteno was infrastructually similarly situated to the other four (4) distribution centers in the network in organization.  For example, but not limited to:

      a.    General Manager

      b.    Operations Manger

      c.    Accounting/Human Resources

      d.    And the like….

36.    Organizationally the Mars Manteno General Manager answered to and conferred with the onsite RDM of Mars, Inc., as a matter of the course of ordinary business operations.

37.    *Black's Law Dictionary* defines "employee" as "a person in the service of another under any contract of hire, express or implied, oral or written, where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed.

38.    Mars, Inc. provided and stipulated such terms and conditions of employment, to Kenco Logistics, as well as, compliance; specifically with the Mandates of Mars outlined in the **Mars US**

**Warehouse Quality Manual** and public policy, including but not limited to FSMA (Food safety and Modernization Act, 2002 Bioterrorism Act, CFR Title 21, and any other applicable public policy, just as it would with any employee and as it had done with the previous Management Company at the Mars Manteno Facility and its various other warehouse.

39.     Mars, Inc. required Kenco Logistics and Kenco Logistics agreed to be compliant with Public Policy, as it relates to the codified laws of the land, just as it would with any employee.

40.     Specifically, Mars, Inc. provided Kenco Logistics with company policies, procedures, manuals and the like, just as it would with any employee.  In addition, Mars, Inc. provided the necessary tools to perform the assigned job functions, such as but not limited to: Leasing the facility, the equipment (warehouse and office), the computers, the software, as well as, the maintenance, upkeep and repairs of such, just as it would for any employee.

41.     Specifically, Mars, Inc. provided to Kenco Logistics, just as it had its former management company on a regular and ongoing basis, a comprehensive standard to safeguard the Quality and Food Safety of its products in the outbound pipeline. The document was developed in conjunction with Global Quality and Food Safety Requirements.

42.     Specifically, Mars, Inc. set the performance management standards and goals for Kenco Logistics, just as it would with any employee.

43.     Kenco Logistics because of its multifunctional and multilayers of management types can be coined as a "Super Manager."

8

44.    Specifically, Mars, Inc. provided it's "Super Manager" Kenco Logistics with ongoing guidance, support and management continually

45.    Specifically, Mars, Inc. provided this support, guidance and management to its "Super Manager" Kenco logistics and the Mars Manteno Facility, by way of an in-house Regional Distribution Manager (RDM).

46.    Kenco Logistics, it's "Super Manager" just as any employee would, on an ongoing regular and regimented basis conferred with, Mars, Inc. for directives and goals, while conforming to these directives, and reporting the results of such to Mars, Inc.

47.    Just as any manager would, Kenco Logistics a type of "Super Manager" dovetailed their management styles to synergize the mandates of it employer, Mars, Inc. and public policy to meet the performance management goals set by Mars, Inc.

48.    Public policy drives industry standards that drive company policy. Specifically, in this case the Food, Drug and Cosmetic Act (FD&C Act), Food Safety and Modernization Act (FSMA, the 2002 Bioterrorism Act and other Acts, as well as, The World Health Organization (WHO), Codex Alimentarius, FAO and other organizations, shape and form the various recognized Global Food Safety Initiative (GFSI) benchmarks; which include but are not limited to: FSSC 2200, ISO2200, BRC, IFS, SQF and other food safety standards.

9

49.    Specifically, Kenco Logistics was assigned the task of implementing a written Quality Management System based upon the current non-documented procedures and protocols being performed at the Mars Manteno facility.  This standard was based upon ISO, the International Standard of Organization.

50.    Kenco Logistics Quality Management System is based on an ISO, the International Standard of Organization; the specific ISO standard is 9001:2008.

51.    Specifically, Kenco Logistics implemented a written Quality Management System at the Mars Manteno Facility.

52.    Mars, Inc. and Kenco Logistics are both certified to some Global Food Safety Initiative standard and or benchmark.

53.    Yearly external audits are required to remain compliant to the Quality Management System, along with internal audits.

54.    Furthermore, the Federal Government under the 2001 Bioterrorism Act and the 2011 Food Safety Modernization Act, require all august body participants along the food supply chain to be complaint; Essentially from farm to fork.

55.    Kenco Logistics publicly purports to "ensure all requirements are documented according to the ISO-9001:2008 structure and are incorporated into the sites' standard operating procedures. Through regular internal audits and program development, Kenco's quality team

10

provides support and industry expertise in FDA, OSHA, EPA, DEA, DOT, and numerous other compliance agencies."

56.     Specifically, the system implemented at the Mars Manteno facility was to be a standardization of all policies, procedures, mandates and the like.  This included, but was not limited to job analysis, job descriptions and the corresponding operating procedures for each job.  These and all-encompassing documents are authored and vetted.

57.     All Quality Management systems, including but not limited to this Mars Manteno Quality Management System, mandate that all documents are to be catalogued, controlled, maintained, and stored amongst other requirements.

58.     Kenco Logistics developed an Appendix A for the Mars Manteno Facility that catalogued the corresponding standardized documents for the Mars Manteno Facility.  This included but was not limited to Job descriptions, Standard Operating Procedures, policies, and forms.

59.     Kenco Logistics also maintained an Appendix F, a higher matrix of Appendix A, top tier documents, that catalogued the corresponding standardized documents for the Kenco Logistics as a whole, inclusive of the Manteno Facility, as well as, other managed facilities.  This included but was not limited to Job functions by titles, Standard Operating Procedures, policies, forms and the like.

60.     The documents itemized in Appendix A for the site super ruled those documents in Appendix F because they were customized to the specific employer's and site requirements.

11

61.    To ensure proper dissemination and training, each policy and or procedure are to be signed off by each employee and a record retained of such.

62.    No deviation from any policy and procedure is to occur, without following the procedure of the exception procedure and an approval of such on any level.

63.    President, David Caines, of the Kenco Group referred to the employees of the Mars Manteno site specifically as Mars, Inc. employees.

64.    The "Super Manager's" role was to manage and enforce the directives and mandates of Mars, Inc. at the Mars Manteno facility that was owned, leased and operated by Mars, Inc. since the Mars, Inc. Manteno inception in 1999.

65.    Title VII provides that it is "an unlawful employment practice for an employer to fail or refuse to hire or discharge any person or otherwise … to discriminate against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, age or natural origin."

66.    Title VII is at bottom an enterprise liability scheme. It is structured to hold employing entities—not individuals—accountable for discrimination within the organization.

67.    However, technically Kelvin Walsh, former General Manager of the Mars-Manteno facility, Mario Lopez, also former General Manager of the Mars-Manteno facility, as well as,

12

Mike Manzello, former Operations Manager were not Kenco employees; but a mere subordinates to the "Super Manager," as they were all line itemed on Mars, Inc. budget as pass thru employees of the "Super Manager."

68.     Technically, Tammi Fowler, Sr. Manager of Employee Relations and David Jabaley Director of Operations were employees of the Kenco Group.

69.     The Mars-Manteno facility, since its inception in 1999, has been a fully functional facility comprised of a General Manager, Operations Manager, Accounting and Human Resource Department, supervisors, and workers.

70.     Kenco, Mars, Inc., "Super Manager" provided back office support to the accounting and human resource department, as well as, the implantation of Kenco management styles, including but not limited to: Kenco Quality Management System (KQMS), an ISO 9001:2008 based system, Operational Excellence and Continuous Improvement based upon Lean and Six Sigma principles.

71.     The specific back office support provided by Kenco entailed pass on the invoices/bills of the Mars Manteno facility to Mars, Inc. after they were receipted, reconciled and the like the Mars Manteno Facility Accounting Department.  In addition to the invoice pass thru to Mars, Inc., Kenco also passed thru the Mars Manteno payroll by issuing the payroll checks, after the payroll had been processed, verified and submitted by the Mars Manteno Accounting Department for the five (5) different payrolls that comprised the Mars Manteno Facility to Kenco's payroll department.

72.    The additional specific back office support provided by Kenco was the recruitment and hiring of salaried personnel for the Mars Manteno facility, as well as, other Human Resource support, such as but not limited to: training, benefit administration, and the like.

73.    The KQMS style was to standardize the facility to bring compliance to 21CFR110, Food Safety and Modernization Act, 2002 Bioterrorism Act, as well as, any other applicable Global Food Safety Initiative (**GFSI**) benchmarked schemes; in addition to, streamlining business process, increase efficiency, profitability and accountability.

74.    At all times, Kelvin Walsh, ("Walsh"), a White, American male, held the position of General Manager. Walsh was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of MCCURRY's employment with Defendant KENCO.

75.    At all relevant times, Walsh, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

76.    At all times relevant, Mike Manzello, ("Manzello"), a White male, held the position of Operations Manager, reporting to Walsh. Manzello was in a position of authority to undertake or recommend tangible employment decisions and/or control the terms and conditions of MCCURRY's employment with KENCO

77.    At all relevant times, Manzello managed operational activities relative to the receipt and distribution of inventory for Mars, Inc., including but not limited to: hiring, scheduling, workflow and the like.

78. At all times, David Jabaley, ("Jabaley"), a White, American male, held the position of Director of Operations at Kenco Logistics a part of the Kenco Group.  Jabaley was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of MCCURYY's employment with Defendant KENCO.

79. At all relevant times, Jabaley, acting on behalf of Kenco Corporate the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

80. At all times, Mario Lopez, ("Lopez"), a White, American male, held the position of General Manager at the Mars, Inc. Manteno facility.  Lopez was in a position of authority to undertake tangible employment decisions and/or control the terms and conditions of MCCURYY's employment with Defendant KENCO.

81. At all relevant times, Lopez, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all operational activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

82. At all times, Tammi Fowler, ("Fowler"), a White, American female, held the position of Senior Employee Manager at the Kenco Corporate.  Fowler was in a position of authority to

undertake tangible employment decisions and/or control the terms and conditions of MCCURYY's employment with Defendants.

83. At all relevant times, Fowler, acting on behalf of Kenco the managing agent for Mars, Inc. directed and approved all Human Resource activities, including but not limited to: hiring, pay, scheduling, performance management, workflow and the like.

84.        Fowler asserts her "responsibilities include management of the Employee Relations function for the five Kenco Companies; providing interpretation and advice to HR Managers and Site Managers on employment law, organization policy and overall employee relations issues; conducting investigations related to claims of harassment or discrimination and recommending steps for resolution; reviewing termination requests and providing management with appropriate action plans; and educating Managers regarding the spirit and intent of laws, regulations and company policies."

85.    McCurry was employed with predecessors of KENCO on or about June 1999 as the Assistant Office Manager, for a 3rd party management company whom at all times acted as agents of Mars, Inc., beginning with 4T's Management Company and then with KENCO on April 21, 2013.

86.    In November of 2013, Karen Smith, outside legal counsel, Miller & Martin P.C., for Defendant Kenco contacted McCurry to speak with McCurry regarding a charge of discrimination that had been filed against the Defendants by Mary Madison.  See Exhibit A

87.    McCurry reported to Smith that Madison had made complaints to not only McCurry, but Paula Hise, Len Szplett's and others about the disparaging and disparate treatment and impact subjugated upon her by Defendant's General Manager, Kelvin Walsh.

88.    McCurry also reported that she had witnessed this treatment to Madison, as well as, outlining the disparate and disparaging treatment and impact imposed upon McCurry.

89.    Despite Madison reporting the incidents, no action was taken by Defendant to investigate Madison's claims.

90.    Defendant had a policy to conduct an investigation into Madison's allegations.

91.    Defendant failed to follow its own company policy.

92.    Defendant allowed the perpetrator of the acts to initiate, disseminate and execute the adverse actions against Madison, without any investigation.

93.    Defendant's Counsel, Karen Smith, reported to the Illinois Department of Human Rights and EEOC that McCurry was only a clerk and unable to intake such information on behalf of the company.

94.    Defendants and Defendant's counsel were fully aware of McCurry's role and position as HR Administrator.

17

95.    Defendant had posted on Defendant's website that McCurry was the HR Administrator for the Mars Manteno site.  See Exhibit B

96.    Defendant had made known McCurry's position to its other agents such as but not limited to: The Hartford.

97.    Defendants and Defendant's Counsel, Karen Smith, intentionally, willfully, and maliciously defamed, marginalized, and mischaracterized McCurry and McCurry's job functions to the Illinois Department of Human Rights and EEOC to continue to intentionally perpetuate the racially motivated conspiracy against Madison's protected rights, as well as, obstruct justice, impede the administration of justice, to avoid culpability and liability.

98.    Contrarily to McCurry's statements to Smith, Smith willfully and intentionally went on to say to the Illinois Department of Human Rights and EEOC that Madison instructed McCurry not to take any action about the complaints waged against defendant.

99.    This is an egregious outright and blatant lie.

100.   McCurry never stated such to Defendants or Smith, nor did Madison instruct McCurry to not take any action.

101.   Defendant intentionally and willfully ostracized McCurry out of Madison's investigation at the Illinois Department of Human Rights and EEOC.

18

102.    Defendant failed to list McCurry as having firsthand knowledge or as a representative of the company having firsthand knowledge during the investigation.

103.    Plaintiff believes that Defendant not only conspired against Madison, but conspired against McCurry as well.

104.    Immediately after speaking with Smith, McCurry began being ostracized, marginalized, harassed and retaliated against by Defendant.

105.    McCurry began being overburden with other tasks that were assigned to her outside the scope of McCurry's job function, as well as, impossible deadlines on an ongoing and regular basis by senior management.

106.    Defendant began capriciously changing the shifts, without notification to McCurry.

107.    Defendant ran a seven (7) day a week, multiple daily overlapping shift operation.

108.    Defendant's actions caused and created payroll errors, impossible deadlines, intentional stress and hostile employees.

109.    The Defendants intentionally and willfully minimized and marginalized McCurry's job status, title, tasks and duties from and HR Administrator to a HR Clerk to relieve themselves of culpability and obstruct justice for the actions of Mars-Kenco and its agents in the creation and

19

sustainment of a racially charged, motivated and animus working atmosphere that fostered hate crimes, threats, disparate and disparaging impact and treatment to those who oppose such treatment.

110.   McCurry was informed to no longer take action in employee related matters but forward them to Fowler.

111.   No reason was given to McCurry for these actions.

112.   Defendant KENCO through its VP of Operations, Paula Hise, openly praised and lauded Walsh as a valued employee and friend, as well as, characterizing his separation from Defendant as a great loss.

113.   Hise made these statements about Walsh despite Defendant being in possession of first-hand knowledge and evidence of Walsh's violation of company and public policy against discriminatory treatment in the workplace. This constituted another form of harassment, and racial animus by Defendant KENCO.

114.   Walsh was offered a severance.

115.   Defendant reported to the IDHR and EEOC that Walsh was terminated for performance.

116.   Other employees who were, African American, allegedly terminated for performance, such as Madison were not given a severance.

117.    Upon information and belief, a term and condition of Walsh's severance was to assist Defendant in Human Resource and legal matters.

118.    On or about Mid-August 2014, McCurry began receiving emails sent from corporate saying that McCurry never gets payroll in on time.

119.    McCurry explained the constraints of:

a.  The faulty time clock;

   a.  Not recording time properly or at all

   b.  Rolling back employee time to previous work week; effectively shorting the employees hours

b.  Capriciously changing the shifts without making an appraisal of such changes;

c.  24 hour/7 day a week operation;

d.  Within five (5) hours of the shift ending payroll was due and three (3) hours of McCurry's scheduled time to begin work (shift ended at 5:00 am-payroll was due at 10:00 am);

e.  Employees working beyond the scheduled shifts ending time and even past the time payroll was due;

f.  Five (5) separate and distinct payrolls for five (5) different entities;

g.  Employee questions and matters;

h.  Employee requests;

i.  Corporate requests;

j.  An ad hoc report assigned by management relevant to operations;

k.  Manual punches from the employees;

l.  New hires;

m. Mandatory overtime for all shifts;

n.  Overtime extending past the shift ending time; and

o.  Overtime extending past the close of payroll

120.    McCurry was instructed by Defendant to estimate or guess what time the employees would be finish and record the time as such.

      a.  Effectively shorting the employee of their wages

      b.  Falsifying official records

121.    McCurry complained, protested and refused to do such.

122.    McCurry indicated that it was unlawful to falsify payroll documents; it created apathy and hostility from and amongst the employees, lowered morale and ultimately increased the workload and burden for McCurry to back tract and correct these errors.

123.    Defendant continued to impose more stringent and impossible deadlines on McCurry as it relates to payroll.

124.    Defendant intentionally and willfully changed the shift ending time to 7:30 am from 5:00 am; now within two (2) and one half hours of the time payroll was due.

125.    McCurry's shift began at 8:00 a.m.; two hours in which payroll was due.

126. The Defendants mandated overtime for employees.

127.   Overtime could be worked before or after the start of an employee's shift.

128.   Most of the Defendants employees were not finished working most of the time when payroll was due, even prior to the change in the shift ending time from 5:00 am to 7:30 am.

129.   Defendant had the ability to change the shift.

130.   Defendant refused to change the shift so that payroll could be completed on time for the five (5) separate payrolls.

131.   Defendant changed the shifts to Plaintiff's detriment.

132.   Defendant intentionally used the impossible deadlines for payroll to harass, inflict emotional and physical stress.

133.   Defendant also intentionally used this impossible deadline to retaliate against McCurry for engaging in protective activity relative to herself and others.

134.   Defendant intentionally contrived this scheme to effectively make this an impossible deadline to use as lawful and non-discriminant reason to eventually terminate McCurry.

23

135.  Manzello reported to McCurry on or about September 2, 2014, upon his termination that Kelvin Walsh, Tammi Fowler, David Jabalay Dan Dey and others conspired against Nathan Doss in regards to his formal complaints of racial and various other employment discriminations.

136.  Manzello indicated several instances where Tammi Fowler and Dan Dey badgered him, once for (2) two hours, about his decision to hire Nathan Doss asking him what was he thinking when he hired him.

137.  Manzello also said that Fowler decided not to invite the leads to a meeting she conducted of employees civil rights; the leads were not invited because she did not want Nathan Doss to know about his rights.

138.  Manzello also said Fowler made disparaging remarks that she knew Nathan Doss was smoking weed every day.

139.  Manzello also indicated that David Jabaley said that he just wished they would write his (Nathan Doss) "black ass" a check and he'd be gone.

140.  Manzello said that the drug test was contrived; Lillie was responsible for the drug test being administered.

141.  Lillie gave him paper work saying that Doss had an accident on equipment (work time injury) as opposed to the alleged reasonable suspicion reason given to Doss because he was supposed to have smelled like weed.

142.  Doss in fact was not scheduled to work nor was he working when they gave him the ultimatum of taking the test or being fired.

143.  Doss came to inquire about a jacket that had been taken from him over the weekend.

144.  Doss was confronted by Lillie and Manzello about him allegedly smelling like weed in front of all the employees in the office.

145.  Doss tried to close the office door for privacy, but was reprimanded for doing so.

146.  Doss was forced to swipe in on the clock or be terminated.

147.  Doss was also given an alcohol test, as well as, the drug test.

148.  Doss was escorted by another employee to the drug testing facility.

149.  Escorting an employee for a drug test had never occurred previously or afterwards.

25

150.   Non-African American employees often times although required by company policy to take drug test when incidents or accidents occurred were not subjected to alcohol or drug testing.

151.   Again subjecting African Americans to harsher scrutiny and different terms and conditions of employment.

152.   On or about the week of October 6, 2014, McCurry was accused of making unauthorized payments to an employee, Dana Woods, African American by David Jabaley, Mario Lopez, and Tammi Fowler

      a.     Woods was suspended for making a comment about an incident that he saw on the national news in a conversation to another employee, Bushey, a white female supervisor, said she felt threatened by the conversation.

      i.     Upon information and belief non-black, African Americans, who made similar comments, or comments that violated persons protected rights were not punished, reprimanded, or suspended

      ii.     Woods was not afforded an opportunity for progressive discipline; he was not counseled, warned or the like.

      iii.     There is no company policy relating to such.

      iv.     Another psychological tool used to subjugated African-Americans.

      v.     Peter Monstwillo, non-black, made racial slurs, epithets and threats to Vernon Henry in February of 2014 in front of a number of employees.

      vi.     Monstwillo was not punished.

26

vii.    Pete Monstwillo attempted to kill Vernon Henry with a Forklift on

October 8, 2014; again he was not punished nor terminated.

153.    Mario Lopez stated that making unauthorized payments was stealing from the
company.

154.    Fowler indicated that the best punishment for employees was "hitting them in the
pocket."

155.    There was no written policy on when an employee's vacation pay could and could
not be disseminated.

156.    Defendant often used this economic and psychological sanction to harass, intimated, and
retaliate against employees by not paying them for weeks at a time and holding their monies
(vacation time) in abeyance.

157.    Hourly employees were paid weekly.

158.    On or about November 10, 2014, the company effectuated another scheme by
purporting to hire a HR Manager, Lori Varvel.

159.    McCurry would be Varvel's direct report.

160.    Within two (2) weeks of Varvel's employment as the HR Manager, Varvel wrote McCurry
and stripped McCurry of her duties and privileges, as well as, the ability to accommodate the
vast payroll discrepancies, by ending Plaintiff's overtime.

27

161.    Effectively McCurry was demoted, retaliated against and harassed.

162.    Defendant knew that this would cause Plaintiff emotional distress and create an impossible task for Plaintiff.

163.    Effectively more stringent and impossible deadlines were imposed.

164.    McCurry was told that she needed to sign the paper.

165.    McCurry was forced to sign the paper that was presented with these restrictions, revocations, and impositions.

166.    McCurry stated that she felt this was a punishment.

167.    Varvel stated that it was not a punishment.

168.    McCurry reiterated that she thought that it was a punishment, as the paper specifically stated that, if McCurry failed to adhere to the terms and conditions, McCurry would be subject to further disciplinary action up to and including termination.

169.    Under duress McCurry signed the paper and made comments on her perception of the paper and what it meant.

170.   Defendant KENCO's document presented to McCurry failed to meet its minimum standards of KENCO's Quality Management System's document control policy/procedure.

171.   The paper did not correlate to a policy, procedure or protocol of Defendant's.

172.   Defendant KENCO failed to follow its own performance management procedures and protocols of the company, as they were not implemented or followed despite it being company policy to do so.

   a.   Varvel did not establish goals or a performance matrix for McCurry

   b.   Varvel implemented a written disciplinary step without following the progressive disciplinary protocol or procedure, as company policy dictates.

   c.   Varvel had not evaluated McCurry's work.

   d.   Varvel did not assign work to McCurry

173.   This was a contrived scheme against McCurry.

174.   This was the same tacit and or scheme enacted/imposed upon Madison

   a.   Madison was never given goals

   b.   Progressive discipline/counseling

   c.   Or the opportunities afforded by Defendant's policies, procedures, protocols and the like.

175.    In late November, the IRS levied a wage assignment against McCurry and informed defendant of such.

176.    Defendant maliciously in animus, harassment and retaliation against McCurry, and against its own best practices, as well as, public policy, willfully and intentionally garnished McCurry's entire payroll check for two (2) consecutive weeks.

177.    The IRS notified Defendant and provided a worksheet for Defendant to fill out assessing a garnishment commensurate with IRS rules and regulations.

178.    Defendant did not abide by the IRS rules and regulations

179.    Defendant never notified McCurry of the garnishment.

180.    The IRS requires that a person not be left indigent.

181.    McCurry as an ordinary course of business and in best practice of Defendant and in compliance with the IRS filled out such forms for other employees.

182.    No other employees at the MARS Manteno facility had been subjugated to such.

183.    Defendant's actions caused McCurry great irreparable harm, duress and stress.

184.    McCurry needed employment verification of hours worked to remediate the matter with the IRS.

185.    On or about November 24, 2014, McCurry asked Varvel for employment verification of the hours to be worked on letterhead.

186.    Varvel asked McCurry the reason she needed employment verification.

187.    McCurry stated it was for a personal matter.

188.    Varvel refused because McCurry would not tell her what it was for, outside of it being for a personal matter.

189.    There is no policy, procedure or protocol that requires such a disclosure for employment verification.

190.    McCurry referred to the paper she signed just a few days earlier stating that in fact the paper stated the same thing McCurry was asking for on official letterhead.

191.    Varvel stated the paper McCurry signed was not meant to be a legal document; despite both Varvel and McCurry having signed it; despite it had language relevant to the terms and conditions of McCurry's employment, as well as, the fact that it could be used to enforce disciplinary action up to and including termination.

31

192.    McCurry asked the GM, Lopez for employment verification he refused.

193.    McCurry asked Fowler and Jason Pendleton for employment verification by email; to date no one has acknowledged McCurry's request.

194.    The company was on notice from the IRS that McCurry's wages were to be garnished.

195.    McCurry had supplied on numerous occasions employment verifications for employees who requested such.

196.    Defendant continued to intentionally, willfully, and maliciously harass, marginalize, retaliate and inflict intentional emotional and economical stress, duress and sanctions that were rooted in racial animus upon McCurry in refusing to verify her employment.

197.    Defendant conspired to intentionally and willfully cause McCurry irreparable harm by denying her employment verification, as Defendant knew that:

      a.    It was unlawful to do so

      b.    McCurry's pay was being garnished

      c.    Defendant had not complied with the IRS mandates and taken McCurry's pay for several weeks

      d.    It would cause irreparable harm and severe emotional distress.

198.    On or about December 19, 2014, McCurry was accused of falsifying a document by Varvel and Lopez.

32

199.    McCurry was written up for signing out at 5:00 pm and allegedly leaving at 6:39 pm according to Varvel.

200.    McCurry was also told by Varvel that it was against the law to volunteer her time to a company and not be paid.

201.    McCurry stated that she was certain that had punched out at 5:00 pm.

202. McCurry was forced and badgered to sign the paper immediately and was not allowed to adequately review the document and comment.

203.    McCurry had no foreknowledge or was not even aware that she would be getting a write up on the matter.

204.    McCurry was not afforded an opportunity to discuss the matter prior to the disciplinary action.

205.    As an overreach, the paper that McCurry was mandated to sign stated that McCurry worked overtime without approval.

206.    McCurry's shift ends at 5:00 pm.

207.    McCurry maintains that she believed she had punched out at 5:00 pm.

2:16-cv-02273-CSB-EIL    # 34    Filed: 01/18/17    Page 33 of 70

208.    Shortly before this incident, McCurry was stripped by Varvel of the benefit of being able to punch in and out at her computer in late November of 2014.

209.    Other office workers, who were hourly, non-black were still afforded the opportunity to punch in and out at their computers.

210.    The time clock to punch in and out was on another floor and in a separate part of the warehouse.

211.    McCurry submitted a mispunch slip for 5:00 pm; overtime would not come into play; therefore, the company incurred no burden or violation of its policies.

212.    Varvel indicated that she had reviewed the video footage.

213.    McCurry requested to see the clock video footage showing that McCurry had not swiped out because the clock malfunctions and does not record time accurately.

214.    Defendant was aware that the clock malfunctioned on an ongoing and regular basis, as that was one of the contentions and contributors of payroll being timely.

215.    McCurry was denied the opportunity to review the video footage.

216.    McCurry requesting on numerous occasions to see this video footage, was not allowed to see the video footage.

217.    The written reprimand also was a mischaracterization of McCurry's job title by stating that McCurry was a HR Clerk, as opposed to her job description of HR Administrator.

218.    The reprimand also stated that McCurry would again be subject to further disciplinary action up to and including termination.

219.    Varvel also told McCurry that if they wanted to get rid of her they were already skipping steps on people and could have done that to McCurry.

220.    Defendant KENCO once again intentionally and willfully failed to follow its own performance management procedures and protocols of the company, as they were not implemented or followed despite it being company policy to do so.

221.    Furthermore, it is not Defendant's KENCO's typical practice to review the video footage when employees miss a punch.

222.    Varvel admitted at the McCurry Fact Finding Conference that she had not reviewed footage for any other employee besides McCurry.

223.    Mispunches are typical and daily occurrences.

224.    McCurry at the time was the sole timekeeper and has never done this to affirm or deny employee's time.

225.    Upon information and belief this has never been done before or after for any other employee.

226.    Defendant does not have a policy that requires persons to vacate the premises after a shift ends.

227.    Defendant could not definitively say what McCurry was allegedly doing between 5:00 pm and 6:39 pm.

228.    Mispunched slips were common for the following reasons:

    a.    Swipe card

        1.    Misplaced

        2.    Lost

        3.    Forgotten

    b.    Faulty time clock

        1.    Did not record swiped time

229.    Defendant again defamed McCurry by stating to the IDHR and EEOC that McCurry had given Henry the wrong information misleading him to seek employment for open positions at the company that he was ineligible to apply for.

230.    Defendant, Kenco, Corporate HR specifically gave McCurry the directives after an inquiry from McCurry that McCurry passed along to Henry.

36

231.    Defendant again committed fraud on the administration of justice by providing misleading and fraudulent information to the IDHR and EEOC.

232.    From April 2013 to January 6, 2015, McCurry has been coerced into defrauding employees out of time owed for hours work because of a malfunctioned clock that has yet to be fixed.

233.    From April 2013 to January 6, 2015, McCurry has been coerced into submitting inaccurate time sheets for employees for hours work because of a malfunctioned clock that has yet to be fixed.

234.    On or about October 2014, McCurry was coerced and forced not to remit monies due to employees because the company has not investigated and resolved disputed hours.

235.    The failure to repair or replace an in accurate and/or faulty time clock is a breach of fiduciary obligation to the employees by Defendants and a violation of public policy.

236.    The failure to repair or replace an in accurate and/or faulty time clock is a breach of fiduciary obligation to government, as it cheats the government out of employment taxes and the like.

237.    On or about November 21, 2014, McCurry was coerced and forced to work in a position with less responsibilities outside of McCurry's assigned position as the HR Administrator to remain employed at the company.

238.    On or about August 2013 to January 6, 2015 McCurry involuntarily conspired, with the company in violation of employees constitutional rights to not be treated differently, disparagingly, or biasedly regarding their fundamental protected rights through the intentional and willful manipulation, mischaracterization, and altering of McCurry's verbal and written  statements of accounts of situations regarding disparate, disparaging, violent, and discriminant incidents occurring in the work place that created a hostile and animus work environment.

    For example:

        a.    Regarding Mary Madison

            i.    Stating that I said that I was instructed to do nothing by Madison.

            ii.    That I was a HR Clerk

        b.    Regarding Jacque Morrison

            i.  Reporting of injury

            ii. Reporting he was forced to sign a paper saying that he was not injured at work.

            iii.    Termination

        c.    Nathan Doss

            i.    Drug test

38

   ii.  Pay disparity

   iii.  Suspension(s)

   iv.  Various other incidents


  d.  Vernon Henry

   i.  Reporting of Racial Slurs and epithets towards Vernon from Pete

   ii.  Vernon not being interviewed for jobs

   iii.  Pete trying to kill Vernon

   iv.  Denial of unemployment


  e.  Scot Marksteiner

   i.  Retraction of employee of the month

   ii.  Job threatened

   iii.  Suspension

   iv.  Drug test

   v.  Indefinite Suspension


  f.  Morris Tyson

   i.  Failure to return to work ADA


239. Defendant contrived a racially motivated scheme to obstruct the administration of justice by containing complaints made by African Americans and those who opposed disparate and disparaging treatment and impact.

39

240. Defendant instituted an anonymous hotline whereby employees could allegedly report employment matters without fear of retribution.

241. Defendants also mislead employees into believing that matters would be addressed according to company policy.

242. This was a breach of duty.

243. Defendant's hotline was not anonymous and the information was directly given to Tammi Fowler.

244. Tammi Fowler would then call the employees manager and reveal the employees identity.

245. Fowler's actions caused irreparable harm to the employees, as they were subjected to harsher scrutiny, discipline and various other measures.

246. Defendant also conspired and contrived additional schemes to contain the complaints of African-Americans by letting them believe that if they reported the incident to Plaintiff, the onsite HR, that:

        a. An unbiased investigation would ensue.

        b. There issues would be addressed according to company and public policy

        c. That the employees' rights would be protected

        d. That it would be documented

247.    On or about November 2013 to date, McCurry has been involuntarily mischaracterized

and defamed by the Defendant and Defendant's Counsel as other than an HR Administrator for

the sole purpose to relieve the company of any culpability and liability for unconscionable acts

of employment discrimination that violate employees, including McCurry's own, fundamental

constitutional rights to not be treated differently or marginalized to achieve illicit, illegal and

negative actions towards employees.


248.    McCurry was defamed on more than several occasions in various matters by Defendant

to the Illinois Department of Human Rights and EEOC.


249.    Defendant knew that this would be adverse to McCurry's professional standing and

cause her severe emotional distress and extreme embarrassment.


250.    On or about December 2013-to January 6, 2015, Defendant engaged McCurry in an

involuntarily conspiracy to aid and abet the company in violation of African American employees

constitutional rights, as well as, those who opposed such disparate treatment to not be treated

differently, disparagingly, or biasly regarding their fundamental protected rights of not being paid

disparately or differently than those non-blacks performing the same duties and tasks, subjecting

them to unfavorable shift changes, abuse of authority, terms and conditions of employment and

other fringe benefits offered to non-blacks, such as but not limited to access to overtime.


251.    On or about August 26, 2013-Janauary 6, 2015, Defendant engaged McCurry

involuntarily to aid and abet the company in the conspiracy of against the violation of employees

constitutional rights to not be treated differently, disparagingly, or biasedly regarding employees

fundamental protected rights of being free from a hostile work environment, abuse of authority,

harassment, nepotism, favoritism, abuse of authority, racism, being subjugated to harsher and

more strenuous work assignments, unfavorable shift assignments, less pay and less hours

afforded to be worked created a hostile and racially animus charged work environment.

252.    In October or November 2014, Jay Elliott and several unknown "Kenco Co-Conspirators"

engaged in the contrived scheme to hire Jay Elliott as Vice President of Legal.

253.    Upon information and belief this scheme was contrived to avoid culpability and liability

of the company.

254.    The plaintiff then alleges that all of the defendants (presumably including the "Kenco Co-

Conspirators" defendants) were the agents and principals of all of the other defendants and were

acting in the course and scope of their authority when they hired Jay Elliott.

255.    According to Kenco Company Exempt Hiring Policy CP-HR-1002:  See Exhibit  C

> **Executive Management —** perform approval authority duties for job openings and responsible for nominating candidates for Vice President levels and above.
>
> **CFO —** performs approval authority duties as described in this procedure
>
> **Kenco Management Services (KMS) — Director of Recruiting and Development —** performs approval authority duties throughout the exempt hiring process and responsible for the overall implementation and enforcement of this policy for the company.
>
> **KMS — Human Resources (HR) Recruiting Assistant —** performs duties outlined in this procedure to assure sites are notified of exempt job openings and that the exempt hiring process is followed through successful placement of a candidate.
>
> **KMS — Human Resources Employee Relations (ER) Administrative Assistant —** enters all exempt level background investigations into the company approved vendor's system.

VP level and above positions will not be posted through the internal process. Those positions will be filled through nominations by VPs or above to be submitted to the Group President and CFO for final approval.

Posting Process

a.   The Hiring Manager will complete form *CP-HR-6.2.2.013-1 Exempt Job Posting Requisition Form,* obtain the required signatures, and submit the completed form along with a current job description to the HR Recruiting Assistant. Postings for both replacement and newly created positions must be approved by the Hiring Manager's immediate Supervisor/Manager, the Director or VP of Operations, and the CFO.

i.         All exempt job postings will be posted by the 2nd business day after the HR Recruiting Assistant receives the required documents.

For example: Job posting requests received by 5:00 p.m. on Monday will be posted by 5:00 p.m. on Wednesday of the same week; Job posting requests received by 5:00 p.m. on Wednesday will be posted by 5:00 p.m. on Friday of the same week.

Pending successful completion of the background check (external candidates only, except in Canada), the Hiring Manager will complete *CP-HR-1002-4 Offer Letter Summary Form* and send it to the HR Recruiting Assistant. Pending successful completion of the background check (except in Canada), the HR Recruiting Assistant Prepares the Offer Letter and emails to the Hiring Manager including the *Relocation Expense Repayment Agreement* (if applicable). The Hiring Manager will sign and extend the finalized Offer Letter to the selected candidate

Upon receipt of the signed Offer Letter and Relocation Expense Repayment Agreement, the HR Recruiting Assistant will obtain the final approval of the Director of Recruiting and Development.

The HR Recruiting Assistant will forward the signed Offer Letter to the appropriate KMS-HR Payroll Supervisor via a flagged email.

All new employees must complete their part of the new hire paperwork through the HRIS Onboarding Program before end of business on their first day of work with Kenco.
a. In Canada, all new hire paperwork must be completed by end of business on the first day of work.

All employer-related new hire paperwork must be completed by the Site HR Administrator through the HRIS Onboarding Program within the first three (3) days of employment.

256.      Plaintiff also alleges and believes that Defendant committed a conspiracy to obstruct and commit fraud against the court.

a.            Elliott stated to the Illinois Department of Human Rights and EEOC on or about January 7, 2015 that he was representing Defendant.

43

b.        Defendant was informed with every filed charged that charges were cross filed with the IDHR and EEOC.

c.        Defendant was informed of the EEEOC's recordkeeping and reporting requirements.

d.        Defendant was also informed the participation requirements for participating in a Fact Finding Conference.

e.        Defendant knew that there were onsite personnel with first-hand knowledge.

f.        Defendant knew it gathered its information from the onsite personnel.

Some examples are:

a.        Defendant knowingly and willingly postulated its Vice President of Legal as an individual who had firsthand knowledge of the material facts and/or matters relating to McCurry and others by allowing him to be a participant in the Fact Finding Conferences for the Illinois Department of Human Rights and EEOC investigation, being a precursor to an obstruction of the Federal Court.


b.        Defendant knew that it had an admitted history to the court of a pattern and practice of disparate and disparaging treatment and impact towards African Americans; specifically Jay Elliott informed the court of such in Brown vs. Kenco. {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}


c.        Defendant knew it had in excess of 30 discrimination charges filed against Defendant at the Mars Manteno Facility.

44

d.    Defendant knew that these and other infractions, if found liable, would be a breach of contract with MARS, Inc.

e.    Defendant knew it was truth to the charges filed.

f.    Defendant knew it had violated a number or public policies.

g.    Defendant crafted and contrived a plan to employ Jay Elliott as an employee of Defendant.

h.    As a matter or ordinary course of business Defendant Kenco and Elliott discussed Elliott's employment expectations, goals and the like.

i.    Defendant and Elliott agreed upon terms and conditions of Elliott's employment, including wages, benefits, goals and the like.

j.    Defendant and Elliott knew that Elliott's employment would circumvent Illinois Department of Human Rights and EEOC guidelines.

k.    Defendant knew it would impede the exhaustive remedy process to the administration of justice.

l.      Defendant knew Elliott was a licensed and practicing attorney in the state of Tennessee

m.      Defendant knew that it had retained Elliott as outside counsel in other employment related matters.  {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

n.      Defendant had a well-established relationship with Elliott, Karen Smith and Miller & Martin PLLC.  {Case # 3:10-CV-668 in the Eastern Division of Virginia Richmond Division}

o.      Defendant knew Elliott was not hired until after the incidents occurred relative to McCurry and others.

p.      Defendant knew that Lori Varvel was not hired as the dedicated Human Resource Manager until after the incidents occurred relative to McCurry in November of 2014.

q.      Defendant knew that Elliott was not physically situated at the Mars Manteno facility.

r.      Defendant knew that Jay Elliott and others such as Tammi Fowler, Senior Manager of Employee Relations, were in Chattanooga, Tennessee and could not have been a party to the incidents in question.

s.    Defendant knew that it could conspire with its employees and not be subject to conspiracy.

t.    Defendant knew that as an attorney Elliott would not be allowed to be an active participant in the Illinois Department of Human Rights and EEOC investigations.

u.    Defendant knew that it had terminated some of the agitators and provocateurs of the allegations set forth by McCurry and others.

v.    Defendant knew that it did not have supporting witnesses to incidents.

w.    Defendant reported to Illinois Department of Human Rights and EEOC that it no longer had its witnesses.

x.    Defendant knew that the incidents with McCurry and others had been contrived and/or valuated differently than those committed by similarly situated non-blacks or those who did not oppose such disparate and disparaging treatment and impact upon African-Americans.  See Exhibit D

y.    Defendant knew that it had ostracized its onsite Human Resource Personnel from formal investigations and the like.

47

z.      Defendant knew it had undermined its onsite Human Resource Personnel from performing their charged duties at the Mars Manteno facility.

aa.     Defendant knew that the onsite Human Resource Personnel had reported the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment to management and Kenco Corporate office.

bb.     Defendant knew that the onsite Human Resource Personnel had opposed the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment.

cc.     Defendant knew that it had misrepresented the onsite Human Resource Personnel stance on the reporting of the disparate and disparaging treatment and impact upon African-Americans and those who opposed such treatment to the Illinois Department of Human Rights and EEOC.

dd.     Defendant knew that it deviated from its organizational structure at the Mars Manteno Facility.

ee.     Defendant knew that Elliott had no firsthand knowledge.

ff.     Defendant knew that they had not taken reasonable steps to correct the hostile and animus work environment for McCurry and others.

gg.    Defendant knew it did not follow its own policies and procedures.


hh.    Defendant knew that the Illinois Department of Human Rights and EEOC

would assume that Elliott and others were legitimate employees of Defendant.


ii.    Defendant knew that employing Elliott would give him a legitimate reason

to be a party to Defendant's administrative proceedings.


jj.    Defendant knew that the Illinois Department of Human Rights and EEOC

would rely on the information provided by Elliott to make an administrative

determination.


kk.    Defendant knew that Elliott would have an unfair advantage over Henry

and others, as an Expert in Law and Subject Matter Expert in employment Law.


ll.    Defendant knew that Elliott would be able to mitigate any statements of

fact made by Plaintiff's because of his expertise and knowledge.


mm.    Defendant knew that Elliott would be able to use his expert knowledge to

aid and abet Defendant in the violation of Henry and others protected rights by

deception, conspiracy, manipulation of material facts to Defendant's advantage,

presenting materially false and misleading documentation and statements to the

Illinois Department of Human Rights and EEOC, impede and obstruct the

administration of justice, commit fraud on the court, perjury and a number of

unconscionable contrived schemes.

nn.    Defendant knew it was evading the law and circumventing justice.

oo.    Defendant knew that evading the law and circumventing justice at the

IDHR and EEOC was a precursor to the obstruction of pending federal court

proceedings.

pp.    Defendant knew its beahviour's toward the employees of the Mars

Manteno, as well as, the administration of justice were/are unlawful,

disingenuous, and contrived.

qq.    Defendant knew that assault was a criminal offense and punishable as

such.

rr.    Defendant knew that it aided and abetted the violators of company and

public policy that included but was not limited to Mars Manteno employees and

Kenco Corporate employees.

ss.    Defendant knew that it had discriminated against McCurry.

tt.    Defendant knew it minimalized its actions.

uu.    Defendant's hedged on prevailing at the IDHR and EEOC

vv.    Defendant knew this would cause irreparable harm to McCurry and others.

ww.    Defendant knew that providing misleading, deceptive, disingenuous statements and documents would make it more encumbering and difficult for McCurry and others to prevail.

    i.    Defendant knew it hired and promoted Stephanie Dumas against and in violation of its own policies.

    ii.    Defendant knew that it intentionally created a racial, animus and hostile work environment for McCurry and others.

    iii.    Defendant knew it had retaliated against McCurry by suspending him, denying him overtime and equal terms and conditions of employment and writing him up.

xx.    Defendant also conspired with Mars Manteno employees, such as, but not limited to: Kelvin Walsh, Mike Manzello, Mario Lopez and Stacey Bushey

257.    As an officer of the court and subject matter experts Defendant and Defendants agents knew better.

51

## MEMORANDUM

Defendant MARS, Inc. alleges that Plaintiff failed to exhaust administrative remedies. Contrarily, Plaintiff believes that she exercised her due diligence towards Defendant in the following respect(s):

a. Plaintiff named Defendant as a respondent in the charges filed with the IDHR and EEOC in January and March of 2015 2015CA1804 and 2015CA2495 respectively.

b. Plaintiff also provided a street address of 1125 W. Sycamore, Manteno, IL 60950 for service of the charges to Defendants; this is the facility Mars has owned/rented and operated since 1999.

c. Plaintiff not only named Defendant on IDHR form #6 and EEO form #5 under oath, but specifically identified Defendants under the various causes of actions.

Plaintiff also notes that all the correspondence disseminated from the IDHR and EEOC also was captioned and styled as Mars Kenco.

Moreover, Plaintiff asserts that according to an affidavit from Donna Evans (See Attached Exhibit J) that she did serve a copy of the perfected charge to Respondent who was notified at Defendant's place of business by certified mail.  (See Exhibit K)

As far as Plaintiff is concerned, both Defendants had an opportunity to participate in the forgoing matters because both the Defendants were named and the correspondence went to the Principal Defendant's place of business, Mars, in which two (2) lines of business are conducted Co-pack operations managed by Jacobson and the warehouse distribution by Kenco.

52

In addition to that, Plaintiff had continually raised the issue with the IDHR/EEOC about

Defendant Mars. Upon information and belief, Defendant Kenco informed the IDHR/EEOC that

Mars was a third party and was not Plaintiff's employer. Plaintiff believes that this statement was

false and misleading. (See Exhibit L) Plaintiff believes this to be true to the extent that the

IDHR/EEOC took steps to technically amend Charge Numbers: 2015CA1804 and 2015CA2495

on or about November 2, 2015 from Mars Kenco to Kenco Logistics. (See Exhibit M)


Plaintiff refused to technically amend the aforementioned charges, as Plaintiff continued to

believe and assert that Defendant Mars should continue to be named and held liable as well.


Plaintiff also asserts that Jay Elliott filed an appearance and an extension of time in the matter

styled Mars Kenco in October and September 2015 respectively. (See Exhibit N). In addition, to

that Defendant Kenco's Vice President Paula Hise, in her offer letter to Plaintiff, in early April

2013 and other employees also styled the Defendants in tandem. ( See Exhibit O) The offer

letter outlined the job offer and compensation, as well as, requiring signatures from both parties

to be effectuated. Due to Plaintiff's personnel file being materially altered the signature page is

missing per company policy CP-HR-1002 -Exhibit C


Furthermore, Plaintiff would not have been apprised or had any foreknowledge that Defendant

Kenco was not continuing to act as an agent of Defendant Mars with respect to the matters that

occurred during the scope of their business relationship.


Plaintiff also believes that Defendant Mars continues on in the intentional, willful and reckless

disregard of the law by making blatantly untrue and misleading statements to his court when it

53

stated that the notice went to Kenco Logistics in Chattanooga, TN and not Mars. As it has been proof texted under oath, and by certified mail, the notice(s) was served at the Mars facility in Manteno, IL, as this was the only address provided by Plaintiff. See Exhibit(s) J & K

Therefore, Plaintiff believes and asserts that Plaintiff did exercise her due diligence in naming Defendant and providing the necessary contact information for Defendant to be served and raised the necessary questions during the administrative process.

Upon information and belief, Plaintiff believes that this forum is proper for the claims of willful interference, intentional infliction of emotional distress and aiding and abetting, as MARS, Inc. is a Virginia Company and Kenco Logistics is a Tennessee company doing business in the state of Illinois and offers a diversity in citizenship.

Likewise, even though Defendant maintains that the claims are allegedly barred by Illinois Human Rights Act, the claims are not barred as common law claims, state claims or various other claims within this court's governance. Moreover, Defendant has failed to articulate these claims being barred under any other rules, statutes or acts.

Contrarily the Illinois Department of Human Rights disseminates a flyer, revised 2012, indicating that various Employment Discrimination Claims, which include, but are not limited to Willful Interference and Aiding and Abetting. See Exhibit E. More Specifically the Illinois Human Rights Act states the following:

```
(775 ILCS 5/Art. 6 heading)
      ARTICLE 6. ADDITIONAL CIVIL RIGHTS VIOLATIONS

(775 ILCS 5/6-101) (from Ch. 68, par. 6-101)
    Sec. 6-101. Additional Civil Rights Violations. It is a
civil rights violation for a person, or for two or more
persons to conspire, to:
```

54

```
        (A) Retaliation. Retaliate against a person because
he or she has opposed that which he or she reasonably and
in good faith believes to be unlawful discrimination,
sexual harassment in employment or sexual harassment in
elementary, secondary, and higher education,
discrimination based on citizenship status in employment,
because he or she has made a charge, filed a complaint,
testified, assisted, or participated in an investigation,
proceeding, or hearing under this Act, or because he or
she has requested, attempted to request, used, or
attempted to use a reasonable accommodation as allowed by
this Act;
        (B) Aiding and Abetting; Coercion. Aid, abet, compel
or coerce a person to commit any violation of this Act;
        (C) Interference. Wilfully interfere with the
performance of a duty or the exercise of a power by the
Commission or one of its members or representatives or the
Department or one of its officers or employees.
    Definitions. For the purposes of this Section, "sexual
harassment" and "citizenship status" shall have the
same meaning as defined in Section 2-101 of this Act.
```

Consequently, based upon the act itself the following claims are not barred: Aiding and Abetting, as well as, Willful Interference.  Furthermore, Plaintiff asserts that she knowingly and unknowingly involuntarily aided and abetted Defendants in unlawful wrong doing against its employees.

Therefore, Plaintiff believes that it would be improper to dismiss these claims based upon the rationale that these claims are barred from the Illinois Human Rights Act.


The Seventh Circuit clarifies that Illinois Human Rights Act does not preempt tort claims. With respect to the Intentional Infliction of Emotional Distress is a separate and distinct claim in tandem with the claims and is being viewed as a continuing tort.


Moreover, Plaintiff believes that the Defendants acting in concert, with one another and their legal counsel caused McCurry and others to suffer severe emotional distress; Defendant's Tammi Fowler, Kelvin Walsh, outside legal counsel Karen Smith and others conspired to continue to violate the protected rights of Madison and myself, when Karen Smith, under oath and subject to the penalty of perjury, stated blatantly false and misleading information to the IDHR and EEOC

55

regarding my statement to Smith relative to Madison's complaints of disparate and disparaging treatment and impact.

Smith marginalized Plaintiff, denigrated Plaintiff, and defamed Plaintiff in writing to a third party for public review by stating that Plaintiff was a mere clerk that had no authority to accept this type of report even if it had been reported to me. She also went on to say, that Madison had instructed me to do nothing as well. This was a malicious attempt to belittle me and reduce my personal and professional standing. See Exhibit F

Contrarily enough, I have been at this same facility since 1999 and have been performing the HR and accounting functions of operating budgets of between 17 -26 million dollars annually.
To protect the perpetrators, Kenco and its executives, the other known and unknown defendants and their attorneys conspired to fabricate false evidence against McCurry, Szplett, Madison, Doss, Henry, Marksteiner, Tyson, Ringo and others—that we were the non-compliant violators of company and public policy; that we were inept and incompetent individuals and non-deserving.

That we were aggressive and hostile for opposing such treatment and that the actions taken against these and other indivudiuals were, therefore, justified legitimate non-discriminatory and non-pretextual basis for unequal terms and conditions of employment, sanctions, disciplinary actions, including and up to termination.

Plaintiff has watched, suffered and been subjected through the years to the unfair and unequitable treatment of African Americans. Ad nauseam, as of recent with the Kenco Management I have seen unprecedented pervasive unbridle racism, bigotry, misogyny and unparalleled hostile and animus work environment. To the point, were people were blackballed and could not get work

like Don Stonchus. Stonchus was terminated by Kelvin Walsh because he opposed disparate and disparaging treatment. Stonchus ultimately killed himself.

Scott Marksteiner who opposed the disparate and disparaging treatment and impact of Nate Doss, was harassed unduly and ultimately the victim of a contrived scheme that led to his termination. This termination ultimately led to an untimely death due to a car accident coming home from a job at a carwash in Indiana.

Not to mention the persons whose lives have been affected by punitive and economic sanctions imposed upon them by Defendant's; for example Tom White, was given a PIP after the Madison Fact Finding Conference and accused of not being a big enough "asshole" towards people; Tom was non-black and supported a racially animus and hostility free work environment and opposed the racial discrimination and treating people differently due to their race. After fifteen (15) years of employment, Tom resigned.

Another example, Morris Tyson was not returned to work in any capacity for more than a year after an injury. He had no income and had been employed with the facility more than ten (10) years. However, similarly situated white male, Mark Baker, was hired during this relevant time period and paid more. Baker sustained an injury within six (6) months of being hired and was returned back to work in an accommodated position as a window clerk.

Vernon Henry was assaulted on numerous occasions by Peter Monstwillo, a similarly situated white male, with racial slurs, threats, and epithets, as well as, physical harm and attempted murder. Monstwillo was rewarded with a premium shift, overtime, no reprisal and punishment on paper for his racially motivated attacks towards Henry and others.

57

The look of anguish and vanquish on the employees faces, when they were wrongfully terminated, walked out, sent for drug test, humiliated, scorned, chastised, berated and the likes was emotionally and psychologically devastating.

After speaking with Karen Smith and informing her and Tammi Fowler about the openly racially hostile treatment and environment imposed upon myself and others at the Mars Manteno facility, Plaintiff was subjugated to having her job title and job description changed.

In addition, impossible deadlines were imposed upon me such as: five (5) payrolls for various agencies including Kenco being due within two (2) hours of Plaintiff's shift starting with employees still being on the clock. The schedule was constantly being changed without notification, causing pervasive payroll and scheduling problems that had to be fixed prior to payroll being finished. The Manteno facility was a seven (7) day a week 24 hour operation.

Defendant refused to repair and or replace malfunctioning clock. Defendant denied Plaintiff overtime to bring corrective action to payroll issues; disgruntled and disenfranchised employees not being paid correctly due to payroll errors and a malfunctioning time clock; cheating the government out of monies due from payroll taxes.

Watching employees being terminated for reporting injuries and unhealthy and unsanitary work conditions to me; working in a rat infested facility

Defendant creating a public health hazard by shipping out tainted product that had been used as a breeding ground, eaten and defecated on by rats to the general public for consumption.

58

Defendant failed to ensure basic safety and health standards for the facility and its employees. Watching Defendant defend the work ethics and practices of Service Master for uncleanliness, spreading fecal matter and germs throughout the warehouse from cross contamination.

Being stripped of my HR responsibilities and duties; being instructed not to follow up on any employee concerns or issues, but to forward them to Tammi Fowler in Chattanooga, a breach of my duty as the HR Administrator and company policy.

Deceptively misleading and having persons thinking, that their needs and concerns were being addressed by me and or that they would be given unbiased and equal attention, application and or protection, when they were not.

Involuntarily aiding and abetting Defendant's in their actions that violated their employee's protected rights, as well as, causing irreparable harm to them and their families.

Having my entire paycheck garnished for two (2) pay periods, against the best practices of the company and the IRS; refusing to verify my employment to remediate the garnishment with the IRS.

Having to directly report to Lori Varvel the new HR Manager, to further Defendant's schemes and circumvent the HR department comprised of McCurry and Szplett.

The position of HR manage was not posted internally as required by company policy; McCurry or Szplett was not apprised that they had created a HR Manager's position and that the position

59

was available; that Len Szplett would be relieved of his HR duties and replaced and that an opportunity existed to even apply for the position.

Szplett was being coerced into waiving his rights and extorted into agreeing to help Defendant with legal matters as the part of the terms and conditions to receive his severance/WARN Act pay.

Plaintiff was coerced into signing a paper relinquishing my duties as HR Administrator; privileges stripped from clocking in and out at my desk and now having to punch in and out on the faulty time clock.

Plaintiff was written up and disciplined for missing a punch and allegedly stealing time, when in fact it was not uncommon, especially due to the malfunctioning time clock for mispunch slips to occur.

Being assigned other duties associated with Operations for daily matrix reporting that exceed the scope of HR and Accounting.

Having the Vice President of Operations, Paula Hise, endorse, encourage, ratify and condone the negative beahviours of Walsh, by praising and hailing him as a valued employee, when she knew for a fact that Walsh had been formally accused of at least ten (10) various employment violations.

Having the executives at Kenco intentionally, deliberately and willfully authorize the hiring of Jay Elliott, as VP of Legal, to postulate himself as an employee of the company having firsthand

knowledge of instances that occurred with McCurry and others, when in fact they already had a

General Counsel for the organization, Ann Christopher.

Intentionally, deliberately, methodically and maliciously being denigrated, marginalized,

defamed and characterized by Elliott in writing and under oath as incompetent and a mired of

other blatant mistruths and mischaracterizations, as well as, a long laundry list of other things

including: Defendants current legal counsel contriving a scheme that I had issued a waiver of

service.  Characterizing the other named defendant's as agents, when in fact, specifically Walsh,

Manzello and Lopez were budget line item employees of Mars, Inc. and Fowler and Jabaley were

direct employees of The Kenco Group.

The conduct of these persons, as well as, Mars failure to intervene, manage or stop these

beahviours is unconscionable, reckless, egregious and another violation of Plaintiff's and others

protected rights and privileges.

Mars, Inc. had an onsite Regional Distribution Manager who managed the facility; Jacobson and

Kenco the two (2) management entities as the Mars Manteno warehouse.  The Regional

Distribution Manager was Robert Coffey.  Mars, Inc. through Robert Coffey and others

controlled the workflow and distribution center.  Consequently, every employment and budgetary

decision ultimately rested with Mars.

Plaintiff believes that the conduct of Kenco and its Executives, along with Mars was truly

extreme and outrageous, as this pervasive conduct ran cross-functionally from the Executive level

of the Corporation to its upper management on down.  Furthermore, Plaintiff also believes that

because of the various Defendants' position, stature, and posture Defendants were fully aware of

the ramifications of their conduct and the conduct of others would at the very least cause a high probability of emotional distress.  It is improbable that an attorney specializing employment law, the Senior Manager of HR that is certified to industry standards according to the Society of Human Resource Management, the Director of Operations, the Vice President of Operations, and other co-conspirators that ratify the hiring of Jay Elliott had no cognizable understanding of the actions it engaged in or authorized. This conduct was reckless.  In addition, Plaintiff believes that Defendant's attorney's acted in conspiracy to create a false account of incidents that occurred relative to Madison, McCurry, Doss, Tyson, Henry, Szplett and others.

As in the aforementioned summary, the severe emotional distress of being connected with persons losing their lives, their livelihoods, their dignity, their personal and professional standing, being defamed, humiliated and berated as result of Defendant's conduct was and still is emotionally, psychologically, and physically devastating, as well as, being a personal victim to this madness, being pushed to the brink of financial despair, being intentionally uniformed on how to continue employment after Kenco's contract had been terminated early, being subjected to unequal terms and conditions of employment, as well as, contrived barriers, impediments and obstructions of justice.

Last as referenced previously, Karen Smith outside legal counsel from Miller & Martin PLLC Chattanooga, TN, for Defendant Kenco conspired with Defendant to violate the protected rights of Madison, as well as, myself by making false statements under oath in the process of the administration of justice.  Admittedly, Smith had spoken with Walsh and Fowler; a scheme was contrived to marginalize, denigrate and defame me to avoid and subvert culpability and liability at my expense.  See Exhibit A This was a breach of duty to the employees.

The conspiracy continues when Tammi Fowler comes to the facility conducts a civil rights class for managers and disallows Nate Doss to attend so that he would not know his civil rights better. The class seemingly was designed to help people circumvent the boundaries of the law.

In furtherance of the scheme, the conspiracy continues when David Jabaley is sent to the facility and continues to incite and support the rampant and blatant racially charged, motivated, hostile and animus work environment by failing to execute company policy, contrive schemes against employees, effectuate policies to fit the current condition and climate of the facility to support the current allegations and charges being brought.

The first official act of Mario Lopez at the Mars Manteno facility was to terminate Mike Manzello the Operations Manager. Mike Manzello called back and reported to me after he was terminated that Defendants had contrived various schemes against Doss and others, that they had disemboweled his office of paperwork that was adverse to Defendant and a number of other instances.

In addition, the conspiracy continues when the Executives of the Kenco Group intentionally, deliberately, and willfully authorize Jay Elliott to be hired as the V.P. of Legal, when in fact the company already had General Counsel, Ann Christopher.

Moreover, David Caines, COO of Kenco refers to the employees of the Mars Manteno as Mars employees in an email. See Exhibit G. Also, according to the RFP each position at the Mars Manteno facility is lined item and is a pass thru from Kenco back to Mars. See Exhibit H. Walsh, Lopez and Manzello were lined item in Exhibit H. Fowler and Jabaley worked for Kenco. See Exhibit I

Kenco, including but not limited to its Corporate Officer, directors, and the like knowingly and willingly aided and abetted these same persons, Mars, Inc. employees, and conspired with them and others to avoid culpability, obstruct and impede justice, as well as, to continue violate the federally protected rights of individuals.

However, the proposed intra-corporate conspiracy doctrine defense theory undermines the very quintessential essence and embodiment of the Ku Klux Klan Act of 1871and 42 U.S. Code § 1985, which dovetails to the heart of the matter set before the court racial inequalities, perpetrated through elaborate and contrived schemes that infringe or revoke the protected rights enjoyed by individuals.

Pointedly the intra-corporate conspiracy doctrine was spawned out of the antitrust law. Specifically, the doctrine evolved from a synergizing of corporate personification, the distinctions between sections 1 and 2 of the Sherman Act, and the underlying objectives of antitrust law, coupled with the plurality requirement of conspiracy law.

When juxtaposing the antitrust and civil rights laws, the contrast in this doctrine may serve the objectives of the antitrust law, but vehemently and ardently subverts, destabilizes, and sabotages the purpose of conspiracy law in the civil rights context, as well as, the inalienable rights of recent that have been bestowed or enjoyed by individuals of protective classes.

Furthermore, the thrust or main driver of the conspiracy provisions of the Ku Klux Klan Act of 1871 was not on the organizational structure of the conspiracy, but focused on to the ability of a group of persons to use collective resources to deny citizens their rights, such as

the numerous, repetitive, and brazen acts of discrimination and disparities committed by Kenco, its employees, its agent's in fact, as well as, the Mars Manteno employee's.

There is a diametrical difference in addressing civil rights violations and competition in the market place (antitrust). The practicality of dealing with competition in the market is that it makes no practical difference if two (2) legal entities (corporations) act in concert or two (2) officers of one corporation act in concert, if the drivers and/or actions are based, motivated, or rooted and grounded in racial animus. If the actions are based in or on racial animus; these actions constitute collective action; effectively denying individuals the equal protection of the laws. At the end of the day, in any scenario, race-based conspiracies cut to the very quick of one's being, to the end that individuals may not enjoy the equality of rights as contrasted with their and other citizens' rights.

As argued by Defendant, a corporation and its manger's are to be considered one person in law. Although, arguable, it does not seem persuasive, drawing on the ideology that corporations were immune from liability based on corporate personification in 1871 is contrary and inconsistent to the current rulings of this era.

Additionally, the foreshadowed legal fiction of corporate personification in 1871 is not necessarily synonymous with or a reflection of what is recognized today.

As an overreach, even if the two doctrines are synonymous, as argued, at its core, corporate personification was not designed to limit corporate liability, but to expand it. The shear idea that corporate personification means immunizing intra-corporate agreements is incongruent

and inconsistent with the many federal intra-corporate criminal conspiracy convictions that occur.

The marked distinction between conspiratorial agreements between two or more entities and conspiratorial agreements within one entity, within the antitrust law realm, should solely serve the purpose of fostering competition in the marketplace.

Again, in a gross overreach, agreements in antitrust would not translate into the realm of civil rights or § 1985(3). In the context of civil rights, conspirators do not seek to enhance the corporation's market power or competitive edge, but instead, conspire to violate federal laws that prohibit racial discrimination that ultimately continues to condone and foster racially animus charged environments and societies.

Consequently, the intra-corporate conspiracy doctrine theory of defense should never be applied to racially-motivated internal agreements within corporations. The intra-corporate conspiracy doctrine is a legal barrier beneath which corporate and other sector perpetrators shield themselves from civil liability, masking practices that cloak over racial discrimination and its irreparable harms of economic deprivation, as well as, psychological intimidation and violence. This type of vile, insipid, disdainful and counterproductive behaviour undermines the core percepts and concepts of equality and democracy.

Unlike agreements within a corporation to compete in the market, it is difficult for any reasonable person to conceive of race-based internal agreements that benefit the corporation or society.

66

To date there is no commentary, commentator, legal expert or technocrat that has penned or articulated what these benefits might be.

However, what is written is according to the majority: The Government has a compelling interest in providing an equal opportunity to participate in the workforce without regard to race.

To uphold this sentiment, we (individually and collectively) must cross-functionally and vehemently work together to eradicated racism, disparate and disparaging treatment and impact, pay disparities, unequal terms and conditions of employment, abuse of authority and power, lack of opportunities and training, disproportionate administering of harsher scrutiny and discipline, as well as, the misapplication and interpretations of the laws.

Defendant Kenco has not met the burden of proof even under its own theory of defense, as it relates to an employer employee relationship. At the onset of this business relationship with Mars, Inc., David Caines, President of The Kenco Group affirmed that the employees of the Mars Manteno Facility were Mars employees. (See Exhibit F) In addition to that, the Defendant consistently until the end of their contractual relationship continued to operate and posture in this manner, by being a pass thru company for Mars, Inc.; whereby Mars, Inc. bore all of the operating costs for the employees and the Manteno facility. Defendant, Kenco, acted more in a management capacity, specifically a "Super Manger" for Mars, Inc. and was specifically paid a management fee for such.

With that being said, according to Defendant's own interpretation of the employment relationships, some of the employees who committed the egregious and reprehensible acts were not there employees. In addition, other participants and or agitators were also not employees of Defendant Kenco Logistics or Mars, Inc.

67

Moreover, Defendant and Defendant's counsel contrived and schemed to continue to subjugate MADISON to disparate and disparaging treatment and impact when it presented in writing under oath that I had stated that Madison had instructed me to do nothing and that even if it was reported to me, I was not in a capacity as a clerk to receive that information.

Conclusively, this is an oxymoron; if Plaintiff was not told of Madison's complaints, how could Plaintiff not have been instructed not do anything about it Madison's complaints according to Smith. Forwardly and rationally thinking, if this had been true account of Plaintiff's statement of facts, seemingly, Plaintiff would have been listed by Smith to attend as a witness for Defendant. This was not the case. Plaintiff was not listed by Defendant or made mention of until Madison raised the issue with the investigator at the IDHR.

This story was contrived to cover Walsh's intentional, malicious, and willful withholding of germane, essential and necessary information to perform MADISON's job functions to bring Federally Mandated compliance to the facility.

Upon information and belief, this intentional and willful scheme was instrumental in the lack of substantial findings decision of MADISON at the IDHR/EEOC and an obstruction of justice.

Moreover, Defendant Kenco did nothing to quash, ameliorate, or discourage these behaviors and precedents. Matter of fact, in one instance Defendant Kenco's Vice President publicly encouraged such behavior, by stating that Kelvin Walsh.

Kenco, including but not limited to its Corporate Officers, directors, and the like  knowingly and willingly aided and abetted these same persons, Mars, Inc. employees, and conspired with them and others to avoid culpability, obstruct and impede justice, inflict intentional emotional distress, as well as, to continue violate the federally protected rights of individuals.

Mars, Inc. did nothing as well.

The individuals named should not be dismissed as they are liable.  They are the perpetrators and co-conspirators, who has caused irreparable psychological, emotional, physical and economic harm to Plaintiff and others.  Furthermore, upon information it is a violation of 42 U.S.C 1985 to conspire against persons protected rights, as well as, be an obstruction to the administration of justice.

Defendant Kenco has a known pattern, practice and admitted history to the Virginia Eastern Court in case number 3:10-cv-00668, of disparate, disparaging treatment and impact, as well as, adverse employment decision making towards African Americans, with some of the same Attorneys of fact making less than genuine representation to various regulators during the process of this administrative remedy.

**WHEREFORE,** Plaintiff requests that this Honorable Court rule in her favor and deny DEFENDANT's Motion.

Respectfully submitted,

By: _Edith McCurry_

Pro Se
EDITH MCCURRY
6239 South 13110 East Rd.
Pembroke Township, IL 60958
815-735-4281

## CERTIFICATE OF SERVICE

Please take notice that on January 17, 2017, I, EDITH MCCURRY, hereby, certify that I did file a
PLAINTIFF'S RESPONSE TO DEFENDANT'S PARTIAL MOTION TO DISMISS
PLAINTIFF'S COMPLAINT PURSUANT TO FED. R. CIV. PRO. 12(b) (6)  with the Central
District of Illinois Urbana Division in the foregoing matter of Case No. 16-cv-02273-CSB-EIL and have served
the persons identified on the docket's service list through Notice of Electronic Filing generated by the Court's
CM/ECF system.

*Edith McCurry*

Pro Se
EDITH MCCURRY
6239 South 13110 East Rd.
Pembroke Township, IL 60958
815-735-4281

1