# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

MARY MADISON,                               )
       Plaintiff,                      )
   vs.                                     )   No. 15-2290
KENCO LOGISTICS SERVICES, LLC, a            )
Tennessee Limited Liability                 )
Company, Mars, Inc., Kelvin Walsh,          )
et al.,                                     )
       Defendants.                     )

    The video deposition of MARY MADISON, called for examination pursuant to the Rules of Civil Procedure for the United States District Court pertaining to the taking of depositions, at 150 North Michigan Avenue, Suite 2400, Chicago, Illinois, on May 24, 2017, at the hour of 9:36 a.m.

Reporter: Kimberly D. Bures, CSR, RDR, CRR, CRC. Illinois CSR License No.: 084-003292.

Page 86

1  doing it that way. He would encourage usurping
2  Mrs. Hise's directives and minimize her position.
3  Q. Okay. And so what directives did he tell
4  you not to follow?
5  A. Well, he told me not to follow the law,
6  was one.
7  Q. I thought you were talking about Ms. Hise.
8  Is that --
9  A. Right, right.
10  Q. What specifically did he tell you not to
11  follow?
12  A. The law.
13  Q. What law?
14  A. Sanitation laws, remediation of the
15  destruction room. It's numerous things. I just --
16  Q. And what else besides the --
17  A. I can't really think of them all, but I --
18  Q. Well, whatever you can think of. So he
19  told you not to follow the sanitation laws.
20  A. Right.
21  Q. And he told you not to do the remediation
22  of the destruction room?
23  A. Yes, correct.
24  Q. Okay. Anything else?

Page 87

1  A. If -- just in general, I mean, because it
2  was so frequent, you know, whatever she would,
3  almost, say do, he would say not to do that.
4  Q. Okay. And why do you think that was
5  related to sex?
6  A. I think it was related to sex because
7  seemingly in an interaction with him he didn't feel
8  that women should just be able to either tell him
9  what to do or he didn't want to follow those type
10  of directives.
11  Q. This is your impression?
12  A. Yes. This is my sense impression.
13  Q. So how does -- you're basing this on the
14  fact that Ms. Hise is female?
15  A. Yes, ma'am.
16  Q. Okay. Anything else?
17  A. No. She was a female, but clearly, I
18  mean, she was his boss and the VP of the company
19  seemingly, you know. I'm sure she earned that, you
20  know, credibly, and every time he could, he would,
21  you know, undermine whatever it is she had to say
22  or directive that she had given, and my sense
23  impression was, you know, the treatment that I got
24  was also a spillover from that.

Page 88

1  Q. Okay. And could it have been that he just
2  didn't like her directives, didn't think she was
3  competent?
4  A. There is a possibility for that. However,
5  he would agree with her in her presence, and then
6  when it came time to execute, it would be a
7  different story, so --
8  Q. Did he ever say anything about Ms. Hise
9  regarding her gender?
10  A. She does not know what she is doing.
11  Q. Referring to her as a she?
12  A. Yes.
13  Q. Okay. Other than referring to her with a
14  feminine pronoun, is there anything that he said
15  about Ms. Hise related to her sex?
16  A. The inference was always on she does not
17  know what she is doing as opposed to addressing
18  her, you know, by name or title or, you know...
19  Q. Okay. Anything else?
20  A. No, that I can think of to this point.
21  Q. There was one meeting, you're saying, that
22  you were in with Kelvin and nonblack males, and you
23  were berated. Is that what you testified to?
24  A. No. It was two times that I had public --

Page 89

1  Q. So there were two meetings?
2  A. Two meetings. But --
3  Q. And so when was the first meeting?
4  A. I don't really know. It was sometime
5  probably in July.
6  Q. Okay. And where was that meeting?
7  A. At the Mars Manteno facility.
8  Q. Where?
9  A. In a conference room.
10  Q. Okay. And who was present?
11  A. ServiceMaster and Mike Manzello,
12  Kelvin Walsh and myself. It was two persons from
13  ServiceMaster.
14  Q. Do you know who the people were at
15  ServiceMaster?
16  A. I think their last name was Brodie, if I
17  can...
18  Q. Okay. So tell us all you can remember
19  about that meeting.
20  A. Basically Kelvin --
21  Q. What was the purpose of the meeting?
22  A. The meeting was to talk about
23  ServiceMaster's -- well, my thought or
24  understanding of the meeting initially was to talk

23 (Pages 86 - 89)

Page 94

1  Q. When you say publicly, when you say
2  publicly, it's in the meeting with two people from
3  ServiceMaster and Mike Manzello.
4  A. Right.
5  Q. Okay. So that's as public as it got,
6  right?
7  A. Correct.
8  Q. Okay.
9  A. But they were outside vendors, and the
10 reality is if we -- if you're going to tell me that
11 my quest for compliance on a public safety and
12 health issue should be minimized because I'm
13 requiring them to do what they should do and you
14 punish me for enforcing what you stated was one of
15 my purposes for being there.
16  Q. When you say punished, what do you mean?
17  A. You're publicly berating me because I've
18 held them in accountability for failing to not
19 comply with proper cleaning techniques, sanitation,
20 not only -- I mean, it's something that could have
21 directly affected every employee at that facility,
22 their families and the public in general from that,
23 and so, I mean, you muss me up.
24  Q. Okay. So I understand that. So you

Page 95

1  didn't like it. So why do you think it was because
2  of your sex?
3  A. My sense impression was he was going to --
4  it was -- I thought it was a sex and a race issue
5  because he was going to get me in there and he was
6  going to show how masculine or, you know, superior
7  that he was in demonstrating his ability to enforce
8  what he wanted over what the law should have been
9  or what his tolerance would be over what the law
10 should be and that I was going to succumb to that
11 because he said so.
12  Q. Okay. He was part of the group that hired
13 you, right? You said you were hired right after
14 you interviewed with him, right?
15  A. He was in the room. He didn't ask me one
16 question.
17  Q. Okay. Well, do you know whether he had
18 any decision-making? You were reporting directly
19 to him. Do you know whether he had any decision or
20 influence as to whether you were hired?
21  A. Probably. I can't say for certain, but
22 based upon what the requirements were and my
23 understanding of his knowledge about it, I can't
24 say that he did or he didn't because I wasn't privy

Page 96

1  to that, so I would probably leave it like that,
2  but from --
3  Q. Okay. Is it fair to say, would you say,
4  Ms. Madison, he was sitting in a meeting in an
5  interview with you; somebody else was asking
6  questions? Is it fair to say if he didn't want to
7  hire an African-American female that you wouldn't
8  have gotten hired?
9  A. I don't believe that -- I can't say
10 because I'm not sure if he would have been brazen
11 enough to suggest something like that.
12  Q. It's not a question of suggesting or
13 saying it.
14  A. Or stating it.
15  Q. Yeah. I'm not saying stating it. I'm
16 saying, if he was racist and sexist, why would he
17 want to hire you?
18  A. Well, they needed somebody. I'm not
19 really sure why he wanted to hire me. I don't know
20 because I didn't have -- I had minimal to none
21 interaction with him in the interview.
22  Q. Okay. Any other reasons for the -- you
23 feel that you were discriminated against because of
24 your sex by Kenco?

Page 97

1  A. Outside of the fact that they failed to
2  follow...
3  Q. Okay. We'll get to that. Okay. You also
4  have -- you have a retaliation claim?
5  A. Yes.
6  Q. Okay. And how do you feel that you were
7  retaliated against?
8  A. Well, I was retaliated against, in my
9  opinion, when I asserted the fact that I felt that
10 I was being treated differently.
11  Q. And who did you tell you were being
12 treated differently?
13  A. I told that to Kelvin Walsh. I told that
14 to Paula Hise, Leonard Splitz, Edith McCurry.
15  Q. Okay. And what did you tell Kelvin as to
16 how you thought you were being treated differently?
17  A. What did I tell him?
18  Q. Uh-huh.
19  A. That I thought he was treating me
20 differently and that he wasn't making the same
21 provisions for me that he was making for others.
22  Q. And did you get into any more specifics
23 than that, or was that it?
24  A. That's pretty much it.

25 (Pages 94 - 97)

Page 150

1   So with that being said, I understood that
2   it wasn't an immediate thing, but when you don't --
3   can't do simple things like clean the glass -- I
4   mean, how difficult is that? Or you can't dust, I
5   mean, you should have been doing that on an ongoing
6   and regular basis. That was part of your
7   contractual agreement. They were not doing that.
8   In addition to -- I mean, Jesus --
9       Q.  So let me see if I understand this. This
10  is -- the way you're saying it. So you're saying
11  that Brian Davis sent you this e-mail on May 23 at
12  8:23 a.m.
13      A.  Uh-huh.
14      Q.  And then you responded with the one above
15  that at 8:41 where you say, yep, gotcha, right?
16  That's a direct response to Brian Davis's e-mail;
17  is that correct?
18      A.  It seems to be something missing here
19  because I'm not sure. So I can't attest to the
20  authenticity of how these documents are being
21  presented because there is definitely something
22  missing.
23      Q.  Okay. So my question, though, is Brian
24  Davis -- you're looking at it here. Maybe there

Page 151

1   are other communications, but is your May 23 e-mail
2   sent at 8:41 a.m., which is above Brian Davis's, is
3   that a response to Brian Davis's e-mail?
4       A.  I don't know; I don't know.
5       Q.  You don't know. You can't tell even by
6   looking at it --
7       A.  No.
8       Q.  -- whether that's a response.
9       A.  No.
10      Q.  Okay. And then you're saying you
11  responded again -- is this your testimony? At 9:12
12  you responded again?
13      A.  I mean, it seems -- yeah, based upon
14  what's here.
15      Q.  Okay.
16      A.  You know, but there is some other
17  communication that was sent to me that is amiss
18  from --
19      Q.  Do you have that?
20      A.  No, I don't.
21      Q.  Okay.
22      A.  You gave me this example here, this
23  exhibit. I didn't give this -- I didn't present
24  this to you.

Page 152

1       Q.  I understand. I'm wondering if you have
2   in your possession any documents --
3       A.  I don't know. I would have to look. I
4   could say that. So don't let me say I don't have
5   it. Let me say that I need to look.
6       Q.  Okay. So in essence you have a
7   conversation with Brian Davis, and he says, let's
8   give them an opportunity to fix these issues,
9   right?
10      A.  Right. I said the same thing as well
11  because I indicated that they should be put on a
12  PIP, so I'm not saying that they don't need an
13  opportunity. My sentiment and my sense impression
14  was if you're called in and someone tells you that
15  you're deficient and there's something that's
16  within your immediate power to bring some
17  correctability or in good faith to demonstrate that
18  you're going to try and move towards this, you
19  should do that.
20      Q.  Immediately.
21      A.  I mean --
22      Q.  Immediately, not wait a day.
23      A.  Two days had gone past since I had
24  discussed this.

Page 153

1       Q.  Right. So two days was too long.
2       A.  Well, I'm not -- well, okay. Let me say
3   this. It was something that they should have been
4   doing in the first place. I wasn't asking them to
5   do anything that they weren't required to do or
6   what they were signing off, saying that they were
7   doing, so hence there's another problem. You're
8   saying that you're completing a task that's not
9   complete, so you're falsifying records.
10      Q.  Which record was falsified?
11      A.  You remember over here you read -- you
12  kindly read for me over here that they talked about
13  that they have a cleaning report filled out by the
14  housekeeper on Bates Stamp 1736.
15      Q.  Yes.
16      A.  I believe it's in the second paragraph.
17      Q.  Yes.
18      A.  It says -- can you read that again for me?
19      Q.  Sure.
20      A.  It's a little --
21      Q.  You currently receive a daily basis --
22  excuse me. You currently receive on a daily basis
23  a performance report filled out by the housekeepers
24  that describes the task being performed and the

Page 174

1 let's me, you and Kelvin get on the phone to
2 discuss. We can accomplish in a short call much
3 more than we can accomplish sending lengthy
4 e-mails.
5     Is that an e-mail that you received from
6 Paula?
7  A. I believe so.
8  Q. Okay. And now I'm just going to kind of
9 direct your attention to the top of that page, and
10 so you see a -- Paula, then an e-mail from Paula to
11 Kelvin Walsh and copying him and says, I'm just
12 keeping you in the loop. All I can say is we need
13 to keep an eye on that 90-day introductory period
14 window. I hate to go there this early in the game,
15 but, man, she's wearing us out.
16     Do you see that?
17  A. Okay.
18  Q. Okay. And that's not anything that you
19 were aware of at the time?
20  A. No.
21  Q. Okay. And then Kelvin's response at the
22 top says, all I can say is I'll try keeping with
23 her. She is really too valuable for us not to try.
24 It's a good thing I have thick skin, LOL.

Page 175

1     Do you see that?
2  A. Yes, I do.
3  Q. Okay. And so -- so Kelvin's going to bat
4 for you here, right? Is that how you read that?
5  A. I read it in a forked tongue because his
6 actions were not reflective of that statement.
7  Q. Okay. Is it fair to say that Kelvin is
8 standing up for you here when he has this
9 conversation with Paula?
10  A. It's fair to me in my sense impression
11 that Kelvin is engaging in an activity that would
12 make it seem as though that Kelvin is trying to be
13 very amenable, supportive and things of that
14 nature.
15  Q. Sure.
16  A. Especially, you know, in light of the
17 situation that --
18  Q. Right.
19  A. -- he created.
20  Q. And so there's a situation where there's
21 some frustration with how you're communicating and
22 instead of saying let's get rid of her, Kelvin
23 says, let's keep trying, she's too valuable, right?
24  A. No. That's not the situation because

Page 176

1 Kelvin didn't try.
2  Q. I'm just asking about -- I'm not asking
3 about what he tried. I'm saying in this
4 communication.
5  A. I can't say because I didn't do it and I
6 wasn't privy to it, so I'm not going to --
7  Q. Okay. Kelvin didn't say --
8  A. -- comment.
9  Q. -- let's get rid of her here, right? Is
10 that correct?
11  A. I don't know.
12  Q. Well, read it. Look at it. It's in black
13 and white.
14  A. No.
15  Q. Did he say, let's fire her?
16  A. What it says is that she's too valuable.
17  Q. Right. Does --
18  A. And I'll keep trying.
19  Q. Correct.
20  A. However, he didn't try.
21  Q. I understand that you're saying that. I'm
22 saying that's the communication he sent to Paula.
23  A. But I wasn't privy to that, so I'm not
24 going to comment.

Page 177

1  Q. I understand you weren't privy to it. I'm
2 not asking you whether you were privy to it. I'm
3 asking what your reaction is when you see it. You
4 see that as an insult?
5  A. My reaction? I think that it's a farce.
6  Q. Okay.
7  A. It's a subterfuge.
8  Q. Why would there be a subterfuge to Paula?
9 Why wouldn't he tell Paula, let's get rid of her?
10 What's the subterfuge? What's the point of a
11 subterfuge with Paula?
12  A. I don't really know. I don't know what
13 was in his mind.
14  Q. Okay. Okay. Directing your attention to
15 1754, there's an e-mail from Mary Madison to
16 Brian Davis, copy to Kelvin Walsh. Now, this is --
17  A. We just went over this.
18  Q. Okay. Okay. And so just confirming,
19 that's an e-mail that you did send?
20  A. Whatever answer that I gave when we
21 discussed this.
22  Q. No. I don't recall --
23  A. And I don't recall either.
24  Q. -- specifically dealing with this, and so

45 (Pages 174 - 177)

Page 214

1  Q. -- and you got no answer?
2  A. Yeah. No. He just -- it was the
3  managers, and it's I'm frustrated and it's -- you
4  know, it's --
5  Q. Okay.
6  A. -- nonevasive information.
7  Q. Okay. And so is there anything in this
8  performance improvement plan that you agree was --
9  could be improved other than your -- you know, your
10 just general statement that all of us as human
11 beings can always improve -- and I totally agree
12 with you with that, but I'm just talking more
13 specifically about the items that are in the
14 performance improvement plan. Is there anything
15 that -- in that performance improvement plan that
16 you agree with his critique of your performance, or
17 there's nothing?
18 A. Again, I don't really know what to --
19 again, there were no goals or no benchmarks ever
20 set out by Mr. Walsh.
21 Q. Okay. Why don't we then -- I was hoping
22 we wouldn't have to do this, but let's kind of go
23 through this. So it's --
24 A. Okay.

Page 215

1  Q. It says, you know, you are not
2  consistently providing updates on the projects
3  you're working on. You disagree with that?
4  A. I absolutely disagree with that.
5  Q. Okay. You're not including the site GM on
6  communication with internal and external
7  communications or vendors even when requested.
8  A. I absolutely disagree with that.
9  Q. Okay. Your approach to the site QC
10 activities is too independent in nature, often
11 exceeding the boundaries of your scope of
12 responsibility.
13 A. I don't know how to even interpret that.
14 Q. Okay. It says, Mary has taken on an
15 active role working directly with the site's local
16 vendors. She is providing directives to the
17 vendors without conferring with her coworkers or
18 the site GM.
19 A. The only vendors that I've ever spoken to
20 was ServiceMaster and the lawn people, which
21 again --
22 Q. What people?
23 A. Lawn, l-a-w-n.
24 Q. Uh-huh.

Page 216

1  A. And, again, that was at the direction of
2  Kevin Moses. I did not independently do that.
3  Q. Okay.
4  A. I was directed to do that. And the time
5  that -- most -- 90 percent of the time that I even
6  ever spoke to ServiceMaster, it was in the presence
7  of someone else. I never -- I've --
8  Q. You sent ServiceMaster a letter, a
9  memorandum of understanding; isn't that correct?
10 A. I said I never spoke with them.
11 Q. Right.
12 A. I was --
13 Q. Well, we're talking about other
14 communications. You communicated with
15 ServiceMaster by e-mail, and you -- correct?
16 A. The only time that I communicated with
17 ServiceMaster by e-mail was at the direction of
18 Mr. Walsh when I sent that information on the 27th,
19 that he asked me to outline that meeting, and I
20 responded to an e-mail from ServiceMaster, but, I
21 mean, I -- literally I didn't have time to be, you
22 know, just constantly --
23 Q. You didn't have time to report to Kelvin.
24 A. No. That's not what I said.

Page 217

1  Q. Oh, okay. You didn't have time for what?
2  A. Don't misconstrue that.
3  Q. No. I'm asking. You didn't --
4  A. No. You did.
5  Q. -- think you had time for what?
6  A. You specifically made a statement.
7  Q. I'm asking you. What was it?
8  A. No.
9  Q. You didn't have time for what?
10 A. I didn't have time to be contacting
11 ServiceMaster repetitively about whatever that was.
12 I contacted them at appropriate times after I had
13 spoken with people. I always had time to contact
14 Mr. Walsh, as he was CC'd in all of the
15 communications that were sent off.
16 Q. Okay. So is there anything that you -- is
17 there any criticism of your performance that's
18 stated in the performance improvement plan that you
19 agreed with, or nothing?
20 A. My sense impression at the time when I was
21 given this document, I said that I didn't agree
22 with this.
23 Q. I understand. I'm asking you now, as you
24 sit here today, as you look at it, is there

55 (Pages 214 - 217)

Page 234

1  A. What I'm saying specifically is the
2 unlawfulness in it comes -- is that it's not
3 consistent with their policies and procedures and
4 protocols that they always use.
5  Q. Okay.
6  A. So I would have to understand or beg the
7 question, what made this become deviant from me?
8 And Mr. Walsh is aware of the fact that you're
9 supposed to always use Kenco forms.
10  Q. And how do you know that he's aware of
11 that?
12  A. Because it's an e-mail that says that he
13 was telling that to another employee that used some
14 paper that didn't have some Kenco information on
15 it.
16  Q. I see. So the memorandum of understanding
17 that you prepared didn't have to be on any
18 particular form or have any format, but the
19 performance improvement plan that Kelvin Walsh did;
20 is that right?
21  A. Well, I'm not saying that this paper
22 shouldn't have in retrospect. I probably should
23 have checked and honed down some --
24  Q. Stationery.

Page 235

1  A. -- stationery, you know, to put on there.
2 That was an error.
3  Q. Yeah. So is that invalid, then, the
4 memorandum of understanding? Is that unlawful that
5 you created because you didn't follow the protocol?
6  A. Well, no. Where it says -- I mean, they
7 don't even have a protocol for memorandums of
8 understanding.
9  Q. Oh, okay. But they do have a protocol for
10 performance improvement plans?
11  A. For performance management for employees.
12  Q. I'm talking about a performance
13 improvement plan. Where does it say --
14  A. Well, performance manage -- performance
15 improvement plans are subordinate to performance
16 management.
17  Q. Okay. And so is it your understanding
18 that no matter what the transgression that is
19 perceived by the manager that there's no way they
20 can go to a performance improvement plan without
21 having a written warning first? Is that your
22 understanding?
23  A. Well, if you speak in terms of no matter
24 what the transgression is, of course, some things

Page 236

1 that are egregious enough, you know, warrant --
2  Q. And who decides -- whose discretion is it?
3 Who decides whether -- what stage is appropriate
4 for a particular employee in terms of the
5 disciplinary action?
6  A. I mean, it depends what the infrastructure
7 is, but according to here -- and the documents that
8 you read to me earlier are referenced -- you said
9 that it was Kelvin Walsh.
10  Q. I'm asking you. Just I'm saying, who is
11 it that would have the decision-making to say,
12 here's how I want to discipline this particular
13 employee? You're saying that there's a specific
14 progressive discipline that they have to do? Is
15 that what you're saying, that they couldn't go to
16 the performance improvement plan first?
17  A. I'm not saying that they couldn't
18 necessarily go to the performance improvement plan
19 first. However, what I am saying is that there was
20 no benchmarks, goals or anything ever set forth in
21 advance of this performance improvement plan, so
22 quintessentially you're telling me that I'm not
23 doing something, and you never told me what I
24 should have been doing in the first place that was

Page 237

1 formidable or palatable to you to be acceptable.
2  Now, with that being said, again I
3 reiterate I've tried to communicate to him, and I
4 asked him, you know, how would you like these
5 things to occur, what would you like to do, you
6 know, I'm here to help, and, you know, nothing --
7 because nothing was being done, you know, in terms
8 of progressively moving toward achieving the goal
9 of what I was supposed to do and getting
10 information.
11  So I'm not saying -- I'm not saying that a
12 performance improvement plan is unlawful. I'm
13 saying the way that you administer things can give
14 a sense impression that there may be some
15 underbelly to that that is not necessarily aligned
16 with the performance improvement plan.
17  I mean, granted, they have a performance
18 management system, and performance management
19 systems -- like, for example, according to SHRM,
20 which is the Society of Human Resource Management,
21 you know, indicates that performance management
22 plans are directly correlated to performance
23 management. That's the industry standard.
24  So I'm not saying that a performance

60 (Pages 234 - 237)

Page 270

1  know what he's asking for?
2      A. Well --
3      Q. I thought you said you didn't understand
4  what he was asking for because the performance
5  improvement plan wasn't properly drafted.
6      A. No, ma'am. You're misquoting me.
7      Q. Okay.
8      A. What I stated was not that I misunderstood
9  what he said, but I -- my sense impression was how
10 am I going to improve on something that you never
11 discussed with me? I don't necessarily have to
12 agree with you to be respectful and to take into
13 consideration your wishes and desires, because I
14 understand, you know, that everybody has different
15 ways of doing things.
16     Just like since we've had engagement here,
17 there's been a time or two that I've felt like
18 you've been badgering me. You indicated that that
19 wasn't necessarily what you were trying to do. I
20 take it that you're probably a nice person, but I
21 don't really know you, and you don't know me, so we
22 operate on perceptions, so that would be the same
23 thing. So with that being said, I don't have to
24 necessarily agree --

Page 271

1      Q. Okay. So --
2      A. -- with --
3      Q. So even though you didn't agree, what kind
4  of changes did you make?
5      A. I tried to accommodate whatever it was
6  that he said and whatever it was that I wrote on
7  this piece of paper that I don't have in front of
8  me, that I said that I would do to try and, you
9  know, come up to speed or --
10     Q. Okay. Is there anything as you sit here
11 today specifically that you can state that you did
12 to change any of the behavior -- the performance
13 deficiencies that were identified in the
14 performance improvement plan?
15     A. You asked me that, and I answered that a
16 little while ago.
17     Q. And what was the answer?
18     A. I told you that I tried. Whatever it was,
19 I told you I couldn't give you any specifics.
20     Q. Okay. So you don't -- that's my question.
21 So you don't -- you can't come up with anything,
22 you can't think of anything specific that you did
23 in response to the performance improvement plan
24 with respect to your performance. Just generally

Page 272

1  you tried to be attentive.
2      A. I tried to be attentive on a case-by-case
3  basis. Everything is not regimented. It's not the
4  same. It's a lot of things that would always be
5  going on, and, you know, I continued as I had
6  always done to continue to keep Mr. Walsh in the
7  loop. I mean, it would just be disrespectful, you
8  know, just not to.
9      Q. It would be disrespectful not to do what?
10     A. To, you know, try to adhere to whatever
11 his request would be. I mean, what the -- you
12 know, I thought they were mandatory to not, so
13 anything that I did.
14     Q. Because he's the manager. He's your
15 manager.
16     A. Right.
17     Q. And he gets -- it's his perception that's
18 important of your work, isn't it?
19     A. Doing -- what is important to me is doing
20 what is lawful.
21     Q. Of course.
22     A. And his perception would be, you know,
23 secondary to that.
24     Q. Sure.

Page 273

1      A. Any other directives that I had got
2  from --
3      Q. Okay. Aside from --
4      A. -- someone higher.
5      Q. -- unlawful activity, putting that aside,
6  as the manager, as the GM, it was Kelvin Walsh who
7  would decide whether you were meeting expectations
8  or not, right?
9      A. If expectations had have been given, then
10 that would be a true statement.
11     Q. Okay. So it's your testimony that no
12 expectations were given to you in terms of your
13 performance. Is that what you're saying? He
14 didn't articulate what he wanted from you.
15     A. Not until that performance improvement
16 plan came.
17     Q. Okay. So what were you doing, then, up
18 until the performance improvement plan? If you had
19 no expectations and no guidance, how were you
20 spending your time?
21     A. I was spending my time -- well, first of
22 all, I was hired because I had the understanding of
23 how to do a vertical start-up of a quality
24 management system. I was also under the impression

69 (Pages 270 - 273)

Page 303

1  that.
2         And I wanted to clarify because we had
3  talked about on Page 2 of this document --
4     Q.   Deposition Exhibit Number 5?
5     A.   Yes, ma'am.
6         It seemed that the sense impression that I
7  got from you in regards to a statement that I had
8  made in here, it wasn't directed to ServiceMaster
9  about imposing litigious or legal action against
10 them.  It was -- the statement was clearly, at
11 least from my perspective, in regards to the
12 protection of the company and the goodwill for the
13 lack of sanitary conditions and the situations that
14 might arise out of that.
15        I was not suggesting to them in any shape
16 or fashion that we would take legal action against
17 them.  It's just that I was trying to impress upon
18 them that if these things weren't corrected and
19 something arose out of that, it could pose a
20 potential legal situation for the company.  And
21 because in knowing that this is a situation that
22 could occur, I was informing them that we needed to
23 make sure that as a vendor they needed to protect
24 the goodwill of Mars and the facility.  So that was

Page 304

1  what my statement was more relegated about than
2  perhaps my interpretation of what you were -- the
3  sense impression that I got. But I wanted to just
4  clarify that I was not threatening them with any
5  legal action, but that we wanted to avoid any legal
6  action that may arise out of these unsanitary
7  conditions or not following proper protocol or
8  unsafe conditions.
9      Q.   And so you are referring to the sentence
10 or at least -- I guess I'll read the whole
11 sentence. You have -- it says, Be it known as a
12 matter of concern that the goodwill and business
13 reputation of Kenco-slash-Mars can be adversely
14 affected and damaged by not fulfilling the current
15 quality mandates and can result in serious illness
16 or even death, semicolon, therefore, comma,
17 prompting unwarranted litigious exchanges.
18     A.   Correct.
19     Q.   That's what you're referring to?
20     A.   Yes.
21     Q.   And could you see how somebody might
22 interpret that as litigation against ServiceMaster?
23     A.   Can I read that again?
24     Q.   Sure.

Page 346

1    Did you understand it when he said to you
2    I want you to relax your standards? Did you
3    understand it?
4    A.    Yeah. My sense impression that I got at
5    the time and what I can recall is that I was
6    supposed to not be either concerned -- as concerned
7    and/or perhaps just turn a blind eye to the
8    situation. I'm not sure specifically what it was,
9    but it was something other than executing my job
10   function.
11   Q.    And so as you think about it, was it your
12   sense impression that he said relax your standards
13   or did he actually say -- is that a quote?
14   A.    Oh, no. He specifically said that.
15   Q.    Okay. And did you have any other
16   conversations where -- I think you said no other
17   conversations about that relaxing the standards
18   with Kelvin Walsh?
19   A.    No.
20   Q.    And so what do you say that you were
21   retaliated against?
22        That happened in June, that conversation.
23   When were you retaliated against?
24        Are you saying that the performance

```
                                                    Page 380
 1   mean it was -- it was a sense impression that
 2   something -- you know -- was not right.
 3       Q.   Or clicking between the two of you?
 4       A.   I wouldn't even say it was a clicking.
 5       Q.   Well, it sounds like you had communication
 6   issues with Kelvin Walsh; is that fair to say?
 7       A.   I don't know because when I spoke to
 8   Kelvin and when we would be speaking, he would most
 9   times seemingly at least pretend to understand the
10   conversation.  Most times when we were speaking, it
11   was with someone else.
12       Q.   So most of the times -- are you saying
13   that most of the times or 90 percent of the times
14   your conversations with Kelvin were okay, you
15   didn't feel that you were being treated
16   differently?
17       A.   No, I didn't -- I didn't -- I didn't say
18   that.  I said that --
19       Q.   You said 90 percent of your conversations
20   with Kelvin were what?
21       A.   I didn't say 90 percent.  You used that
22   term.  I didn't say that.
23       Q.   Okay.  I thought you did.  I'm sorry.
24            Most of your conversations with Kelvin,
```

```
                                                     Page 392
 1   him, what would you say?  Was he confused or
 2   ignorant or something else?  What was your sense
 3   impression?
 4        A.   My sense impression was -- well, let me
 5   say this.  According to the federal mandate, you
 6   have to have a certain amount of education and
 7   experience.  He didn't have either, so...
 8        Q.   He didn't have either in terms of what?
 9        A.   Education.
10        Q.   Education in terms of what?  Education
11   for?
12        A.   For the compliance.
13        Q.   For the compliance?
14        A.   Right.  And it's a specialized area.
15        Q.   Okay.  So was it an area then that would
16   be a good idea for you to educate him on since you
17   were reporting to him?
18        A.   Absolutely.  I tried to educate him every
19   step of the way.  I provided him with information
20   to try and shirr up wherever any gaps were.
21        Q.   And you know that he -- are you aware that
22   he believed that the communications that you were
23   producing were not -- were not clear?
24        A.   He never said that to me.
```