E-FILED
Friday, 22 December, 2017 02:16:59 PM
Clerk, U.S. District Court, ILCD

# EXHIBIT B

Page 210

1 something needed to be done or what the mandate
2 was.
3      I mean, obviously -- I mean, I mean, there
4 is -- it's an authority, and it has to be cited,
5 and I didn't continue to want misunderstandings
6 about I'm asking for something or I want something.
7   Q.  Okay.  And so is it your position, then,
8 that you disagree with Kelvin Walsh, that you
9 thought that your written communications were
10 understandable and clear?
11   A.  Again, every communication, the ones that
12 you have highlighted are not reflective of all the
13 communications that have gone on.
14   Q.  Ms. Madison, I understand we don't have
15 all the documents here.  I'm asking you whether you
16 thought you were an effective communicator when you
17 worked at Kenco.  Did you think you were effective?
18   A.  I think that I addressed the situations on
19 an as-need basis.
20   Q.  Okay.  And when you addressed the
21 communications, you thought your communication --
22 your e-mails and your communications were clear and
23 concise; is that right?
24   A.  I believe that I addressed the situation

Page 211

1 based upon --
2   Q.  Okay.  And so you don't think -- let me
3 say it this way.  You don't think you had any need
4 to improve on your communication skills; is that
5 right?
6   A.  We can all improve on anything that we do.
7 And matter of factly, in the documents that seem to
8 be missing, I indicated that, you know, if there
9 was something, I would welcome, you know, whatever
10 information or feedback that would allow me to meet
11 his particular style.
12   Q.  Okay.  Ms. Madison, there's -- the
13 competencies that Mr. Walsh was critical of in your
14 performance improvement plan are listed in
15 Deposition Exhibit No. 4, working collaboratively
16 with fellow site managers, demonstrating commitment
17 with compassion, communication with leadership,
18 working outside of the outlying job
19 responsibilities, effective communication, leading
20 others, time management, interpersonal skills and
21 project management.
22      Do you agree that -- is it your position
23 that this is all false, or do you agree that you
24 had any areas that needed improvement that are

Page 212

1 addressed in this performance improvement plan?
2   A.  I don't know what areas I needed
3 because -- improvement on because I never had any
4 benchmarks to reflect where a margin of improvement
5 could have come.
6   Q.  Okay.
7   A.  Just out of --
8   Q.  Okay.  Well, you have -- you have a
9 performance improvement plan, and it lays out here
10 with examples what Kelvin Walsh's opinion was of
11 your work product as of July 8, 2013.  You disagree
12 with him?
13   A.  Yeah.  I said that.  I signed on the back.
14 I said I didn't agree.
15   Q.  That's right.  Is there anything in
16 Deposition Exhibit No. 4 that you agreed with that
17 he thought you could improve upon, or is everything
18 here just not fair?
19   A.  Well, again I'm going to state as human
20 beings there is no person that is without -- who --
21 and that cannot, again, be improved upon, but
22 improvement usually is predicated on some type of
23 benchmark, goal or attribute.  Matter of factly, I
24 responded to this --

Page 213

1   Q.  We'll get to that.
2   A.  Right.  And I even asked during -- what
3 was he talking about.  For example, you said with
4 other managers.  I worked closely with Bill
5 Schwerin and Mr. Len in regard to the things that
6 needed to be done, and I had to deal with
7 Mr. Schwerin almost on an everyday basis, and he
8 was very prompt in getting me back the materials
9 that I needed in regards to the facility.
10      So I wasn't quite sure, just as I'm not
11 sure now, what other managers he would be talking
12 about because it would only be himself, Mr. Len and
13 Mr. Schwerin that would have been the primary
14 persons that I would have needed to have gotten
15 to -- to have dealt with.
16   Q.  Well, I thought you said that you spent
17 two days with Leonard and Kelvin Walsh talking
18 about the performance improvement plan.
19   A.  Yeah.  We did.
20   Q.  Okay.  And that was never discussed in
21 that conversation?
22   A.  I never got an answer.
23   Q.  So you asked who were the managers --
24   A.  Right.

Page 230
1  there.
2  Q. Okay. So let's just mark it so we can --
3  A. Sure.
4  Q. -- refer, okay? So --
5  A. It should be similarly situated.
6  Q. Okay.
7  A. That seems to be a job description, but it
8  should be similarly situated in how it's set up.
9  MS. MORAN: Okay. Just -- let's just get this.
10  THE WITNESS: Sure.
11  MS. MORAN: Okay? So this is No. 8; is that
12  right?
13  THE COURT REPORTER: Yes.
14      (Whereupon, Madison Deposition
15      Exhibit 8 was marked for
16      identification as of 05/24/2017.)
17  THE WITNESS: So --
18  BY MS. MORAN:
19  Q. Okay. So just before you -- you know,
20  you're now looking at Deposition Exhibit No. 8, and
21  it looks like a job description for the quality
22  engineer; is that right?
23  A. Yes.
24  Q. Okay. And so it's a job description. Is

Page 231
1  that a job description that you were talking about
2  earlier that you prepared?
3  A. That I assisted in preparing. To be
4  clear, each person assisted in preparing their own
5  job description because they had to delineate the
6  responsibilities and things that they did, so I
7  just wasn't the only person --
8  Q. No. I understand. But you were the
9  quality engineer?
10  A. Right.
11  Q. And so this is a document that you said
12  you created with assistance?
13  A. Correct.
14  Q. Okay. And who assisted you on this?
15  A. Kevin Moses.
16  Q. Okay. And so what does that have to do
17  with your performance improvement plan?
18  A. Okay. So the document at the top, it has
19  a specific styling under -- according to the
20  quality management system documentation policy
21  where every document that -- procedure, protocol,
22  form at the company is to have a document number,
23  is to have a title, is supposed to have a date of
24  the person who authored it, and it references back

Page 232
1  to there.
2      So the styling at the top is similarly
3  situated to perhaps a way the document should look,
4  and a form would be hyphenated with a one or a two
5  or something behind the actual policy number, and
6  this document here does not reflect that at all.
7  Q. Yeah. And so -- but the performance
8  improvement plan is not a policy.
9  A. Oh, it is a policy because they have a
10  performance management policy on Appendix F.
11  Q. Well, that's a policy. I'm saying, the
12  performance improvement plan itself is not a
13  policy, right?
14  A. Well, any policy, procedure or plan, form
15  has to be associated under the governing system
16  with a specific policy, so you just can't have a
17  plan and not have a policy.
18  Q. Okay. So it's your understanding, then,
19  that it's, what, unlawful to -- for an employer to
20  put together a performance improvement plan for an
21  employee, just put it together on a piece of paper,
22  but if it doesn't have these -- this top format,
23  then it's unlawful? Is that what you're saying?
24  A. Well, I'm not saying that it has to have

Page 233
1  this top format because I'm saying --
2  Q. What are you saying?
3  A. I'm saying what is unlawful is you have a
4  regimen of how you execute your policies,
5  procedures and protocol, and if you deviate from
6  that, that is where that causes an issue, an
7  inference of inconsistency.
8      ==Matter of factly==, Kenco has a policy and
9  procedure that talks about exceptions, and if you
10  do an exception that deviates from any policy,
11  procedure or protocol, you have to have an
12  associated business case with that, and you have to
13  have it signed off, and it has to be vetted before
14  it occurs because it also says somewhere in that
15  policy that I'm speaking of that you are to have --
16  all documents are supposed to be correlated to a
17  specific -- to the specific matrix that I'm
18  speaking of under that policy.
19  Q. Okay. So is what you're saying that every
20  time an employer in Illinois wants to discipline
21  somebody -- or let's just say Kenco. Every time
22  Kenco issued written discipline, it had to go and
23  do it by a certain form. Otherwise, it would be
24  unlawful. Is that what you're saying?

Page 250

1  could he answer the question? That's an anomaly.
2  Q. I don't know. Why wouldn't you ask him?
3  I just got the audit report; I've got some
4  questions about the audit report. Why wouldn't you
5  go to Kelvin first before you go to Mars?
6  A. Well, actually Matthew Chick was the
7  auditor, so he would be the one who would
8  specifically be able to delineate to me exactly --
9  Q. Matthew Chick was an employee of Mars --
10  A. Correct.
11  Q. -- correct?
12  A. And so Mars, Mr. Chick, is the one who
13  conducted the audit at the Mars Manteno facility.
14  Q. And so why did you think that you had the
15  authority to engage -- introduce yourself to
16  Mr. Chick and ask these questions without
17  conferring with Kelvin Walsh first when he
18  specifically said in his performance improvement
19  plan just a couple of weeks earlier that you needed
20  to consult with him and communicate with him first?
21  A. I did consult with him. And also
22  Mr. Chick asked me if I had questions to ask.
23  Q. I understand, but you don't report to
24  Mr. Chick. You report to the GM, and the GM said,

Page 251

1  I want you to confer with me first, and you didn't.
2  Did you not think about it, or did you purposefully
3  decide that you were not going to confer with
4  Kelvin Walsh before you drafted an e-mail to
5  somebody at Mars?
6  A. Well, the facility is Mars, and that is --
7  Q. Mars is the customer, right? Mars is who
8  we are -- who Kenco is supplying. What does Kenco
9  do? What is your understanding of what Kenco does?
10  A. Kenco is a management company.
11  Q. And what do they do?
12  A. They manage facilities.
13  Q. Okay. And so what were they doing for
14  Mars at the Manteno plant?
15  A. Managing the facility.
16  Q. Okay. And so they're -- it's Mars's
17  facility, right? It's a contract between Mars and
18  Kenco, correct? Do you know? Maybe you don't
19  know.
20  A. Yeah.
21  Q. You do know.
22  A. Yes, yes.
23  Q. Okay. So what gives you the authority to
24  reach out to somebody at Mars without consulting

Page 252

1  with your GM beforehand when you've been told in a
2  performance improvement plan consult with the GM?
3  A. Okay. Everybody at the facility talks to
4  people from Mars, not just myself. Matter of
5  factly, they have a regional distribution manager
6  that was on site, Robert Coffey, and we all would
7  have meetings and things of that nature. So my
8  action was nothing inappropriate or inconsistent
9  with the habits that were conducive to the Mars
10  Manteno facility.
11  And pointedly, an individual, as I stated,
12  Tari Hart, was the individual who facilitated this
13  request because everybody was under the impression
14  that this information was not at the Mars Manteno
15  facility, and we all needed this information in a
16  certain sense to move forward with the projects
17  that were online.
18  Q. Tari Hart worked for who, which company?
19  A. Ultimately everybody worked for Mars. It
20  was a pass-through.
21  Q. No.
22  A. Yes.
23  Q. You were employed by whom?
24  A. It says here on the offer letter that I

Page 253

1  worked at the Kenco/Mars --
2  Q. Right. I understand. Kenco provided the
3  services for the Mars facility, right?
4  A. Uh-huh.
5  Q. And your paycheck came from Kenco? Do you
6  know who your paycheck came from?
7  A. Yeah. My paycheck was issued to Kenco,
8  but Mars --
9  Q. Issued to Kenco or from Kenco?
10  A. No. From Kenco to me, but the money was a
11  pass-through from Mars to Kenco.
12  Q. So what significance does that have with
13  your case?
14  A. That ultimately, I mean, Kenco was a
15  manager.
16  Q. Okay. So if Kenco was a manager for Mars
17  and your manager, GM, said, I don't want you
18  communicating with Mars about anything significant
19  without consulting with me --
20  A. He never said that until that day.
21  Q. Oh, okay. Before that in the performance
22  improvement plan, you didn't understand the
23  conversation in the performance improvement plan to
24  say that you shouldn't be communicating with