E-FILED
Monday, 26 March, 2018  10:38:01 AM
Clerk, U.S. District Court, ILCD

# EXHIBIT III

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

Edith McCurry,

          Plaintiff

          v.

Kenco Logistic Services, LLC, a Tennessee Limited Liability Company, Mars, Inc., Kelvin Walsh, Mike Manzello, David Jabaley, Tammi Fowler, Lori Varvel and Mario Lopez

          Defendants.

Case No. 2:16-cv-02273-CSB-EIL

Judge Colin Stirling Bruce

Magistrate Judge Eric I. Long

## PLAINTIFF'S SUPPORTING EVIDENCE TO PLAINTIFF'S MOTION TO COMPEL DISCOVERY FROM DEFENDANT'S LORI VARVEL, MIKE MANZELLO, KELVIN WALSH, DAVID JABALEY, TAMMI FOWLER, MARIO LOPEZ AND KENCO LOGISTICS

Plaintiff, Edith McCurry, pursuant to Federal Rules of Civil Procedure 26 and 37 respectfully submits the following Supporting Evidence in support of Plaintiff's Motion to Compel discovery responses from Defendants' VARVEL, MANZELLO, WALSH, JABALEY, FOWLER, LOPEZ AND KENCO, and moves this Honorable Court to compel complete responses to the following attached request for discovery.

1. On August 1, 2017 Defendants were served Request for Production of Documents and Interrogatories to Defendants Varvel, Manzello and Kenco.

2. Defendants' counsel requested on September 5, 2017 additional time to on or before September 19, 2017 to fulfill the request.

3. Defendants' counsel stated in writing that if I objected or had questions regarding the request contact her. **Exhibit A**

4. Defendants' counsel confirmation to acceptance was not contacting her regarding the request.

5. Defendants' counsel provided interrogatory and production responses on September 22, 2017. **Exhibit B**

6. Defendants' counsel only produced Bate Stamp numbers from 1176-1531 on September 22, 2017. **Exhibit C**

7. After receiving Defendants' responses, on or about September 22, 2017 Defendants were asked to reconsider their answers, as most of their answers were objections, vague, incomplete and failed to offer specific or particularized answers or reasons for objections or a combination of the above.

8. The initial request was made of Defendants on October 28, 2017 to revise their answers.

9. I followed up again with another request; neither did I get the revised and compliant information as requested; nor were any attempts from Defendants counsel made to amicably resolve the issues at hand, despite being made aware that a situation existed.

10. However, what did happen instead of Defendant revising their answers or amicably trying to resolve these issues in 'good faith' Defendants motioned the court for a protective order regarding discovery on November 6, 2017.

11. The court granted the Defendants' motion. I never received a copy of Defendants motion for a protective order. I became aware of a protective motion when I called the Clerk's office, but I thought it was the same protective motion that was brought before the court in September of 2017, docket 52.

12. During the status call of November 9, 2017, a discussion came about responding to the motion; a motion that I did not yet have. My understanding was that when I got the motion I was to respond to it. I never received the motion from Defendants counsel by mail, as I have every other piece of correspondence. As a result, I did not respond to the motion.

13. Recently, I found a copy of the motion attached to a series of emails that were sent by Defendants counsel on November 6th and 7th 2017; it appears that the emails were cached together. **Exhibit D**

14. It also seems that the emails were tethered and not sent individually, perhaps causing the email to not be viewed, as if it were a separate and distinct email.

15. I verified all the emails to my hard copies of the documents and found that I had not received that information.

16. The Certificate of Service on the motion indicated that it was to have been served by mail. **Exhibit E.**

17. I also had explained to Defendants counsel that email was not the best way to contact me. The reason being that I live in a rural community and often times more than not the internet is interrupted due to weather or poor reception amongst other things.

18. Matter of factly, Defendants counsel was made aware of this in July of 2017 see attached **Exhibit F.**

19. Failing, to get this motion prevented me from responding and put me at a tremendous disadvantage that has caused me severe harm and prejudice in this matter.

20. On or about October 11, 2017, the remaining Defendants were served discovery requests that included interrogatories and document production request.

21. At that same time Requests for Admits were served to Defendants **Exhibit G.**

22. Supplemental discovery requests were made because of the lack of production on September 22, 2017 refer to **Exhibit C.**

23. Under the immediate and current circumstances of Defendants' recent and similar mission to obtain discovery, without a doubt it is established that Defendants are aware of the rules and the deficiencies they have presented to me, as they have requested the court to compel me to comply with these very same rules that they have broken just several weeks after making their request from the court.
   In addition, Defendants' counsel has on an ongoing and regular basis suggested and or urged the court to impose sanctions upon me because of these supposed deficiencies and alleged malapropisms or for being amateurish.

24. Just as Defendants stated in its motion to compel that they cannot move forward with discovery because of these deficiencies the same holds true for Plaintiff.

25. Defendants go onto say in their memorandum that they are entitled to discovery. Plaintiff is also entitled to discovery as well.

26. Matter of fact the rules establish the fact that every party is entitled to discovery.

27. I cannot imagine that through Defendants' rose colored glasses that it overlooked or failed to realize that the same measures applied to me in their conquest applied to them

3

and that essentially, I am looking for the same things in the same way that they are from a different vantage.

28. Especially because they are in possession of information that I need and that I know that they have because they are required to have it, as a matter of law. As opposed to the information that they sought from me that I did not have, that I had to get from them, that they already had in their possession, but would not seek to obtain it internally, that I gave back to them, after I gave it to them.

29. Without a shadow of a doubt there should be no discrepancy in the information Defendant gave me and what they have.

30. I am sure that the Defendants are to be in possession of this information as the information requested is mandated by law and Defendants were notified that they were to retain records relative to this case.

31. Defendants and Defendants' counsel have litigated other employment cases and have had sufficient knowledge in what the requirements are in terms of the civil rules of procedures, spoliation, record management and retention.

32. Defendants' counsel, Jackson and Lewis and it former counsel Miller & Martin, specialize in employment law.

33. Defendant Kenco's V.P. of Legal, Elliott, specializes in employment law and had been Defendant Kenco's legal counsel for a number of years prior to his employment with Defendant Kenco.

34. I am also sure that Defendant Kenco has possession of this and other information, as Defendants provided me with information relative to an employee who was not named as a defendant nor did I request any information pertaining to this employee who was not named as a Defendant in this matter Defendants Bate Stamp 1292-1333.

35. Clearly, if they can produce information about an employee that was not named in the complaint, certainly the other information that they were mandated by various laws to retain should be in their possession and should be produced.
This production of information is an indictment that Defendant Kenco is in possession of these and other requested information and documents.

36. Failing to have this information is an obstruction and impediment to justice.

37. As you can see from the attached responses **Group Exhibit H**, nearly every answer was objected to or poses some generalized language for not fully answering the request.

38. Defendants answers are not in accord with Rules 26 and 34; Defendant should have stated with specificity the grounds for the objections, what was being objected to as well as, they did not state whether any responsive materials were being withheld on the basis of that objection.

39. For example, Varvel and Manzello were asked questions relative to their job duties and functions. They objected and refused to provide adequate responses. Varvel interrogatories page 3 # 3 and Defendant's Bate Stamp document 1268-1269, curriculum vitae's, do not reflect the duties, tasks and responsibilities of Varvel for Defendant Kenco or during the relevant times nor does it reflect what is outlined on her social media page.

40. Additionally, their job functions and duties are relative, as they both were persons who had authority to make and did make employment decisions, just as Fowler, Jabaley, Walsh, and Lopez.

41. Varvel and others made adverse employment decisions towards me.

42. Another example is integratory number one (1) for Kelvin Walsh, Defendant Walsh and his counsel refused to provide basic information regarding Walsh's employment history, job titles, tasks and duties amongst other queries because he is represented by counsel.

43. There is no correlation of Walsh's working history and other relevant information to his current legal counsel, nor were there any client-attorney privileges established and or associated with the information requested.

44. Defendants counsel made this same proclamation for the other Defendants and those persons answering the discovery requests.

45. It is believed that the named Defendants have some type of social media platform that discusses to some extent the information requested from the Defendants.

46. The discovery is based upon Defendant Kenco's policies, procedures, best practices, protocols and forms that governed the employment relationships of Kenco and Mars and the Mars Manteno employees.

47.    According to Kenco in its handbook, it states that this information is "just a click away."

48.    Therefore, their responses that indicate that it is burdensome and so forth contradict the printed information in their hand book. **Exhibit I page 9**


# BACKGROUND

49.    In 1999 the Mars Manteno Facility was erected at 1125 W. Sycamore in Manteo, IL. for the purpose of the receipt, packaging, storage and distribution of Mars, Inc. products.

50.    I was hired at the Mars Manteno Facility in June of 1999.

51.    Since 1999, I performed HR/Accounting/Office duties at the Mars Manteno Facility until 2015.

52.    From 1999-2001, I was solely responsible for compliance to the current employment laws, implementing them and applying them correctly.  These laws included state and federal laws; the relevant laws were the: Fair Labor Standards Act (FLSA), Family Medical Leave ACT (FMLA), The Americans with Disability Act (ADA), Employment Retirement Income Security Act (ERISA), Health Insurance Portability and Accountability Act (HIPAA), Title VII of the Civil Rights Act, Federal Insurance Contributions Act (FICA), Occupational Safety and Health Act (OSHA), Equal Employment Opportunity (EEO) reporting, The Workers Adjustment and Retraining Notification Act and other laws as outlined in the attached document. **Exhibit 1**

53.    I was also responsible for recruiting, hiring/onboarding of employees, employee's benefits, human resource/employee issues including discipline and investigations into employee issues, on the job injuries, workers compensation, termination, unemployment, disability amongst other things.  **Exhibit 2**

54.    Mars, Inc. had rules, regulations, policies, procedures and protocols that were implemented at the Mars Manteno Facility.

55.    I was also responsible for the policies, procedures, and protocols of the Mars Manteno Facility.

56.     Employee handbooks were created for the application, dissemination and interpretation of such policies, procedures, and protocols to the employees of the Mars Manteno Facility that complied with the current laws, Mars, Inc. and those of 4T's management.

57.     I attended staff meetings and was the liaison between employees and management.

58.     I am very familiar with the policies, procedures, and protocols of the Mars Manteno Facility, as well as, with the current employment laws.

59.     The Mars Manteno Facility was audited by Mars, Inc. for compliance on an ongoing and regular basis.

60.     The facility was also audited by other 3rd parties, such as the Harrington and other independent parties for compliance to a number of standards.

61.     Prior to 2001, I solely performed the HR/Accounting/Office duties at the Mars Manteno Facility.

62.     In 2001, I became part of a two (2) person combined department that daily executed HR/Office/Accounting functions.

63.     In 2001, Leonard "Len" Szplett became the HR/Accounting/Office Manager.

64.     Len and I continued to operate the HR/Accounting/Office department together.

65.     Len and I performed the various tasks within the HR/Accounting/Office department and would perform them interchangeably.

66.     Len and I performed every aspect of Human Resources.

67.     Len and I have the same educational discipline.

68.     Len, Lori and I have the same educational levels.

69.     Lori has less human resource experience than Len or I.

70.     Lori has no special certifications as requested by Defendant Kenco.

71.     At the apex of 4T's Management of the Mars Manteno Facility, Len and I managed close to 500 employees, including temporary employees and an operating budget in excess of $20 Million.

72.     In 2000 Mars began instituting various audits at the Mars Manteno facility.  Mars audited all of their warehouse facilities, as well. Group **Exhibit 3 of various Mars Audits.**

7

73. The warehouse continued to grow and in 2007, the Co-Pack operation of the facility was split off and was now managed by Jacobson Companies.

74. In 2008, Len and I created/revised the employee handbook that superseded the previous handbooks that complied with the newly implemented rules, regulations, policies, procedures and protocols of Mars, Inc. and other mandates.

75. The handbook was proofed for legal compliance by Seaton, Beck and Peters, P.A. **Exhibit 4**

76. On February 15, 2013, Terri Tyson of 4T's notified us that she would be retiring and that she was working with another management company to take over the facility on April 21, 2013.

77. Terri Tyson indicated that it was expected that many people would continue to work at the facility essentially performing the same duties.

78. The employees of the Mars Manteno facility were informed that we would continue to perform are specific job functions.

79. We were also informed that some job titles would change to accommodate the new management company's existing timekeeping clock categories. **Exhibit 5**

80. On April 21, 2013, Kenco Logistics began managing the Mars Manteno Facility.

81. Len and I continued to perform are respective HR/Accounting/Office duties at the Mars Manteno Facility.

82. Upon hiring we were given a Kenco Employee Handbook. **Exhibit I**

83. Kenco represented themselves as their quality system being based upon ISO.

84. This was memorialized in Defendant Kenco's 2010 Social Responsibility report **Exhibit 6**

85. Len now reported to Kenco corporate's HR. **Exhibit 7 Defendants Bate Stamp 1335-1336 this was also Defendants Exhibit and is cross-referenced with Exhibit 16 page 38 Exhibit Q.**

86. Defendant Kenco analyzed all of the job descriptions of the employees and in July of 2013, the job descriptions were finalized for the employees of the Mars Manteno facility according to the ISO standards.

87. I am aware that law mandates that jobs are characterized by the functions and duties of the position and not the title.

8

88.    After reviewing my job description, Len signed off on my job description on July 29, 2013 and my performance evaluation. **Exhibit 2 Defendants' evidence number 313-315 and 1407-1410**

89.    My job description was vetted by corporate, according to company policy, prior to Len signing off on it.

90.    My job description outlines in detail my job functions and tasks at the Mars Manteno Facility. My job description reflects the job posting for my position by Defendant Kenco. **Exhibit 8**

91.    I continued to perform the job duties and tasks as I had prior to Kenco managing the Mars Manteno facility.

92.    I became familiar with Kenco's policies, procedures, protocols and best practices. Kenco's policy, procedure, protocol and best practice was to have job descriptions for their employees see **Exhibit 9.** This same policy references the site having an HR Administrator. Kenco offered this same policy that references job descriptions and the responsible person for such as their Evidence to the Illinois Department of Human Rights and EEOC in Vernon Henry's charge 2015CF0034-21B-A42027

93.    The policies, procedures, protocols and best practices of Kenco relative to the Mars Manteno Facility do not contain any proprietary or confidential information relative to any patents, recipes, trade secrets, processes or confidential information.

94.    Kenco's policies, procedures protocols and best practices encompassed those of Mars, Inc., prevailing rules and regulations of the government and those outlined by Kenco the Manager.

95.    I executed the new management's policies, procedures, protocols, forms and best practices just as I had previously in compliance with the prevailing rules and regulations of the government and Mars, Inc.

96.    Employees of the Mars Manteno facility engaged me in the capacity of HR Administrator; reporting employee issues and concerns of every kind.

97.    At all times, I responded and acted in the capacity of HR Administrator.

98.    I was listed on Kenco's website as the HR Administrator. **Exhibit 10 Defendants Bate Stamp 364--366**

99.    Mary Madison engaged me in that capacity and reported to me discriminatory treatment and various incidents that violated the law and company policy several occasions.

100.    Kenco corporate was aware of the discriminant treatment received by Madison.

101.    Kenco's outside legal counsel, Karen Smith of Miller & martin, spoke with me regarding the report of discriminant treatment that Mary Madison had made to me. **Exhibit 11 Defendants' Bate Stamp number 875.**

102.    I affirmed to Kenco's outside legal counsel that Mary Madison had reported discriminatory treatment.

103.    I also stated that I too had been subjected to various forms of discriminatory treatment at the Mars Manteno Facility.

104.    After speaking with Karen Smith of Miller and Martin, outside legal counsel for Kenco, I began being subjected to adverse actions and employment decisions, such as: being characterized, as a clerk in November of 2013, and someone who was unable to accept reports of discrimination in Kenco's position statement to the Illinois Department of Human Rights and EEOC. **Exhibit 12 page 12 paragraphs 1 & 2.**

105.    Kenco affirmed in that same document that Len was the Office/HR Manager. **Exhibit 12 page 12 paragraph 1 line 2 cross-referenced with and page 15 of 17 IDHR findings Witness list Section D.**

106.    Kenco also stated that Len had first-hand knowledge of the Madison matter and listed him as having that knowledge.

107.    Karen Smith of Miller and Martin and Kenco failed to state to the Illinois Department of Human Rights and EEOC that I had firsthand knowledge regarding the Madison matter.

108.    Karen Smith of Miller and Martin and Kenco intentionally ostracized and alienated me from the Madison administrative preceding's because I affirmed that Madison had reported discriminatory treatment from the General Manager.

109.    Karen Smith of Miller and Martin and Kenco intentionally marginalized me to be a clerk to avoid liability in the Madison administrative preceding's at the Illinois Department of Human Rights and EEOC.

110. Essentially, I was mischaracterized as a clerk, a substantially lower position, to aid and abet Defendants in getting away discriminating against Madison and other employees.

111. Defendants committed a fraudulent act when they misrepresented me and my duties the Illinois Department of Human Rights and EEOC.

112. Ultimately, Defendants committed a fraudulent act on the administration of justice and the court through this intentional misrepresentation.

113. Initially, I was not listed or invited to be a witness, with firsthand knowledge, at the Madison Fact Finding Conference for Illinois Department of Human Rights and EEOC, by Karen Smith of Miller and Martin and Kenco despite having firsthand knowledge and receiving the complaint of discrimination from Madison.

114. During the Madison Fact Finding Conference at the Illinois Department of Human Rights for the Illinois Department of Human Rights and EEOC, Len and I signed in with our respective jot titles.   Len as the HR/Accounting/Office Manager and myself as the HR Administrator. **Exhibit 13 Defendants Bate Stamp number 368**

115. During the Madison Fact Finding Conference, I affirmed that I had received the report of discrimination and that I too had been subject to discriminant treatment.

116. Around the time of the Madison Fact Finding Conference, I was instructed by Tammi Fowler, Senior Manager of Employee Relations for Kenco, to no longer handle employee issues, but now forward all employee issues that I would receive to her, as she would handle them moving forward.

117. This was another adverse retaliatory employment decision imposed upon me- a reduction in duties, marginalization, and ostracism.

118. I also believe that this was in retaliation for stepping up and saying that Madison had reported discriminant treatment, as well as, also stating that I had received discriminant treatment as well.

119. Tammi Fowler was located at Kenco's corporate office in Chattanooga, TN.

120. As instructed, employee issues were forwarded to Tammi Fowler.

121. Employee issues/complaints were not being attended or addressed.

122. Employees were being misled into believing that their issues were being addressed and addressed fairly and equitably.

123.    This was a breach in Defendant Kenco's legal obligation and duty to its employees, to have a work environment free harassment, hostility, racial tension and discrimination amongst other things.

124.    The work environment became so racially charged and intense that management and other employees felt that they could physically and verbally threaten African American employees or those that opposed the discrimination or adverse treatment of African Americans, as well as, they also felt it was acceptable to alter the terms and conditions of the individuals employment with regards to pay, fringe benefits, shift preferentialism, application and interpretation of the law, as well as, other acts of employment inequality and discrimination.

125.    Kenco corporate did nothing to correct, deter or circumvent the discriminant actions and behaviors of the onsite management and the employees of the Mars Manteno Facility it managed, as well as, those employees it managed in Chattanooga.

126.    Despite being aware of the actions being taken, Kenco continued to engage in their culture of systemic discrimination.

127.    A number of employees also filed internal complaints on the "supposed anonymous hotline"

128.    A number of employees began filing formal charges of discrimination with the Illinois Department of Human Rights and EEOC.  A few of those persons are listed below.

129.    Some of Nathan Doss' case numbers are: **Group Exhibit 14**

      **a.**     IDHR 2014CF2858 and EEOC 21B-2014-01536

      **b.**     IDHR 2014CF3057 and EEOC 21B-2014-01685

      **c.**     IDHR 2014CF3161 and EEOC 21B-2014-01747

130.    Tracy Davis case number: **Exhibit 15**

      **a.**     IDHR 2014CF3162 and EEOC 21B-A41748

131.    One of Jacque Morrison's case number: **Exhibit 16**

      **a.**     IDHR 2015CF0008

132.    Some of Vernon Henry's case numbers: **Exhibit 17**

      **a.**     IDHR 2015CF0034 and EEOC 21B-A42027

      **b.**     IDHR 2015CF1315 and EEOC

       **c.**      IDHR 2015CF2497 and EEOC 21B-A511360

133.    One of Morris Tyson's case numbers:

       **a.**      IDHR 2015CF0699 and EEOC 21B-2014-02563

134.    Scott Marksteiner case number: **Exhibit 18**

       **a.**      IDHR 2015CF1054 and EEOC 21B-A50171

135.    Kenco stated to the Illinois Department of Human and Rights and EEOC in 2015 regarding the matters I filed against them that I reported to Len Szplett. **Exhibit 19 page 3 paragraph 3.**

136.    Kenco later stated that Len Szplett was not the Human Resource Manager. **Exhibit 20 page 1 paragraph 4 section 2 line 2.**

137.    Kenco previously stated to the Illinois Department of Human Rights in November of 2013 in Madison vs. Kenco 2014CF0475 in its response to the department that Szplett was the Human Resource Manager. **Exhibit 12**

138.    Kenco, Lori Varvel and Mike Manzello were served Interrogatories and Request for Production of Documents.

139.    Kenco, Lori Varvel and Mike Manzello have primarily objected to nearly every Interrogatory and a great number of production request. The answers given were in general were evasive, boilerplate and incomplete. Some answers were even perjurious. **Exhibit I**

140.    The answers and/or the objections to the discovery were neither detailed, specified or particularized; nor did it specify what was being objected to when objections were being made and if discovery was being withheld because of the objection; failing to conform to the Civil Rules of Procedure 26, 34 and 37.

141.    In addition, the production of documents did not conform to the Civil Rules of Procedure either and was grossly deficient.

## Summation

142.    Defendants did not particularize beyond statements that they felt that the information requested was not relevant to any parties claim, vague, overbroad or reasonably calculated to lead to discovery.

143.    No facts were given to support the statement used to make the objections to the request.

144.  In reading various articles such as *Improper and Abusive Written Discovery Requests In Single and Multiple-Plaintiff Employment Cases by Debra I G. Haile and Sara Leitenberger* stated boilerplate objections, evasive and non-particularized answers are procedural and ethical violations that hinders the adjudication process.

145.  The Rule 26 also says "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense."

146.  The Discovery requests issued are directly relevant to my claim, support my allegations, and are directly proportional to the needs of my case.

147.  It is self-serving for Defendants counsel to state that discovery requests are not relevant to any party's claim.

148.  Furthermore and matter of factly,  it is ridiculous and unreasonable to state, elude, or assert that the company's policies, procedures, protocols, best practices and forms are not relevant to an employment case.

149.  The requested information from each party is not only reasonably calculated to lead to admissible evidence, but in fact are the policies, procedures, protocols, best practices, forms, and business records of Kenco.  In addition, the job duties and tasks of the employees it managed is relevant because it establishes the roles and positions of the employees Kenco employed and/or managed.

150.  Kenco's policies, procedures, protocols, forms and business records cannot be privileged, as the unequitable administration of the policies, procedures, protocols, forms and business records have been the issues throughout the administrative process and are the issues before the court.

151.  I also read that the court gave a ruling that upheld this thought in Mitchell vs Home Depot U.S.A (W.D. Ky. Jun 14, 2012) No. 3:11-CV-332, 2012 WL 2192279,*5), when it rejected Home Depot's argument that its training manuals and standard operating procedures should be protected.

152.  This is the same exact material that I am requesting the policies, procedures, protocols and best practices that make up the operating procedures that I have yet to receive.

153.  We should continue in the same sentiments of the court and these materials should not be marked confidential.

154.  Furthermore, I also read documents that are widely disseminated internally and externally are generally not subject to confidentiality.

155.  Relative to this case, it would be the policies, procedures, protocols, and best practices along with any associated forms, as well as, the information given to the Illinois Department of Human Rights and EEOC.

156.  I also read that documents that are outdated should not be marked as confidential.

157.  A number of documents that were policies, procedures, protocols, best practices and forms during the relevant time are no longer in place; thereby, no longer posing any perceived real or unreal threat of harm to Defendant(s).

158.  Rule 37 outlines the outcomes for a party when it fails to answer, object to, or respond to written discovery unless the failure is substantially justified or otherwise unjust.

159.  Defendants' legal counsel raised issue with the court relevant to my discovery responses that speak to Rules 26, 34 and 37, just several weeks prior to issuing their discovery responses.

> **a.** Some of the issues raised by Defendants' counsel related to me producing information that Kenco was in possession of relative to monies that were received from them and medical providers seen while I was working on disability.
>
> Despite the fact that the requesting party, (Defendant Kenco), had greater access to the relevant information than I, as I did not have the information they were requesting. A big stink was made about me referring them to check their own records because I did not have the information to give and the only way to get the information was to get if from them to ultimately give it back to them. In addition to that fact, Defendant Kenco would not have been burdened and or disadvantaged in utilizing their ability to access this information, as Kenco was self-insured and payer and ultimately this is what they had to do after I requested it from them.
>
> I specifically stated that Kenco had this information and that it was a part of their normal business record keeping regime. Defendant produced to me a report generated from the Hartford dated July24, 2017 that detailed monies I had received from them 2015 to date in 2017. It is **Defendants Bate Stamp numbered 1498 Exhibit 21.** ***The document clearly states that it was from an employer view.***
>
> This request was duplicative and harassive, especially since Kenco had the information, as they were the disability providers that not only had that

information, but all of my medical records, including records from Social Security.

**b.** Another issue raised to the court was about a form that Defendants' counsel never sent to me to obtain Social Security records. Defendants' counsel was informed the form was not attached and failed to correct their error until several months later. **Exhibit K**

160. Within 30 days of raising their issues about discovery with the Court, it is an undisputable fact that Defendants' counsel is familiar with the rules that govern discovery, but still elected to make boiler plate objections refusing to answer, with no particularized reasons or supporting facts, and or providing evasive answers to requests to and for information that either they should know or be in possession of by law.

161. Essentially intentionally and willfully not following the same rules that they said I violated.

162. Kenco was required by law to maintain the records of this facility for various specified amounts of time relative to the respective record keeping policies.

163. Under the FDA Mars Manteno Facility was to maintain its business records for seven (7) years.

164. Employee records/files are to be kept for a specified amount of time relative to application for employment, termination of employment or disability as mandated by Title VII, American with Disability Act, Age Discrimination in Employment Act, and various other laws.

165. Business records, such as payroll records, are to be kept for a specified amount of time as well according to the Fair Labor Standards Act.

166. Defendant Kenco had policies related to the retention of Human resources Documentation and Document Retention Personnel Files. STD-HR-1000 and BR-HR-4.2.2.002 respectfully attached as **group Exhibit 22**

167. ISO standards as they relate to FDA compliance for the Mars Manteo Facility mandate that records be kept according to the ISO 22000 standards. That mandates that the records be governed by a designated person, appendicized, logged, kept in a specific location, and kept for a specified amount of time.

168.   Kenco as the Manager of the Mars Manteno Facility was required to comply with the Mars North American Quality Agreement, which included record keeping. **Exhibit 23**

169.   Kenco stored its corporate policies, procedures, best practices, protocols and forms electronically on the Kenco Connection Website-www.kencoconnection.com.

170.   This website was hosted by SiteNow from Williams Web a 3rd party provider. Kenco also touts to have a "common Sense, Uncommon Value" information technology solutions. **Group Exhibit 10 Defendants Kenco advertised information technology solutions overview and Bate Stamp Document 365-366 .**

171.   **Each site had its own specific** policies, procedures, best practices, protocols and forms that complied with each sites specific customer and regulatory requirements.

172.   2010 revealed that Kenco also stated that its system was based on ISO according to its Corporate Social Responsibility Report. **Exhibit 6**

173.   Production of the requested records and any other business record are not burdensome or expensive, as Kenco is required by law to preserve records for compliance to the FDA regulations.  Moreover, Defendant Kenco pays a provider to host its website which includes Defendants records, policies, procedures, protocols, best practices and forms.

174.   Furthermore, Defendants failed to identify what was "vague and ambiguous" or "unduly burdensome" about the requests that were being made as required under Rule 34.

175.   In actuality, it cost Kenco more money to have its legal counsel draft motions and memorandums resisting discovery requests and filing them, as opposed to accessing the Kenco Connection and printing the requested documents that are were already setup for printing.

176.   Example, a case of paper (5,000) sheets is about $30.00 toner for a copier about two (2) hundred fifty (50) dollars to copy 5,000 sheets. The supplies needed to copy up to six (6) thousand pages would have been less than $300.00-three hundred dollars. Kenco could have used one of its employees at no additional charge to copies these materials.  If you factor in labor, the cost of using the machine, shipping and miscellaneous things like Bate Stamping, clearly this option could have been under

five (5) hundred dollars, as opposed to the thousands of dollars spent on drafting and filing the motions and memorandums resisting the discovery requests, as well as, further enacting these sentiments of resistance in their written responses to the discovery.

177. Kenco was also noticed and required by the Illinois Department of Human Rights and EEOC to retain its records relative to the employment matters it had been charged with, as a matter of ordinary course of business.  They were also informed persons with firsthand knowledge should attend and that attorney's would not be permitted to answer, but only advise its client. They were also apprised of the Federal Injunction that the Illinois Department of Human Rights is under.  **Defendants bate Stamp Documents 448, 390, and 443 respectively Exhibit 25.**

178. Kenco received its first notice to retain its records from the Illinois Department of Human Rights and EEOC in 2013.

179. I went on medical leave in January of 2015.

180. I filed charges with the Illinois Department of Human Rights and EEOC also in January of 2015, while I was still an employee.

181. My employment records should have been maintained, as required by Fair Labor Standards Act and corresponding Illinois State Law, as I was an active employee at the time I filed the charges at Illinois Department of Human Rights and EEOC.

182. After requesting my personnel file, it was noted that a number of items relative to my employment were missing from my file.  **Exhibit 26**

183. Kenco produced a number of items during this discovery that were not contained in the personnel file emailed from Jay Elliott to my then attorney and given to the Illinois Department of Human Rights and EEOC.

184. In particular a levy from the IRS that should have been given to me in 2014.  **Exhibit 27 Defendants Bate Stamp 1532-1535 .**

185. **Failing to give me this levy caused me to have a number of my paycheck garnished.**

186. **In addition, Kenco turned over to the IRS monies in excess over the required amount by law, leaving me indigent which was against the law.  This was another retaliatory and adverse employment action taken against me.**

187. Elliott and Varvel were hired in November of 2014, well after a number of my issues had happened.

188. Elliott makes a number of statements in writing saying that Kenco lost its contract and does not have access to witnesses beginning on March 4, 2015 Brownlee Vs. Kenco 2015CA1464 **Exhibit 28**

189. Elliott on October 12, 2015, informs the Illinois Department of Human Rights and EEOC that Lori Varvel was not employed until after Henry had been terminated Henry V. Kenco 2015CF2497 and that he would be the representative answering the charge. **Exhibit 29.**

190. **Elliott himself was not employed with Defendant Kenco until November of 2014 and had represented Kenco as outside legal counsel in one of Henry's matters before the Illinois Department of Human Rights in July of 2015.**

191. On October 29, 2015, Jay Elliott participated in my Fact Finding Conference along with Lori Varvel, answering the charges. **Exhibit 30-Defendants Bate Stamp 1021.**

192. Jay Elliott made a number of statements during my fact finding conference that he had no firsthand knowledge about. **Exhibit 19 page 13 and 14**

193. Just a mere seventeen (17) days later from his October 12, 2015 written statement, on October 29, 2015, Elliott and Varvel now were versed in the matters that happened prior to their employment or that happened without them having firsthand knowledge.

194. With the same rationale that he had stated to the Illinois Department of Human Rights and EEOC on March 4, 2015 and October 12, 2015, Elliott and Varvel participated in my fact finding conference of October 29, 2015, to which they had no firsthand knowledge about the matters that were being investigated prior to their employment in November of 2014, coupled with the fact that Elliott was physically located in Chattanooga, TN.

195. Jay was hired by Kenco in November of 2014 according to his LinkedIn page and Defendant Kenco's interrogatories **Exhibit 31**

196. Elliott was located in Chattanooga, TN and not at the Mars Manteno Facility and nor do I recall Elliott coming to the Mars Manteno Facility prior to or since his employment began with Kenco. (I was responsible for keeping track and logging in all visitors)

197. Elliott knew and stated to the Illinois Department of Human Rights and EEOC that Varvel did not have information about matters prior to her employment, Elliott knew that he did not have information about matters prior to his employment either, as well as, matters after his employment relative to the Mars Manteno Facility and its employees, as he was always located in Chattanooga, TN.

198. Elliott and Varvel intentionally and willfully misled the Illinois Department of Human Rights and EEOC regarding incidents that occurred as Elliott nor Varvel or anyone else had access to employees to even investigate the issues at hand to legitimately respond to the charges in a verified response or position statement according to Elliott's March 4, 2015 statement see **Exhibit 28**.

199. Kenco, Elliott and others continued to mislead the Illinois Department of Human Rights and EEOC by participating in the Fact Finding Conference as an "employee" and having Elliott be the attorney of record.

200. Elliott knew that he was not to participate in the Fact Finding Conference with the Illinois Department of Human Rights and EEOC, as he had filed an appearance as the attorney of Record for Kenco and according to policy he was not to answer factual questions for the parties or be a witness. **Exhibit 32**

201. Elliott reiterates that again in January 11, 2016 email to the Illinois Department of Human Rights/EEOC, that he is not sure what Varvel could say that he could not say because her employment began after the incidents had occurred Henry V. Kenco 2015CF2497. **Exhibit 33**

202. This truth of Elliott's would hold true for me and any other employee of the Mars Manteno facility.

203. Reasonably, if the benchmark is the same, the same would hold true for me, that he nor Varvel could speak to any issues that occurred before their employment or that they did not have firsthand knowledge of, as well as, that there were no other witnesses available with firsthand knowledge.

204. Elliott made as number of statements during my fact finding conference refer to the Illinois Department of Human Rights report **Exhibit 19 part B**.

205.  The Illinois Department of Human Rights and EEOC informed Defendant Kenco along with myself that attorneys were not allowed to participate in the fact finding conference nor could attorneys be a witness for either party.

206.  My attorney was not able to participate, as Elliott did in my fact finding conference.

207.  This unfair advantage prejudiced me has caused me irreparable harm and the taxpayers great financial liability.  This has also caused a burden on the courts, as it has caused judicial resources to be unwisely.

208.  Bringing the matter before the Illinois Department of Human Rights and EEOC is a prerequisite to this matter being brought before this court.

209.  Prior to employment with Kenco, Elliott was employed by Miller and Martin of Chattanooga, TN.

210.  Elliott had represented Kenco in other employment matters along with Karen Smith of Miller and Martin Craig Brown v. Kenco 3:10-CV-668 Richmond Division of The Eastern District of Virginia.

211.  Karen Smith and Jay Elliott of Miller and Martin stated to the court in Brown V. Kenco 3:10-CV-668 that Kenco was aware that Kenco had a predisposition and habit of treating African Americans discriminately and harsher than non-African American employees.

212.  Karen Smith, Jay Elliott, Kenco and others have aided the Defendants in conspiring and contriving to break and evade the law to violate the employees protected rights including mine.

213.  Karen Smith, Jay Elliott, Kenco and others have hindered and obstructed the administration of justice causing undue stress, increased financial costs and delay in the adjudication process.

214.  Karen Smith, Jay Elliott, Kenco and others have committed fraud on the administration of justice and the court by misleading the Illinois Department of Human Rights and EEOC with the information, documents and persons it provided as being true, correct and having firsthand knowledge.

215.  I also believe that these actions were contrived.

216.  I also believe that these intentional, willfully and maliciously contrived attitudes and behaviors have carried over into this part of the administration of justice; shaping and influencing various outcomes and decisions in my case.

217.  Specifically, I believe that Defendant Kenco hired Jay Elliott through contrivance to spearhead or mastermind a scheme to avoid liability, obstruct justice, defraud the court, usurp justice and prejudice its employees who have made claims of discrimination, including myself.

218.  According to Defendant Kenco's company policy that was submitted by Defendant Kenco as its evidence, specifically Exhibit 5, in Vernon Henry's Charge 2015CF0034- 21B-A42027 filed with the Illinois Department of Human Rights/EEOC, the procedure for hiring a VP requires an internal recommendation by a VP or higher, as well as, the approval of the CFO and President.  See **Exhibit 34**

219.  Consequently, at the helm of Defendant Kenco's leadership, at the executive level, aided and abetted the named Defendants in the violation of my protected rights by participating in a contrived scheme to hire Elliott as an employee of the company to avoid liability, culpability and obstruct justice and its administration.

220.  The gist of the matter is that the Executives of Kenco and others acted together intentionally in concert with Elliott to obstruct and impede justice, continue to violate my protected rights and ultimately commit fraud on the court.

221.  Hiring Elliott as an employee and allowing Elliott to be the counsel of record, to participate in fact finding conferences under a false pretense, and make statements about incidents and matters that Elliott had no firsthand knowledge about was/is: a violation of my protected rights, an obstruction of justice, and fraud on the administration of justice and on the court.

222.  I also believe these actions to be malicious and criminal.

223.  These actions also allowed Defendants to avoid liability through a contrived scheme. These actions disadvantaged and prejudiced me, as well as, obstructed and impeded justice.

224.  These actions also intentionally and willfully have and continue to violate my protected rights and the rights of others, including the integrity of the judicial system and this court.

225. Another intentional inconsistency by Defendants was, Defendant Manzello stated under the penalty of perjury in his discovery responses to me that he was not aware of any discriminant instances at the Mars Manteno Facility. **EXHIBIT I Mike Manzello's answers to interrogatories page 4 #5**

226. Mike Manzello was named in the cases of: Nathan Doss, Tracy Davis, Jacque Morrison, Vernon Henry (case number 2015CF0034), Morris Tyson and Scott Marksteiner's as referenced in the above line numbers 129-134 respectively.

227. Matter of fact Mike Manzello signed off on the verification form for Tracy Davis' case **Exhibit 15 verified response page 2 and;**

228. Kenco admitted in its verified response to the Illinois Department of Human Rights and EEOC in Vernon Henry's case 2015CF0034 page 3 Section 5 that: "It was admitted that Complainant once reported to Mike Manzello that coworker Pete Monstwillo told complainant to 'look in the mirror." **Exhibit 17.**

229. Tammi Fowler, Senior Manager of Employee Relations, Chattanooga, TN verified this statement to be true.

230. Therefore, it is impossible for Mike Manzello not to have known about the number of discriminant acts of the Mars Manteno Facility.

231. This seems odd that Manzello would not remember what he verified under oath and the penalty of perjury, along with what coincided with alleged reasons for his termination.

232. Furthermore, I reported the Jacque Morrison incident to corporate and filled out paper work regarding the incident **Exhibit 16**

233. Also, it is not possible for the job functions, roles and tasks of the Defendants to be irrelevant in this matter, as stated by Defendants in their interrogatories.

234. Each parties functions is relevant because each party had the power and authority to affect the terms and conditions of the Mars Manteno employee's employment, as well as, make employment decisions relative to my employment and the employment of others at the Mars Manteno Facility.

235. As a matter of fact, one of the many issues in my complaint before the court is about my job functions (tasks) and title.

236. Lori Varvel response to her discovery indicated that I was a clerk, however another factual issue exist because according to Defendants' Bate Stamp Document 922-923, Varvel stated in December 2014 that I was the HR Administrator. **Exhibit 35**

237. Varvel also relieved me of some of my duties as HR Administrator. **Defendants bate stamp 00906-00907 Exhibit 36**

238. Defendants also produced a number of logs signed by Len and myself relative to various policies that we were trained on. Employees are to sign off as verification that they were trained on the individual policies according to company policy. Defendants' group evidence numbered 1411, 1501-1520 **Exhibit 37**

239. The submission of these logs by Defendants support the fact that there are corresponding policies, procedures, protocols and forms of Kenco that Kenco is to be in possession of that correlate to these logs that were relative to them managing the Mars Manteno Facility.

240. It also supports the fact that Defendant Kenco operated under the ISO system, as stated in their Corporate Responsibility Report.

241. Any policy, procedure, protocol, best practice or form that I was trained or any other employee was trained on or that was applicable to me or any other employee has a corresponding verification log for that policy, procedure, protocol or form as contained in **Exhibit 37.**

242. Since Kenco's website was managed by a 3rd party provider, that provider has Kenco's electronically stored information as mandated by law and can be obtained in the event Kenco cannot or is not willing to provide the requested information.

243. Varvel applied a policy to me that was not in effect; I was written up and disciplined according to this policy, a policy that was not in effect until after the alleged incident happened. **Defendants bate stamp 000195 and Exhibit 38**

244. On August 11, 2017, Kenco through Jackson and Lewis, specifically Ms. Argentieri and Ms. Moran, renewed its position on Szplett executing HR Managerial functions and duties in its Motion for Summary Decision in Madison vs. Kenco 2016-FDA-4.

245. Prior to August 11, 2017, Kenco has publicly denounced Len as the HR Manager of the Mars Manteno, since the Madison Fact Finding Conference in April of 2014.

246. Neither Len nor I have been cited by Kenco or any of its Defendants as having firsthand knowledge of the discriminatory events that have occurred at the Mars Manteno Facility. We are the go to persons at the facility and have been these go to persons since our respective employment began; as there is no one else at the facility to handle these matters.

247. From employment through October 2014, Len has actively been involved in a number of disciplinary actions and terminations taken against employees, including Mary Madison, Nathan Doss, Vernon Henry and others. **Exhibit 39**

248. It is unreasonable to believe that a facility of this size with hundred(s) of employees would not have an onsite HR Department to address the various employee needs, issues and concerns, as well as, bringing compliance to the various state and federal laws and mandates.

249. Each named Defendant has a unique and distinct contribution and part played in the allegations outlined in my complaint.

250. I also feel that not compelling them to comply with and to the Civil Rules is a violation of my rights to an unbiased administration of justice.

251. My feelings mount and grow about Defendants counsel rationale of it essentially being too much work.

252. **I am appalled that Defendants' counsel stated to this court that they acted in "good faith," when in fact they have not.**

253. **For instances, they did not send the discovery as stated to the court on September 28, 2017. Defendants' counsel only sent 355 pages See Exhibit C. This was the only discovery sent by Defendant prior to the motion to compel and my request for hard copies.**

254. It was only I after I called them and told them that I could not open the link to the documents that they had sent I received an additional 1176 pages in October of 2017, by mail well after they had told the court that they had given me discovery of over 1500 pages.

255. "Good Faith" is not removing documents out of the Illinois Department of Human Rights/EEOC file that they received through FOIA. That's tampering with and withholding evidence-spoliation.

256. "Good Faith" is not blotting out information to this court that is not subject to the confidentiality or protective order, i.e. Walsh interrogatory #4 and Manzello interrogatory # 7. That's tampering with and withholding evidence-spoliation.

257. "Good Faith" is not when Defendants' counsel does not provide documentation to substantiate or support the actual reason or reasons for Walsh and Manzello's terminations; when in fact their terminations were for poor performance and this poor performance could be directly linked to the matters before the court. That's tampering with and withholding evidence- spoliation.

258. Furthermore, performance covers every aspect of employment and is covered by Defendant Kenco's Performance Management Policy for exempt employees **CP-HR-6.2.2.009. Exhibit 40.**

259. For example, Defendant Kenco states to the **DOL in inspection 985037 letter dated August 14, 2014 #9 part g** that the General Manager had been terminated who had retaliated against employees who were injured at work by withholding wage increases. **Exhibit 41.**

260. **Matter of fact, corporate instructed Walsh based on their attorneys recommendation to not withhold the employees monies. Exhibit 42** email from corporate

261. Defendants counsel knew that each Defendant it represented is subject to discovery under the Civil Rules of Procedure and that the possibility existed for each Defendant when it took on the responsibility to represent the number of Defendants.

262. I do not believe that I should be punished, penalized or prejudiced because I choose to exercise my rights to pursue discovery under the Civil Rules of Procedure 26, 34, 36 & 37.

263. I also do not believe that they should use the tools of the court to disparage or prejudice me; as well as, legally and lawfully avoid liability.

264. Moreover, there are allegations of conspiracy in my complaint; conspiracy at its core means that multiple persons are involved.

265. I also believe that I am entitled to information to prove pretext.

266. From my perspective the only way to prove or disprove these and other theories and/or allegations is to have viable and tangible information from the accused parties.

267. A way of obtaining this information is through the discovery process utilizing Civil Rules of Procedure 26, 34, 36 & 37.

268. Defendants' counsel also believed this to be true or understood its legal obligation, as Defendants' counsel partially responded to my discovery requests by answering the interrogatories for the Defendants, but failed to produce and or pair up documents associated with the interrogatory responses and production requests.

269. Defendant gave this discovery to me on or about November 7, 2017.

270. The day before on November 6, 2017 Defendants counsel moved the court for a protective order.

271. Defendants' counsel also alleged that they produced to me over 1500 pages, when in fact they only initially gave me 355 pages

272. Of the 355 pages a number of pages were in duplicate and a number of pages stated the same information in different ways.

273. For example, Defendant provided to me Varvel's and Szplett's pay statements and pay registers. For a total of 48 pages. Kenco bate stamp 1232-1259 and 1272-1291

274. Defendant gave me my Time and attendance register totaling 156 pages Kenco bate stamp 5-160 and payroll register and Time and Attendance totaling 52 pages Kenco bate stamp 1176-1227.

275. Based upon the two (2) examples 256 pages were duplicative.

276. There are a number of additional pages that are repeated.

277. More than 85% of the FOIA requested file was documents that I had produced as evidence to the Illinois Department of Human Rights and EEOC in 2015

278. On two (2) separate occasions, I invited Defendants counsel to pair up the documents they already produced to me with the interrogatories and production requests, if indeed these documents coincided with the interrogatories. **Exhibit 43**

279. Apparently the documents did not coincide with the interrogatories and production requests or they just flat out refused to comply, as they did not pair them up.

280. Of the 1535 pages or so produced by Defendant, the vast majority of the documents produced were documents that I had supplied to Defendant directly and to the Illinois Department of Human Rights and EEOC at some point during this administrative process along with a number of other documents.

281. Essentially Defendants recycled the information that I provided to them and the Illinois Department of Human Rights and EEOC back to me, as verified by Defendant Kenco in its Responses and Objections to Plaintiff's First Set of Requests for Production question and answer 2 page 2. **Exhibit II.**

282. Defendants counsel made a FOIA request to the Illinois Department of Human Rights and EEOC regarding the formal charges that I filed at these agencies.

283. Defendants counsel received a copy of the file from its FOIA request.

284. These records are now in the custody and control of Defendants counsel.

285. There are a significant amount of documents that Defendant has not produced that were contained in the file that are in their possession that was obtained through their FOIA request, as well as, that were kept as a matter of ordinary course of business and record keeping.

286. I know this disparity to be true as, I made the same FOIA request and there are gaps in the information provided by Defendant.

287. Matter of factly, I made a FOIA request to the IDHR in February of 2016 and on February 17, 2016, I was sent a true and correct copy of my IDHR Files. **Exhibit 44**

288. The ordinary course of business and record keeping practice is governed by the FDA, 21 CFR Chapter I: Subchapter B Part 117 Subpart F and Part 121 Subpart D; Subchapter A Part 1 Subpart; Kenco was subject to this provision.

289. It seems as though they have "cherry picked" documents from their production that they know that will be detrimental or damning to them and intentionally withheld them; which is in my opinion intentionally tampering with evidence.

290. *Defendant produced three hundred fifty five (355) pages* of information. **Exhibit 45 cross-reference Exhibit C**

291. *Of the 355 pages encompassed* several other employees' information, short and long term disability employer view, my payroll and time card records, benefit information, training logs, policies, physical work analysis.

292. These same 355 pages contained documents that Defendant had produced to the IDHR/EEOC in other matters 145 pages.

293. Defendant also had marked 88 pages, as confidential.

294. The only documents based upon the motion that should have been marked confidential would have been those that belonged to Marci DeRosier, who is not a party to this matter.

295. On an additional note, no query was made or information requested relative to Marci DeRosier.

296. For all intensive purposes, DeRosier was/is not a comparable to me in this matter.

297. However, what it did show was that how a non-African American, with a GED and no special skill set, could be promoted to a management position, make more money and perform less tasks (including skilled tasks) than an educated African American with specialized skill sets, such as myself.

298. With the exception of DeRosier's documents, the documents marked as confidential go against the very motion that Defendants counsel presented to me.

299. I also thought that Defendants counsel should have discussed making the November 6, 2017 motion with me prior to bring the motion, to resolve any discovery issues.

300. This did not occur, nor has Defendants counsel ever consulted to resolve an issue before making a motion.

301. Furthermore, Defendants counsel has had a habit of not getting my input before making decisions that affect me when I have a right to weigh in on the process or decision.

302. I also read that the resisting party was to bear the burden of establishing good cause for the order for each particular document it sought to protect, as well as, identifying the specific prejudice or harm that would result if no protective order was granted for each document.

303. The reasons Defendants counsel offered were along the lines that they did not want to embarrass anyone; upon hearing that I was floored.

304. To me this is not a reasonable or intelligent reason, as the request was not to embarrass, but to get truth and justice.

305. Furthermore, I cannot recall Defendants providing any specifics to me or the court as to who would be embarrassed or what would be embarrassing, if a protective order was not granted.

306. I was glad that I was not the only one who felt this way; I was glad to learn that mere embarrassing information that could detail corporate mismanagement or the injuries occurring from a faulty product is *not* entitled to protection. (See *Kamakana v. City and County of Honolulu* (9th Cir. 2006) 447 F.3d 1172, 1179 ["[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records."].)-Cited from an article by Lori E. Andrus entitled Fighting Protective and Secrecy Orders, August 2014. I also read the court disfavored and frowned on generalizations of alleging privilege with respect to documents, without specifications or reference to the documents. They went so far to say in Kamakana V. City and County of Honolulu (9th Cir. 20016) 447 F.3d 1172, 1184 that these generalizations, without elaboration or specifics linked with documents, do not satisfy the burden necessary to obtain an order.

307. Furthermore, Defendants' counsel redacted all pertinent information that would have constituted the document being marked as confidential, despite marking it confidential.

308. In addition, I was never shown any documents that were to be marked confidential and to the best of my knowledge I do not believe the court was shown any documents either.

309. My belief is that the court granted an order to the Defendants and they have used the court and its order, as instruments to obstruct, hinder and delay justice, as well as, marginalize and prejudice me in my case by taking the liberty at their discretion to mark documents confidential that do not fall within the criteria they outlined to the court as being confidential material.

310. I also believe that Defendants have not demonstrated or shown a good cause for marking documents confidential or subjecting them to a protective order, when they have redacted information that would support such a motion, as well as, presenting documents that they knowingly knew were presented to regulatory agencies that are subject to the Freedom of Information Act or that were widely disseminated or outdated.

311. Essentially Defendants counsel gave me documents that it believed were non-consequential or harmless to them.

312.    Defendant Kenco and its counsel also gave me documents/policies that were drafted and effectuated after my medical leave and the employment relationship ended with Mars at the Mars Manteno facility.

313.    I believe that Defendant Kenco intentionally and willfully produced documents that were not relevant to the times, days, instances and incidents in an attempt to avoid liability.

314.    I also believe that these policies were crafted to support Defendants position in this litigation.

315.    I also believe that this is an obstruction and impediment of and to justice.

316.    Defendants have not produced any information requested by Plaintiff relative to the production requests.

317.    For example, I requested Appendix A and F along with the corresponding documents. Defendants refused to provide that information, as they said that it had nothing to do with the claims.  **Exhibit H Kenco's Answers to Plaintiff's First request for Interrogatories page 20 # 82.**

318.    Appendix A and F along with the corresponding documents are the policies, procedures, protocols, best practices and forms of Defendant Kenco.

319.    These appendices and documents govern the terms and conditions of the employees that Kenco managed for Mars, Inc. at the Mars Manteno Facility.

320.    It is unreasonable, ridiculous and ludicrous to assert that the terms and conditions of an employee's employment are not relevant to an employment discrimination case that is before the court.

321.    Defendant has willfully and intentionally refused to produce it policies, procedures, protocols, best practices and forms that it touts as being so readily accessible in **Exhibit I page 9.**

322.    Furthermore, these policies, procedures, protocols, best practices and forms are governed by the FDA and are a requisite to compliance to the FDA mandates.

323.    **Record Keeping procedures are mandated under 21 CFR** Chapter I: Subchapter B Part 117 Subpart F and Part 121 Subpart D; Subchapter A Part 1 Subpart J

324. Additionally, Defendants on November 7, 2017 provide answers to the remaining Defendants discovery requests. Walsh, for example, provided answers that stated he was not able to accept internal complaints. **Walsh interrogatories page 6 #9**

325. This statement is ridiculous, disingenuous and misleading as Walsh was the General Manager of the Mars Manteno facility and made employment decisions daily.

326. Mater of factly, Walsh refused to allow Tyson to return to work after an injury and also retaliated against employees who had been injured on the job. 2015CF0699/ 21B-2014-02563 Tyson and **Group Exhibit** 42 specifically bate stamp 888.

327. In addition, Walsh also facilitated an investigation with an employee with the Illinois State Police regarding the $362,000.00 worth of candy that was stolen from the Mars Manteno Facility while Walsh was the General Manager. See Exhibit 46

328. Matter of fact, Defendant Kenco has General Employment Policies-POL-HR-6.2.001 and is **Defendant's Bate Stamp document 0287-0288- Exhibit 47** that encourages an open door policy and resolution with the immediate supervisor this policy is cross-referenced with **Exhibit 19 page 38 Exhibit list Exhibit L Respondent's November 5, 2014, General Employment Policies.**

329. POL-HR-6.2.001 correlates to the FDA mandated ISO 9001 & 22000 6.2 Human Resources standard. **Exhibit 48 Table of Contents page iii and Page 9 and 23.**

330. Walsh was the immediate supervisor of the Mars Manteno facility. **Exhibit 49 (org chart)**

331. Walsh reiterates his supervisory role on his LinkedIn page- **Exhibit 50**

332. Therefore, **Defendant's Bate Stamp document 0287-0288** clearly contradicts Walsh's answer in interrogatory #9 that he was unable to receive internal complaints.

333. Furthermore, Defendant Kenco required that all incidents be reported CP-BIC-802-Incident Reporting Procedure- **Defendant's Bate Stamp document 0293-0294- Exhibit 51**

334. Moreover, there is a specific section, section 4, outlining site management responsibilities with regards to incident reporting **Exhibit 51**

    a. The first responsibility of site management outlined is that the incident scene is secure and an incident investigation is conducted (CP-SH-819) paragraph 1.

b. Another responsibility of site management outlined is to correct unsafe condition or actions that contributed to the incident as appropriate and report any and all corrections to Risk Management utilizing the HR OFI Procedure if appropriate paragraph 7

c. Another responsibility of site management is to review reports that occur at their facility paragraph 10.

335. Walsh was the site management; the General Manager. **See Exhibit 49**

336. Walsh reported to Paula Hise, the VP of Operations for Kenco Corporate located in Chattanooga, TN. **See Exhibit 49**

337. Defendant Fowler states in her interrogatory #11that Varvel was hired because Szplett and McCurry did not have background or training in that Role (HR Manager).

a. Fowler signed in at Madison's Fact Finding Conference refer to **Exhibit 10,** Fowler, Walsh, Hise, Miller and Martin along with others endorsed Szplett's as the HR Manager, when they believed that Szplett would support their position.

b. After Fowler and the others realized Szplett would not support unlawful and discriminate actions against employees, especially when it came to African American employees, Szplett was no longer publicly characterized as the HR Manager for the purpose of any external investigations or formally filed complaints. Contrary to the fact that Szplett continued to perform HR duties that included hiring, disciplinary actions, firings and the other employee relations issues.

c. Szplett had held his position since 2001 and I held my position since the facility opened in 1999.

d. We were well trained in handling employee issues/relations of all kinds.

e. We handled employee issues/relations at the Mars Manteno Facility during our employment.

f. After meeting with the Director of Human Resource Development for Kenco, Eddy Register, **Exhibit 52** in early 2013 Register felt that we were adequately trained in handling employee issues/relations of all kinds.

33

g. Len and I were trained on Defendant Kenco's procedures regarding Human Resources and Payroll see **Exhibit 53**

h. This was evidenced as I continued to perform the HR duties and functions along with Len at the Mars Manteno Facility for more than eighteen (18) months.

i. Varvel had less HR experience than Szplett or myself.

j. Varvel did not have any specialized training or certification, as required in Defendants job posting.

k. Varvel was actually classified as a HR Generalist according to Defendant Kenco's termination list of February 29, 2015 as presented to the Illinois Department of Human Rights and EEOC as Defendants **Exhibit L** and referenced as Defendant's Bate Stamp number document 1115-1116 **Exhibit 54**

338. Defendant's policies, procedures, protocols, best practices and forms were subject to the Food Drug and Cosmetic Act, specifically 21 CFR Chapter 9 and as amended by the Food Safety and Modernization Act.

339. Defendant Kenco had a legal obligation under the Food Drug and Cosmetic Act to comply.

340. Defendant Kenco established and was bound by a duty of care because of the governing FDA regulations.

341. The Mars Manteno facility had been previously subjected to FDA governing through Mars compliance schemes and audits.

342. The FDA governance is based on standardization.  21 CFR Chapter I Subchapter M

343. The standardize scheme is the ISO 9001/ISO 22000 scheme.

344. This scheme governed Kenco, Mars, Inc., myself and the remaining employees of the Mars Manteno facility.

345. Kenco acknowledges its compliance to the FDA mandates. **Exhibit 55**

346. I believe that discovery is a critically important part to the viability of any case; actually it is the life blood.

347. I also believe and have read that discovery also helps reduce "gamesmanship."

348.  I also believe and have read that the discovery process reduces the time spent by the parties and the courts in resolving discovery issues and disputes, and promotes the prompt and just resolution of cases.

349.  However, in this instance this does not seem to be the case.

350.  I believe that this proactive and prompt resolution will avoid later conflicts regarding the admission of evidence into trial.

351.  Furthermore, the withholding of discovery from the named parties stifles and limits the remaining discovery opportunities available and is prejudicial.  It violates due process and it is criminal.

352.  Additionally, this also affects the case, as it disallows me the opportunity to adequately support and or defend/uphold my position.

353.  These substantive issues are not strictly measured monetarily, but also philosophically, socially, institutionally, ethically and morally effecting society on a whole.

354.  In addition, I read that it is a violation of Rule 37 when a party has incomplete disclosure and has failed timely to disclose evidence.

355.  I also read that Defendants have a duty to disclose.

356.  I also read that under the Rules the parties are to disclose all the documents that they have in their possession.

357.  I also read that failure to produce material documents renders Defendants' initial production incomplete.

358.  I also read that an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer or respond under Rule 37

359.  I also read that parties cannot withhold information.

360.  I also read that it is well established that a lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer according to Rule 3. 1 and Rule 3.3 of the Model Rules of Professional Conduct respectively.

361.  Defendants' counsel have made a number of egregiously blatant false, misrepresentations and misleading statements to this court regarding compliance to discovery, discovery abuse, acting in "good faith," misuse of court order tools of

confidentiality for Defendants own public relations tool, failing to serve Plaintiff motions and confer with Plaintiff about various alleged issues.

362.   I also read that Rule 26(b)(1) simply states that information need not be admissible to be discoverable.

363.   I also read that the N.D. court of Texas explained that "the burden [remains] on the party resisting discovery to ... specifically object and show that the requested discovery does not fall within Rule 26(b)(1)'s scope of relevance (as now amended) or that a discovery request would impose an undue burden or expense or is otherwise objectionable." *Areizaga v. ADW Corp., No 3:14-cv-2899, 2016 U.S. Dist. WL 1305065*

364.   I also read in other instances like *Sanders v. Howmedica Osteonics Corp.*, No. 1:14-cv-698, 2016 U.S. Dist. WL 1337559  in the Middle District of Alabama Apr. 5, 2016), that discovery objections under the new Rule 26 "must include a specific explanation describing why the request lacks relevance, and why the information sought will not reasonably lead to admissible evidence."

365.   Ultimately, I gathered that it is the responsibility of whomever it is resisting discovery rest the burden of showing or demonstrating the undue burden or expense associated with their objections.

366.   Defendants manipulated the confidentiality order to couch documents that were already widely disseminated internally and externally as confidential, as well as, marking documents confidential that were already publicly accessible through FOIA.

367.   In my opinion, Defendants counsel used the confidentiality and protective orders as a judicially sanctioned public relations tool, to minimize fallout, avoid liability, obstruct justice and strategically place themselves in a position where documents may or may not be allowed in the actual court proceedings or withheld from witnesses or legal counsel advisement who could either affirm or refute the documents.

368.   I believe that this is an abuse of discovery and a contrived platform to prejudice me, hinder, delay, obstruct justice and manipulate the outcomes of the case.

369.   I also believe that it was an intentional and deliberate fraud on the court.

370. I also read and concur that these actions undermine the number one (1) Civil Rule of Procedure and its goal of securing "the just, speedy, and inexpensive determination of every action."

371. I also read that Rule 34(b)(2)(B) says for each item or category, the response must either state that the inspection/production and related activities will be permitted as required or state with specificity the grounds for objecting to the request, including the reasons.

372. Defendants never gave specifics or grounds for the objections or the justifying reason for making the objection or identified what was being objected to.

373. Defendants also did not identify what portions of the requests were "vague, ambiguous or unduly burdensome."

374. Nor did Defendants identify for every objection, whether any responsive materials were withheld on the basis of the objection that was made according to Rule 34(b)(2)(C). I also read and learned that one court said that the burden rested on the party resisting discovery to specifically object and show how the discovery does not fall within Rule 26(b)(1).

375. I also read that it is also their burden to show that this discovery request would impose and undue burden or expense or is some other way is objectionable.- Areizeaga V. ADW Corp., No 3:14-cv-2899, 2016 U.S. Dist. WL 1305065

376. I also read that under Rule 34(b) that failure to adhere to these requirements may result in waiver of the objection.

377. The information requested through interrogatories and production request are directly related to policies, procedures, protocols, forms and best practices of Defendants, as well as, specific information related to each Defendant, their employment, job duties, tasks, responsibilities and the incidents that occurred during and post-employment.

378. Defendants offer a number of self-serving boiler plate objections that are just contrary to the rules at hand; such as, but not limited to: the information sought is not relevant and or overbroad, and or not limited in time or scope, and or incomprehensible, and or unduly burdensome without offering grounds for the objection(s), particularized details, specifics or verified factual basis in support of one or more of these statements.

37

379.  Defendant Kenco is a relatively large company, with a national presence, with 1 to 2 Billion dollars in revenue yearly, **Exhibit 56**. Kenco has sophisticated access to data that is managed by third (3rd) party who manages its data infrastructure, a dedicated department to quality management that oversees the policies, procedures, protocols, forms and best practices of the company, a documented control of records and record keeping system, a documented quality management system audited by AIB that is governed by **21CFR Chapter I Subchapter M.**

380.  Therefore, document production is not a burden based upon the streamlined business processes and regulatory compliances of Defendant Kenco.

381.  Moreover, Defendant Kenco stated to employees that the policies, procedures, protocols, forms and best practices of the company was just a click away. **Exhibit I** page 9.

382.  There are a number of mistruths and false statements made by Defendants' and Defendants' counsel that have been factually bared out in this document.

383.  Based upon the intentional and willful mistruths, misleading's and false statements made during this administrative process and to this court, I believe that this alone constitutes and establishes a firm basis for granting this motion to compel; aside from the other factual basis cited in this motion.

384.  I also believe that this is treasonous crime against the justice system, this court and society.

385.  I read these and other things on line and in a number of cases and articles, like an article from the Trial Evidence Committee-The Duty to Disclose: Rule 37(c) and Self-Executing Sanctions by Lisa Stockholm published by the American Bar Association.

386.  I also read several other cases such as *Libertarian Party of Ohio et al v. Husted, Docket No. 2:13-cv-00953, information from Bloomberg Law and Rules 26, 34, 36 & 37.*

387.  I also read that requests for admits are useful tools in narrowing the issues down and a number of articles from the American Bar Association who also support this thought.

388.  I also believe that this tool will assist in facilitating the truth.

389.    I also believe and believe that my belief is supported by this document that Defendants' counsel has made a number of intentional and willfully misleading, false and disingenuous statements to the court that have caused me great harm and additional emotional distress and duress, as well as, being a crimes against the court.

390.    I also believe that Defendants sought relief from the court in its protective order and motions regarding discovery, ultimately to avoid and obstruct justice through "gamesmanship," as a number of Defendants confidentially labeled documents are documents that are already part of public records at the Illinois Department of Human Rights/EEOC; policies, procedures, protocols, forms and best practices of the company that are the issues before the court.  Defendants' counsel also used the protective order in my case to blot out information regarding named Defendants, Walsh and Manzello's involuntary terminations amongst other things.  Despite the fact that they had already given as evidence to the Illinois Department of Human Rights/EEOC in Vernon Henry's case 2015CF1315 documentation stating that Walsh and Manzello had been terminated for poor performance **see Exhibit 57**.  Walsh and Manzello's termination is relative to the issues at hand.

391.    I believe that Defendants and Defendants' counsel have unwittingly manipulated and used the court to continue to violate my protected rights, hinder, delay, harass, prejudice and frustrate me, as well as, ultimately obstruct justice and defraud the court and society.

392.    I believe that Defendants and Defendants' counsel are acting very contemptuously towards: their required professional conduct, this court, the judicial system and society at large.

393.    I believe that these actions are a theft of the taxpayers money, including mine, and a constitutional violations of a right an expedient and unbiased trial.

394.    In my opinion to not compel each Defendant gives those Defendants an unfair advantage over me and will allow them a greater opportunity to prevail, as well as, usurping and undermining the law, the judicial system and the due process afforded by law.

395.    This action is causing me and will cause me further irreparable harm.

396.    Furthermore, disallowing or limiting discovery seems in my opinion to go against the reason and purpose for bringing this claim and specifically naming each Defendant.

397.    I also believe that this would disadvantage and prejudice me from adequately and effectively combating any defenses or motions that Defendants may raise against me now and in the future.

398.    From my understanding about the judicial system, each named Defendant has to defend their own allegations.

399.    Attached you will find an examination and explanation of the discovery requests deficiencies for the answers previously provided by Defendants see **Exhibits H & J.**

400.    Some additional items were identified while preparing this motion and they are:

   a.    Mario Lopez stated that the Mars account was in "extreme duress" on David Jabaley's LinkedIn page on November 18, 2017.  Likewise David Jabaley gave Lopez a letter of recommendation.  **Exhibit 58**

   b.    *Kelvin Walsh was given a Personal Development Plan according to Defendant's Bate Stamp document 1306.*  ***Exhibit 59***

   c.    *Payroll records of Szplett's.  Defendant Kenco produced the same payroll records for Szplett's in different versions with different names for Szplett's-"Lynn" and "Leonard".  As mentioned earlier we call "Leonard" "Len" for short.  I was responsible for payroll from the beginning of my employment until my sick leave in 2015; "Len" has never been referred to as "Lynn".  Furthermore, "Lynn" is a female spelling and most of all "Len" or "Lynn" is not Leonard's legal name and because of that nicknames, not only for "Len" but other employees would not, were not and could not be used on legal records.  To further belabor the point, Leonard's name should have been the exact same way in the payroll system, as the reports and information are linked together.  To further belabor the point, "Len" would not have allowed his name to be reflected as such on any legal document.  To further belabor the point, as primary overseer of the Mars Manteno payroll, I would not have allowed such either.  To further belabor the point, Len and I had access through the management of the HR/Accounting Department to payroll, payroll records, and personnel files.  Consequently, such document entitled as such should not exist, as it is not authentic.*

d. *That Defendant Kenco and its counsel did not exercise the same due diligence it applied to others in the redaction of sensitive information, as my husband and children's sensitive information was not redacted before it was given to the Illinois Department of Human Rights/EEOC, as required.*

Submitted by:        Edith McCurry *Edith McCurry*        March 23, 2018
                     6239 South 13110 East Road
                     Pembroke Township, IL 60958